UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEMICONDUCTOR ENERGY
LABORATORY COMPANY LTD

              Plaintiff,

     v.

CHI MEI OPTOELECTRONICS CORP., et
al.,

              Defendant(s).

_____/

No. C 04-04675 MHP

**MEMORANDUM & ORDER**
Re: Defendants' Motions for Summary
Judgment

     Plaintiff Semiconductor Energy Laboratory Company Ltd. ("SEL") brought this patent infringement action against defendant Chi Mei Optoelectronics Corp. ("CMO") et al., alleging infringement of four United States patents related to in situ DNA hybridization. Three patents in suit currently remain. Now before the court are CMO's motions for summary judgment of noninfringement and invalidity as to the asserted claims of all three patents . Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

     An overview of LCD technology and summaries of the asserted patents are provided in this court's Claim Construction Order. Docket Entry 111 at 1–6 (hereinafter "Claim Construction Order"). The claims at issue in these motions are summarized below.

I.      U.S. Patent No. 6,756,258

SEL alleges that CMO's method of manufacturing thin film transistors ("TFTs") for inclusion in certain LCD products infringes claims 3–6, 10–13 and 18–21 of the U.S. Patent No. 6,657,258 ("the '258 Patent").  Claim 3 of the patent claims:

> A method of manufacturing a semiconductor device comprising the steps of:
>
> forming a gate electrode on an insulating surface;
>
> forming a gate insulating film comprising silicon nitride on said gate electrode;
>
> forming a first semiconductor film comprising amorphous silicon over said gate electrode with said gate insulating interposed therebetween;
>
> forming a second semiconductor film on said first semiconductor film, said semiconductor doped with an N-type dopant;
>
> patterning said first and second semiconductor films;
>
> forming a conductive layer on the patterned second semiconductor film;
>
> patterning the conductive layer to form source and drain electrodes by using a mask wherein a portion of the patterned second semiconductor film is exposed between said source and drain electrodes;
>
> etching the exposed portion of the second semiconductor film to form source and drain regions wherein a channel forming region is formed in said first semiconductor film between said source and drain regions;
>
> wherein said conductive layer is overetched to form a stepped portion from an upper surface at the source and drain electrodes to the surface at the first semiconductor film.

Claims 4–6 recite the same steps as Claim 3 with the exception of the final element, though the final element of each of these claims includes the limitations "stepped portion" and "upper surface."  Id. ¶¶ 15–17.  Claims 10–13 depend from claims 3–6, respectively, and further require that the gate electrode "comprises a material selected from the group consisting of chromium, aluminum and tantalum."  Claims 18–21 also depend from claims 3–6, respectively, and further require that "the first semiconductor film comprises intrinsic amorphous silicon."  Each of the asserted claims, therefore, contains the "upper surface" limitation.

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

II.     U.S. Patent No. 6,404,480

CMO seeks summary judgment of noninfringement and invalidity as to claims 1, 2, 4, 5, 11, 12, 14 and 15 of U.S. Patent No. 6,404,480 ("the '480 Patent"). Claims 1 and 11 are independent claims. Claim 1 claims:

> An active matrix display device comprising:
>
> a first substrate;
>
> a first interlayer insulating film provided over said first substrate;
>
> a first conductive film provided on said first interlayer insulating film;
>
> a second interlayer insulating film provided on said first conductive film, said second interlayer insulating film having at least two openings;
>
> a second conductive film provided on said second interlayer insulating film and in said openings;
>
> a second substrate opposed to said first substrate;
>
> a third conductive film provided on said second substrate; and
>
> a plurality of conductive spacers held between said first substrate and said second substrate;
>
> wherein said first conductive film is connected with said second conductive film in said openings;
>
> wherein at least one of said conductive spacers is held over said second interlayer insulating film and in contact with both said second conductive film and said third conductive film.

Claims 2, 4 and 5 depend from Claim 1.

Claim 11 claims:

> An active matrix display device comprising:
>
> a first substrate;
>
> a first interlayer insulating film provided over said first substrate;
>
> a first conductive film provided on said first interlayer insulating film;
>
> a second interlayer insulting film provided on said first conductive film, said second interlayer insulating film having at least two openings;
>
> a second conductive film provided on said second interlayer insulating

3

film and in said openings;

a second substrate opposed to said first substrate;

a third conductive film provided on said second substrate; and

a plurality of conductive spacers held between said first substrate and said second substrate;

wherein said first conductive film is connected with said second conductive film in said openings;

wherein at least one of said conductive spacers is held over said second interlayer insulating film and in contact with both said second conductive film and said third conductive film;

wherein each of said openings occupies an area larger than the area occupied by each of said conductive spacers.

Claims 12, 14 and 15 depend from Claim 11.

III.     U.S. Patent No. 4,691,995

CMO claims that claims 22–30, 40, 41, 53–58 and 62–67 of U.S. Patent No. 4,691,995 ("the '995 Patent") are invalid and/or not infringed by CMO's manufacturing process. Each of the asserted claims requires "a step of making a sealing structure on the periphery of the first and second substrates." JSUF ¶ 4. The court previously construed this limitation in connection with the application of a thermosetting resin to join the two substrates prior to the formation of the sealing structure. See Claim Construction Order at 35–37. CMO's accused devices are formed by applying a thermosetting and UV curable resin to one substrate before pressing an opposing substrate into contact with the resin. JSUF ¶ 17. The first application of CMO's thermosetting resin, therefore, is only to one substrate rather than both. Id. ¶ 18. After the substrates are brought together, the resin is cured by applying UV radiation and heat.

LEGAL STANDARD

I.      Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1   matter of law." FED. R. CIV. P. 56(c).  Material facts are those which may affect the outcome of the

2   case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

3   genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

4   party.  Id.  The party moving for summary judgment bears the burden of identifying those portions

5   of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of

6   material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the

7   opposing party will have the burden of proof at trial, the moving party need only point out "that

8   there is an absence of evidence to support the nonmoving party's case."  Id.

9       Once the moving party meets its initial burden, the nonmoving party must go beyond the

10  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

11  genuine issue for trial."  Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

12  party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.

13  1994).  The court may not make credibility determinations, and inferences to be drawn from the

14  facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New

15  Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

16      The moving party may "move with or without supporting affidavits for a summary judgment

17  in the party's favor upon all or any part thereof."  Fed. R. Civ. P. 56(a).  "Supporting and opposing

18  affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

19  evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

20  therein."  Fed. R. Civ. P. 56(e).

21

22  II.    Patent Infringement

23      Determination of infringement is a two-step process.  First, the court must determine the

24  meaning of the language of the claims, a question of law.  Markman v. Westview Instruments, Inc.,

25  517 U.S. 370, 384 (1996).  Second, the finder of fact must compare the construed claims to the

26  accused product, to determine if each claim element is present, either literally or under the doctrine

27  of equivalents.  Irdeto Access, Inc. v. Echostart Satellite Corp., 383 F.3d 1295, 1299 (Fed. Cir.

28

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1    2004).

2

3    III.    Novelty and Anticipation

4        The Patent Act precludes the patenting of any invention that "was known or used by others

5    in this country, or patented or described in a printed publication in this or a foreign country" before

6    the date of its invention. 35 U.S.C. § 102(a); Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314

7    F.3d 1313, 1352 (Fed. Cir. 2003). Similarly, section 102(b) provides that a patent claim is invalid if

8    the patented invention is "described in a printed publication . . . more than one year prior to the date

9    of the application for patent in the United States." 35 U.S.C. § 102(b); see Schering Corp. v.

10   Geneva Pharm., Inc., 339 F.3d 1373, 1377 (Fed. Cir 2003). To anticipate under either section 102(a)

11   or section 102(b), a single prior art reference must disclose every limitation of the claimed invention.

12   See id. at 1377 (citing Lewmar Mar., Inc. v. Barient, Inc., 827 F.2d 744, 747 (Fed. Cir. 1987)).

13   Furthermore, such disclosure must be "enabling"—i.e., it must be sufficient to permit a person

14   having ordinary skill in the art to practice the invention. SmithKline Beecham Corp. v. Apotex

15   Corp., 403 F.3d 1331, 1342 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 2887 (quoting Minnesota Min.

16   & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002)).

17       Anticipation is a question of fact, id. at 1343, and the determination of whether a prior art

18   reference is enabling "is a question of law, although based upon underlying factual findings."

19   Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1376. "However, without genuine

20   factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of

21   law." SmithKline Beecham, 403 F.3d at 1343. The burden of proof in all instances falls upon the

22   party seeking to establish the invalidity of a patent claim, who "must overcome the presumption of

23   validity in 35 U.S.C. § 282 by clear and convincing evidence." State Contracting & Eng'g Corp. v.

24   Condotte Am., Inc., 346 F.3d 1057, 1067 (Fed. Cir. 2003)).

25

26   IV.    Nonobviousness

27       An additional prerequisite to patentability is the "nonobviousness" requirement of 35 U.S.C.

28

                                          6

section 103(a), which states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in [35 U.S.C. § 102], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

To prove that a patented invention is invalid under section 103(a), the accused infringer must identify prior art references "which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention." Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citations omitted). In addition, if more than one prior art reference is employed, "there must be some teaching, suggestion, or motivation to combine the references." In re Fulton, 391 F.3d 1195, 1200 (Fed. Cir. 2004) (quoting In re Rouffet, 149 F.3d 1350, 1355 (Fed. Cir. 1998)). Although such a motivation "may flow from the nature of the problem," there must be something in "the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination." Ecolochem, Inc. v. Southern Cal. Edison Co., 227 F.3d 1361, 1372 (Fed Cir. 2000). "The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co., 464 F.3d 1356, 1361 (Fed. Cir. 2006) (citing In re Dembiczak, 175 F.3d 994, 999 (Fed. Cir. 1999)).

"Obviousness is a question of law premised on underlying findings of fact." Eolas Techs., Inc. v. Microsoft Corp., 399 F.3d 1325, 1332 (Fed. Cir. 2005) (citing Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)). These underlying factual determinations include: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and, if necessary, (4) secondary evidence of nonobviousness. Graham, 383 U.S. at 17–18; Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc., 73 F.3d 1085, 1087-88 (Fed. Cir. 1995). Secondary evidence of nonobviousness can include the commercial success of the invention, long-felt need, failure of others to solve the problem, licensing of the patented invention, professional recognition and approval, and copying of the invention. Graham, 383 U.S. at 17–18;

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1573 (Fed.

2   Cir. 1992).  Like anticipation, the affirmative defense of obviousness must be established by clear

3   and convincing evidence.  See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320

4   F.3d 1339, 1353 (Fed. Cir. 2003).

5

6   V.      Written Description

7        In addition to the requirements that a patented invention be novel and nonobvious, the

8   validity of a patent further depends on compliance with the written description requirements of 35

9   U.S.C. section 112 ¶ 1.  See Space Systems/Loral, Inc. v. Lockheed Martin Corp., 405 F.3d 985, 987

10  (Fed. Cir. 2005).  Section 112 ¶ 1 states:

11              The specification shall contain a written description of the invention,
                and of the manner and process of making and using it, in such full,
12              clear, concise, and exact terms as to enable any person skilled in the
                art to which it pertains, or with which it is most nearly connected, to
13              make and use the same, and shall set forth the best mode contemplated
                by the inventor of carrying out his invention.
14
15  35 U.S.C. § 112 ¶ 1.  Although a patent's specification need not include information that is already

16  known and available to one of ordinary skill in the art to which the patent pertains, its description of

17  the invention claimed must be sufficient to convey to such an ordinarily skilled artisan that the

18  inventor was in possession of the invention on the date that the patent application was filed.

19  Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997); Vas-Cath Inc. v. Mahurkar,

20  935 F.2d 1555, 1563–64 (Fed. Cir. 1991).  This is achieved "by such descriptive means as words,

21  structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention."  Lockwood,

22  107 F.3d at 1572.  The issue of compliance with the written description requirement is a question of

23  fact.  Tronzo v. Biomet, Inc., 156 F.3d 1154, 1158 (Fed. Cir. 1998).

24  DISCUSSION

25        As the party moving for summary judgment, CMO bears the burden of identifying those

26  portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue

27  of material fact.  Celotex, 477 U.S. at 323.  Should CMO meet this burden, SEL, as the party with

28

UNITED STATES DISTRICT COURT
For the Northern District of California

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the  burden of proof to show infringement, must go beyond the pleadings and, by its own affidavits

2   or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

3   56(e).

4

5   I.      The '258 Patent

6

7           A.      Infringement

8           The dispute over the '258 Patent boils down to the question of whether the n+-doped

9   amorphous silicon layers in CMO's TFTs have an exposed "upper surface."  CMO claims that its

10  products are designed to have a "sloped" or "tapered" geometry whereby the upper n+-doped

11  amorphous silicon layer is not exposed, rather than a "stepped structure" as claimed in the '258

12  Patent.  SEL does not deny that a tapered geometry would not infringe the asserted claims.

13  However, SEL claims that the evidence demonstrates that CMO does, in fact, regularly manufacture

14  TFTs with a stepped structure.

15          In support of its contention that CMO's production method is designed to produce tapered

16  TFTs, CMO points to a diagram of its product design and statements by Cheng-Hsu Chou, an

17  integration engineer at CMO, which clearly show a tapered geometry.  Lindsey Dec., Exh. L at

18  CMO 0087640.  CMO asserts that its tapered design is identical to the tapered designs set forth in

19  U.S. Patent Nos. 5,028,551 to Dohjo, and 4,960,719 to Tanaka, both of which teach tapered TFT

20  structures.  In prosecuting its patents, SEL expressly distinguished its patented design from these

21  prior patents on the grounds that the Tanaka patent "fails to disclose a stepped portion that includes

22  an upper surface of the source and drain electrodes to a surface of the first semiconductor film."

23  Lindsey Dec., Exh. I at 18.  In that same document SEL stated that it was amending a claim to add

24  an upper surface limitation in order to overcome the Tanaka Patent.  Id.  CMO claims that, due to the

25  similarities in design between CMO's TFT design and the Tanaka and Dohjo Patents, SEL's

26  statements distinguishing its claims from the prior patents applies with equal force to CMO's TFT

27  design.

28

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In response, SEL argues that there is a disputed issue as to whether SEL's design is actually

2    directed toward a tapered geometry.  SEL further argues that, even if CMO's design prescribes a

3    tapered geometry, there is a disconnect between CMO's intended design of its products and the

4    structure of the products that CMO actually produces.  Specifically, SEL claims that CMO's

5    production method results in the production of stepped structure TFTs, regardless of whether the

6    method is intended to do so.  In support of this contention, SEL points to the six pieces of evidence

7    cited by CMO.  The court will consider each document separately.

8

9                    1.      Photographs

10    SEL has identified 27 photographs of CMO TFTs that purport to show a stepped structure.

11    Thomas Dec., Exh. 2.  These photographs have been selected from a series of photomicrographs

12    submitted by CMO in support of its motion for summary judgment.  Lindsey Dec., Exh. Q.  SEL's

13    expert states that, in each of these photos, an exposed upper surface of the n+ layer is visible.

14    Thomas Dec. ¶¶ 3–5.

15    In response, CMO raises a number of arguments.  First, CMO attempts to downplay the fact

16    that SEL has produced only 27 examples from among the "TRILLIONS" of TFTs that CMO

17    produces each year.  This argument is misleading.  It is not as though SEL scoured trillions of

18    photomicrographs and found only 27 examples of exposed upper surfaces.  Rather, SEL identified a

19    significant subset of a sampling of CMO's products purporting to demonstrate that CMO's

20    production method produces TFTs with exposed upper surfaces.

21    Additionally, CMO disputes that the photos show what SEL claims they show.  CMO asserts

22    that there is no discernible contrast between the n+ region and the thicker intrinsic amorphous

23    silicon layer that underlies it.  CMO additionally claims that SEL's expert's conclusions are not

24    supported by any testing related to the thickness of the respective layers.  Because the n+ layer

25    comprises only 1/5 of the total thickness of the amorphous silicon layer, CMO claims that measuring

26    layer thickness is critical to determine whether the alleged "step" has a "generally vertical" region as

27    required for the stepped structure to exist.

28

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    CMO claims that Thomas' conclusory statements do not satisfy SEL's burden on summary

2    judgment.  In support of this proposition, CMO cites <u>Rohm & Haas Co. v. Brotech Corp.</u>, 127 F.3d

3    1089 (Fed. Cir. 1997).  There, the district court, after a bench trial, held that the patentee had not

4    satisfied its burden of proof on showing infringement by offering "nothing more than its expert's

5    general opinion that the accused product or process infringed the patents." <u>Id.</u> at 1092.  Having

6    "little or no basis to question the district court's determination," the Federal Circuit detected "no

7    clear error in the district court's finding that [plaintiff] did not prove infringement." <u>Id.</u>  This case

8    does not stand for the fact that expert declarations as to the ultimate issue to be decided cannot

9    defeat summary judgment.  On the contrary, the court specifically stated that a patentee is "permitted

10   to rest its prima facie case on [the] expert testimony, including charts, that the patents were

11   infringed, and the District Court [is] free to accept or reject that evidence." <u>Id.</u> (quoting <u>Symbol</u>

12   <u>Techs., Inc. v. Opticon, Inc.</u>, 935 F.2d 1569, 1576 (Fed. Cir. 1991)).  However, wholly conclusory or

13   unsupported statements of experts are insufficient to raise a genuine issue of material fact precluding

14   summary judgment. <u>TechSearch, L.L.C. v. Intel Corp.</u>, 286 F.3d 1360, 1372 (Fed. Cir. 2002).

15   The case of <u>Phillips Petroleum Co. v. Huntsman Polymers Corp.</u>, 157 F.3d 866 (Fed. Cir.

16   1998), dealt with insufficient expert testimony and photomicrographs.  There, a finding that the

17   defendant produced "block copolymers" was necessary to support a finding of infringement. <u>Id.</u> at

18   876.  Although the plaintiff's expert declared that such polymers were present, he "could not say

19   that the photomicrographs showed the presence of block copolymer molecules in the accused

20   compositions and products," and his declaration was "wholly conclusory, devoid of facts upon

21   which the affiants' conclusions, as experts, were reached." <u>Id.</u> (internal quotations omitted).  The

22   court therefore found that the experts' unsupported declarations could not defeat summary judgment.

23   Here, by contrast, Thomas' determination that CMO's products contain exposed upper n+

24   surfaces is based on Thomas' direct analysis of the photomicrographs.  Accordingly, Thomas'

25   conclusion is not a bare assertion.  While CMO is certainly free to attack the credibility and

26   reliability of the tests and measurements underlying Thomas' conclusion, those are matters for trial.

27   For the purposes of this motion, therefore, SEL has raised an issue of fact as to whether some

28

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1   identifiable portion of CMO's products contain stepped geometries.

2

3                   2.        Chou's Testimony

4           Chou has testified extensively to the design and manufacture of CMO's TFTs.  The parties

5   dispute the significance of this testimony.  Chou testified that the etching rate for the molynitride

6   layer is designed to create a tapered shape with respect to that layer.  Chou Dep. at 38:8–22.  This

7   testimony does not pertain to the n+-doped amorphous silicon layer.  With respect to the n+ layer,

8   however, Chou testified that "[a]s far as our design is concerned, we desire that the N plus on this

9   area will be etched away so that there will be a good taper." Id. at 104:12–14.  Referring to his

10  drawing, discussed below, Chou stated that because the exposed area will be etched away, the actual

11  product would differ slightly from his "conceptual drawing." Id. at 104:19–23.  Chou later testified

12  to the inherent uncertainty as to whether the finished product conforms to the tapered design:

13          A.  We don't have a way to find out exactly to what extent the etch
            will be etched into because there are too many parameters that will
14          affect the shape.  I can only say that our design will follow metal 2 to
            go downward to have a taper shape.
15          Q.  How do you know that?
            A.  How do I know what?
16          Q.  That your design will follow the metal 2 to go downward to have a
            taper shape?
17          A.  This is a requirement of the process design.  As a matter of fact,
            we have not conducted any testing and measurement.
18          Q.  So you've not conducted any test or measurement to confirm that
            it follows downward to have a taper shape?
19          A.  It will be extremely difficult to perform this measurement in the
            process, but in the periodical inspection we can tell about the shape of
20          this area from the inspection results.  But basically speaking, as long
            as the electrical properties or the yield has the normal situation and in
21          addition because of the considerations of process variations, we will
            not perform any process adjustments to this shape.
22

23  Id. at 270:20–271:19.  SEL additionally points to a hand-drawing that Chou made during his

24  deposition.  Lindsey Dec., Exh. O at CMO 0087607.  This drawing, however, contains overlapping

25  lines, and is therefore ambiguous as to whether Chou was intending to draw the CMO TFT as having

26  an exposed upper surface.  Chou's deposition testimony regarding the drawing is unhelpful in

27  resolving the ambiguity.  See Chou Dep. at 273:1–12.  The court therefore affords these drawings

28  little weight.  Moreover, Chou testified elsewhere that a diagram which clearly shows a tapered n+

1  layer is a more accurate conceptual drawing of a cross-section of CMO's design "as far as the

2  process design is concerned." Chou Dep. at 315:22–316:7; Lindsey Dec., Exh. L at CMO 0087644.

3        Finally, Chou testified generally as to the fact that due to inherent variations in all

4  manufacturing steps, no two TFTs produced by CMO's manufacturing process are dimensionally

5  identical. Chou Dep at 64:6–14, 70:14–23, 109:2–110:17, 158:23–19.

6        Taken together, Chou's testimony supports CMO's contention that its design is geared

7  toward a tapered geometry, but is also consistent with SEL's claim that CMO's manufacturing

8  process nonetheless produces stepped geometry. While CMO may not be required to individually

9  test each of the "trillions" of TFTs it produces, the fact that CMO lacks a reliable basis for

10  determining that its manufacturing process produces only tapered n+ layers, combined with Chou's

11  testimony that he is not certain as to whether all of CMO's TFTs have a tapered shape, leaves a

12  triable issue as to whether CMO produces stepped TFTs.

13

14          3.    <u>Chou's Statements</u>

15        Chou prepared two statements regarding CMO's manufacturing processes. Lindsey Dec.,

16  Exhs. M & N. SEL claims that these documents demonstrate that CMO's TFTs have n+-doped

17  amorphous silicon layers with exposed upper surfaces. Indeed, the diagram of the finished product,

18  labeled "Step 8," clearly shows that the n+-doped amorphous silicon layer (labeled "208") has an

19  exposed upper surface. Lindsey Dec., Exh. M at CMO 0182158. With regard to these process flow

20  diagrams, however, CMO's witnesses have testified that these drawings were meant to illustrate the

21  steps taken to produce TFTs, not provide accurate depictions of the finished products. Chou Dep. at

22  85:16–20 ("This is the only conceptual drawing . . . . [I]t does not actually indicate the actual

23  circumstance"), 104:8–16 ("Okay, in step seven for the areas that are not covered by the photoresist .

24  . . [t]he N plus on this area will be etched away"), 112:1–2 ("But this drawing is only a conceptual

25  drawing. It cannot represent the actual situation."); Shih Dep. at 183:20–186:6 (testifying that the

26  diagram was meant to explain the process flow to the lawyers and did not accurately represent the

27  structure of the finished product). Paul Kohl, SEL's expert, acknowledges this distinction between

28

UNITED STATES DISTRICT COURT
For the Northern District of California

13

1   conceptual drawings and actual product cross-sections.  Kohl Dep. at 60:22–63:22.  The "conceptual

2   drawings" therefore do not decidedly indicate that CMO's product design is stepped.

3

4                        4.      Product Diagrams

5        SEL claims that the court should disregard defendant's Exhibit O, a collection of documents

6   related to CMO products.  CMO claims that a single page of this exhibit indicates that CMO's TFTs

7   are tapered.  Lindsey Dec., Exh. O at CMO 0087609.  When questioned about this page, Dr. Hatalis,

8   CMO's expert, testified that he could not draw any conclusions based on the photographs on that

9   page and that he "use[d] this figure primarily from the title that says that it was clear and understood

10  by the [sic] CMO that tapered and sloped are preferred than completely anisotropic processes."

11  Hatalis Dep. at 51:11–16.  SEL further objects to the use of this document because CMO has

12  represented that the full document is not a true and complete representation of CMO's processes.

13  Schlitter Dec., Exh. D.  CMO suggests that the court rely upon Chou's hand-sketch from his

14  deposition as representative of TFT's products.

15       In addition to the diagram at CMO 0087609, CMO points to a diagram on a page titled

16  "CMO TFT ARRAY (FAB3) 3900 Channel Device Unit SEM Diagram," which contains a TFT

17  diagram clearly showing a tapered n+ layer.  Lindsey Dec., Exh. L at CMO 0087640.  SEL asserts

18  that this single drawing is insufficient to demonstrate that there is no dispute regarding the structure

19  of CMO's products.  While the Federal Circuit has held that "rough drawings" alone cannot support

20  a finding of summary judgment where they are the only evidence submitted on a particular factual

21  issue, Pfaff v. Wells Elecs., Inc., 5 F.3d 514, 519 (Fed. Cir. 1993), the diagrams at issue here are

22  more than "rough drawings."  The fact that a diagram labeled as a "TFT" clearly shows a tapered

23  structure supports the conclusion that CMO's product is designed to have a tapered geometry.

24       In addition, SEL points to another diagram in Exhibit L which clearly shows an n+ layer with

25  an exposed upper surface.  Lindsey Dec., Exh. L at CMO 008647.  This diagram appears on a page

26  titled "3900 Process TEG Test Check Item: Surface Leakage VS 3900 BT Ability," and closely

27  resembles the hand-drawing that Chou made during his deposition.  CMO states that this latter

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  diagram is irrelevant because it shows a "test" TFT configuration which is "wholly dissimilar to

2  CMO's actual TFT design."  The court notes that, although the diagram at issue appears to follow

3  the same basic scheme as the TFT designs, the term "TFT" does not appear on the page containing

4  the diagram.

5        In considering these various images, the court can only conclude that the record is manifestly

6  unclear as to what these diagrams represent, or how they were used.  These diagrams therefore do

7  nothing to resolve the ambiguity as to whether the tapered structure is an essential component of

8  CMO's TFT design.

9

10            5.     SEL's Additional Evidence

11        In addition to disputing CMO's evidence, SEL has submitted schematic diagrams and

12  photographs that were provided by CMO to its attorneys.  Schlitter Dec., Exh. B at CMO 0181377 &

13  181388.  These images, like the photomicrographs, appear to show n+ layers with exposed upper

14  surfaces.

15

16            6.     Infringement Analysis

17        SEL has raised an issue of fact as to whether a certain proportion of CMO's products have

18  stepped geometries, and has pointed to at least some degree of ambiguity as to whether CMO

19  consistently designs its TFTs to have a tapered structure.  At best, therefore, CMO has shown that its

20  TFTs are designed to be tapered but that inherent variations in the manufacturing process

21  occasionally produce stepped TFTs.  The issue, then, is whether this incidental production of

22  stepped TFTs is sufficient to bring CMO's production process within the method claimed in the '258

23  Patent.

24        "[T]he motive of the accused infringer when performing a claimed method is simply not

25  relevant."  Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370, 1380 (Fed. Cir. 2003).  CMO asserts,

26  quite forcefully, that this holding is inapplicable to the case at bar because, to practice a claimed

27  method, a party must actually implement the patent's specific process steps so as to create the

28

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1    claimed "stepped" structure.  CMO claims that it implements a process to create a tapered structure,

2    and therefore the process is not covered by the '258 claims.  CMO, however, has not raised any

3    arguments with respect to the *steps* of the method in this motion.  Rather, CMO's motion is geared

4    entirely at the *end result* of the process—namely, whether the TFT produced by the process has a

5    stepped or tapered geometry.  Accordingly, SEL can defeat summary judgment by raising an issue

6    of fact as to whether CMO's production process creates stepped TFTs as its end result.

7         In further support of its contention that a process which is designed to and regularly does

8    produce tapered TFTs cannot infringe a patented method for producing stepped TFTs, CMO cites a

9    number of cases dealing with unintended consequences.

10        In Angelo Mongiello's Children, LLC v. Pizza Hut, Inc., 70 F. Supp. 2d 196, 198 (E.D.N.Y.

11   1999), the patent covered, in essence, a method "to create multiple, individually sealed pockets

12   made of dough that are filled with cheese (or other ingredients) and enclosed within the outer rim of

13   a pizza crust or placed on a portion of the pizza crust."  Defendant Pizza Hut made and sold a cheese

14   "Stuffed Crust Pizza."  Id. at 199.  The objective of the defendant's method for creating the cheese

15   Stuffed Crust Pizza was to create a continuous ring of cheese throughout the outer rim of the pizza

16   crust, as opposed to cheese pockets as claimed in the patent.  Id.  However, the plaintiffs in the

17   action at some point observed a cheese Stuffed Crust Pizza containing "'pockets' of mozzarella

18   cheese and spots where 'a dough wall separated adjacent mozzarella strings.'"  Id.  The plaintiffs

19   therefore sued Pizza Hut, alleging that the method of creating the cheese Stuffed Crust Pizza

20   infringed their patent.  In terms of the regularity of cheese pockets, plaintiffs "were not able to find

21   the so-called pockets easily, but had to cut through at several places before they found an offending

22   bit of dough, and the 'pockets' did not appear consistently throughout the samples shown."  Id. at

23   200.  The court, after construing the claims, held that the accused method did not infringe.  Critical

24   to the court's analysis was its conclusion that "cutting the pizza so that the individual, sealed pockets

25   are on each slice" was an essential limitation of the patent.  Id. at 204.  Because the cheese pockets

26   in the defendant's pizza appeared randomly but the accused process provided for cutting the pizza

27   into eight equal slices, it was "impossible for individual portions of cheese to be located on each

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  portion of defendant's pizza." Id. at 206.  Based on its claim construction, therefore, the court did

2  not decide whether making a pizza with randomly generated cheese pockets with the intent of

3  creating a continuous cheese ring infringed a patent on a method of creating a pizza with

4  intentionally created cheese pockets.  The additional claim element of cutting the pizza in a

5  particular way rendered literal infringement impossible.

6      In LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1380 (Fed. Cir. 2006), the asserted

7  patent covered an information processing system explicitly designed to handle multiple "read

8  addresses."  The patent stated that "each" of the read addresses was to be handled in a particular

9  way. Id.  The court held that the fact that the accused product "occasionally" handled read addresses

10 in the claimed manner did not amount to literal infringement.  Id.  This case is likewise

11 distinguishable because SEL's patent covers "A method of manufacturing a semiconductor device"

12 (emphasis added), not a single method for producing multiple semiconductor devices, each of which

13 must be created in a particular way.  Thus the invention is practiced or not practiced every time

14 CMO manufactures a single TFT.  Accordingly, if CMO's production process creates one stepped

15 TFT, CMO has practiced the patented method.

16      Finally, in Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452–453 (Fed. Cir. 1985),

17 the Federal Circuit upheld a district court's judgment of noninfringement despite the fact that the

18 defendant's process and the claimed invention both employed copper as a catalyst.  Once again, the

19 court's claim construction was critical to the result.  The court held that the patent was limited to

20 catalysts consisting of "'a copper ion' which is 'at least partially soluble.'" Id. at 452.  The accused

21 product used "a solid, insoluble catalyst, comprised of metallic copper, as pure as industrial

22 chemical methods are capable of producing." Id.  Because the accused device did not practice the

23 invention at all, therefore, there was obviously no infringement.  This case is inapplicable to the

24 current dispute.

25      In sum, even if SEL has not raised a genuine issue as to whether CMO's manufacturing

26 process is designed to create tapered TFTs only, SEL has at least raised an issue of fact as to

27 whether CMO's process actually creates stepped TFTs.  The frequency with which CMO's process

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   produces stepped TFTs is unclear—CMO claims that the percentage is impossible to determine,

2   while SEL claims that 85–90% of the photographs with sufficient resolution that SEL has examined

3   show a stepped structure.  In any case, such incidental practicing of the patented method would

4   constitute infringement, and CMO is therefore not entitled to summary judgment of noninfringement

5   of the '258 Patent.

6

7           B.      Invalidity

8           CMO's invalidity arguments are expressly conditioned upon a finding that the '258 covers a

9   process for manufacturing tapered TFTs.  Such a construction, CMO argues, would render the '258

10  Patent invalid as anticipated by U.S. Patent No. 5,198,694, anticipated and/or rendered obvious by

11  U.S. Patent No. 4,862,234, invalid for lack of enablement and invalid for inadequate written

12  description.  CMO's principal contention, however, is that the '258 Patent does not cover the

13  manufacture of tapered TFTs (otherwise it would clearly cover CMO's manufacturing process).

14  SEL acknowledges that the '258 Patent does not cover tapered TFTs, and its infringement argument

15  is based on the contention that CMO manufactures stepped TFTs.  Because the parties agree that the

16  '258 Patent does not reach tapered TFTs, CMO is not entitled to summary judgment of invalidity.[1]

17

18  II.     The '480 Patent

19

20          A.      Infringement

21          CMO asserts that, based on the '480 Patent's written description, (1) the claimed LCD

22  structure must have a second interlayer insulating film that is planarized, and (2) the claimed LCD

23  structure must not have a second insulating film with an uneven, undulating top surface.  CMO

24  states that, under this construction, CMO's products cannot infringe because they have a deliberately

25  undulating second interlayer insulating film.  SEL disputes that the patent requires this construction

26  of "second interlayer insulating film," and disputes CMO's claims regarding the nature of its

27  products.

28

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2          1.     Construction of "Second Interlayer Dielectric Film"

3          The claims of the patent contain no express limitation on "second interlayer dielectric film."

4   CMO nonetheless claims that the specification indicates that the second interlayer dielectric film

5   must have a planarized surface, and if the term cannot be so construed then the patent must be

6   deemed invalid for lack of enablement and inadequate written description.

7          The abstract states that the claimed contact structure "assure[s] a uniform cell gap among

8   different cells if the interlayer dielectric film thickness is nonuniform across the cell or among

9   different cells."  '480 Pat. Abstract.  The abstract further states that "[t]he cell gap depends only on

10  the size of the spacers, which maintain the cell gap."  Id.  From the outset, therefore, the patent

11  explicitly contemplates variations in interlayer dielectric film thickness not only among different

12  cells but within the same cell.

13         Reviewing the specification, the uniformity of the "cell gap"—the space between the

14  substrates—and its relation to the nonuniformity of the interlayer dielectric film features

15  prominently in the description of the relevant prior art, the summary of the invention, and the

16  description of the invention.  The relevant passages are analyzed below.

17         The description of the related art states that "[i]t is common practice to use standardized

18  spacers as the insulating spacers," such that the cell gap in the pixel region will be "substantially

19  uniform" so long as the spacers have a uniform diameter.  Id. col. 2 ll. 38–42.  The patent draws a

20  distinction between the cell gap in the pixel region ("Gp") and the cell gap in the common contact

21  region ("Gc"), stating that while substantial uniformity in the pixel region can be attained using

22  spacers of uniform diameter, it is difficult to avoid nonuniformity in the common contact region cell

23  gap.  Id. col. 2 ll. 42–44.  The patent states that, while the Gp cell gap is determined by the diameter

24  of the spacers, "the cell gap Gc in the common contact portion depends only on the film thickness t

25  of the interlayer dielectric film."  Id. col. 2 ll. 45–49.  As the patent explains: "Consequently, to

26  make the cell gap Gc uniform among liquid-crystal cells, it is necessary that the film thickness t of

27  this interlayer dielectric film 18 be uniform among cells.  However, this is impossible to

28

                                              19

1   circumvent." Id. col. 2 ll. 49–53.  This latter sentence apparently refers to the lack of uniformity

2   which seemed to plague the prior art.

3        The relevant art description goes on to explain that the thickness of the interlayer dielectric

4   film "may differ from location to location on the same substrate.  In this case, the film thickness t

5   may differ among different common contacts even on the same substrate." Id. col 2 ll. 55–69.  This

6   variation in thickness creates nonuniformity both in the pixel cell gap Gp and the common contact

7   cell gap Gc.  Id. col. 2 ll. 60–65.  This nonuniformity in the cell gap is later identified as a "problem"

8   that prevents a display from being provided because it is impossible to properly connect the counter

9   electrode.  Id. col. 3 ll. 3–18.

10        Given the problem of nonuniformity in the prior art, the stated object of the invention is "to

11   provide a contact structure which is free of the foregoing problems, provides less nonuniform cell

12   gap among different cells if the thickness of the interlayer dielectric film is nonuniform across the

13   cell or among different cells, and reduces poor electrical contacts which would normally be caused

14   by conducting spacers." Id. col. 3 ll. 22–28.

15        Turning to the primary example given in the written description ("Example 1"), the

16   description addresses the second interlayer dielectric film as follows: "The organic resinous material

17   acts to planarize the surface of the second interlayer dielectric film 319.  This is important to make

18   the cell gap uniform.  In the present example, polymide was deposited as the second interlayer

19   dielectric film 319 to a thickness of 1 μm." Id. col. 10 ll. 19–23.  After the second interlayer

20   dielectric film is planarized, contact holes are formed in the second interlayer dielectric film to

21   provide access to the drain electrode and internal conducting lines.  Id.  col. 10 ll. 24–27.  After the

22   holes are formed, a "thin metal film which would later be made into pixel electrodes 322 and a

23   conducting pad 323" are formed.  Id. col. 10 ll. 50–51.  Judging from the drawings, the conducting

24   pad is formed on top of the second interlayer dielectric film and the internal conducting lines after

25   the contact holes are created.  The contact holes appear to be created only in the common contact

26   portion—the pixel portion remains intact and thus planarized.

27        After this structure is created, and after some additional steps are performed preparing the

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

20

substrates to be joined, the cell gap is created as follows.  Non-conducting (insulating) spacers with a diameter of 3 μm are applied to the pixel region.  Id. col. 11 ll. 47–49.  Additionally, conducting spacers with a diameter of 3.5 μm are applied to the common contact region.  Id. col. 11 l. 49.  When the two surfaces are clamped together creating a cell gap of 3 μm, the conducting spacers are crushed, creating a larger surface in contact with the electrodes and conducting pads, leading to a better electrical connection.  Id. col. 11 ll. 53–59.  So long as the conducting spacers are greater than 3 μm, they are able to be compressed to conform with the cell gap created by the insulating spacers.  Discussing the planarity, the patent elsewhere states that "it is important to flatten the surface of the second interlayer dielectric film 319 on which the pixel electrodes 322 are formed in order to make uniform the cell gap."  Id. col. 12 ll. 3–7.   The patent goes on to describe a particular process for planarizing the second interlayer dielectric film in the pixel region.

This detailed discussion, and the comments regarding the importance of a flat second interlayer dielectric film, appear in the description of "Example 1."  The patent provides two additional examples, neither of which discusses the second interlayer dielectric film in any meaningful way.  The second example is "a modification of the common contact portions of Example 1," in which the electrical resistance of the counter electrode and conducting spacers is reduced, and contains no mention of the cell gap.  Id. col 12 ll. 58–64.  The third example is "a modification of Example 2," adding openings to the connecting pad at various places so that the conducting spacers can be visually checked.  Id. col. 13 ll. 25–36.  The third example provides guidance as to the spacing and size of the openings in order to maintain the cell gap.  Id. col. 13 ll. 46-51.  The patent goes on to state that "[i]n Examples 2 and 3, the cell gap in the common contact portions is made uniform," without elaborating on how the cell gap would be made uniform without planarizing the second interlayer dielectric film of the pixel region.  Id. col. 13 ll. 36-64.

The written description concludes with this curious passage:

> The common contact structure in accordance with the present invention can eliminate variations of the cell gap among liquid-crystal cells even if the film thickness varies among interlayer dielectric films.  Also, poor contacts due to conducting spacers can be reduced.
> In particular, in accordance with the present invention, the cell gap depends only on the size of *conducting spacers*.  Therefore, where

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   the *conducting spacers* are uniform in size, the cell gap between
2   opposite substrates or plates can be made uniform among different
    liquid-crystal cells, if the thickness of the dielectric film electrically
3   insulating the first and second conducting films is different among
    different liquid-crystal cells.

4   Id. col. 14 ll. 13-26 (emphasis added).  This passage is odd in that the specification explicitly

5   discloses conductive spacers of varying diameters which are crushed to conform to the cell gap

6   created by insulating spacers.  Furthermore, even if the conducting spacers are of uniform diameter,

7   they could only maintain a uniform cell gap if the common contact region is planar.  And yet, the

8   patent explicitly contemplates variations in the thickness of the interlayer dielectric films.

9          SEL's explanation for this apparent inconsistency is that, in the described embodiment, the

10  second interlayer dielectric film need only be planarized in the pixel region.  The 3-μm insulating

11  spacers are applied to the pixel region, where the second interlayer dielectric film is uniform.  The

12  3.5-μm conducting spacers are applied to the common contact portion, and are crushed when the

13  electrode is formed, conforming to the 3-μm cell gap created by the insulating spacers.  Because the

14  cell gap is defined by the 3-μm spacers applied to a uniform second interlayer dielectric film, any

15  nonuniformities in the second interlayer dielectric film in the common contact portion will be

16  corrected by the compressibility of the conducting spacers.  This is consistent with the passage

17  regarding planarity, which states that "it is important to flatten the surface of the second interlayer

18  dielectric film 319 on which the pixel electrodes 322 are formed in order to make uniform the cell

19  gap." Id. col. 12 ll. 3–7.  In the drawings, "322" indicates the region where the insulating spacers

20  (402), not the conducting spacers (401), are located.  Id. Fig. 6.

21         Accordingly, the second paragraph quoted above is inaccurate.  Accepting SEL's

22  explanation, which is borne out by the patent, the cell gap is still tied to the insulating spacers.  It is

23  explicitly not tied to the conducting spacers, which must be larger than the intended cell gap in order

24  for the patented invention to function properly.  The court need not dwell on this error, however.  It

25  is sufficient to hold that the asserted claims of the '480 Patent cover nonuniform second interlayer

26  dielectric films in the common contact portion of the matrix.[2]

27

28

1

2             2.      Infringement Analysis

3       In view of the above, the patent need not be construed to cover only planarized second

4   interlayer dielectric surfaces in the common contact region.  Accordingly, a factual analysis of

5   CMO's products is unnecessary for the purposes of determining infringement.

6

7       B.      Invalidity Based on Enablement and Written Description

8       CMO claims that, if the '480 Patent can be construed to cover devices having insulated

9   layers with undulating top surfaces, the patent must be invalid either for lack of enablement or

10  inadequate written description.

11

12            1.      Enablement

13      To satisfy the enablement requirement of 35 U.S.C. section 112,[3] "the specification of a

14  patent must teach those skilled in the art how to make and use the full scope of the claimed invention

15  without 'undue experimentation.'" Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed.

16  Cir. 1997) (internal quotations omitted).  Furthermore, a specification does not enable a claimed

17  aspect of an invention as a matter of law where the specification "expressly teaches against it."  AK

18  Steel Corp. v. Sollac and Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003).  CMO claims that SEL

19  identified nonuniform dielectric surfaces as a problem to be addressed by the invention, but that the

20  specification cannot enable the creation of such nonuniform surfaces.  As the patent explains,

21  however, one of the problems to be addressed was nonuniform *cell gaps* in the common contact

22  region, given nonuniformity in dielectric surfaces.  The patent addresses this problem by teaching, as

23  one example, to planarize the surface of the second interlayer dielectric film in the pixel region and

24  establish the cell gap through the use of non-insulating spacers in that region.  The patent

25  acknowledges the presence of nonuniform surfaces in the common contact region.  The court does

26  not find that planarizing only the pixel region would require undue experimentation.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2.      Written Description

2      "To fulfill the written description requirement, the patent specification 'must clearly allow

3   persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'"

4   Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1479 (Fed. Cir. 1998).  The requirement is

5   not met where the claims of a patent exclude a limitation that is an essential element of the described

6   invention.  Id. at 1479.  Additionally, a written description is inadequate where the description

7   clearly discloses only a particular species but the claims are generic.  Tronzo, 156 F.3d at 1159.

8      Here, the patent only discloses one means of creating a uniform cell gap, which is the stated

9   objective of the invention.  All three embodiments in the written description involve planarizing the

10  second interlayer dielectric film in the pixel region and applying non-conducting spacers of uniform

11  diameter.  However, neither planarization or even non-conductive spacers are mentioned in the

12  claims.  This is not necessarily a fatal flaw, however, as "[a] claim will not be invalidated on section

13  112 grounds simply because the embodiments of the specification do not contain examples explicitly

14  covering the full scope of the claim language."  LizardTech, Inc. v. Earth Resource Mapping, Inc.,

15  424 F.3d 1336, 1345 (Fed. Cir. 2005).  As this court previously held in its claim construction order,

16  "[t]he improvement of the '480 patent is to locate the metal contact for the electrical connection on

17  top of the dielectric layer, eliminating the relationship between the thickness of the dielectric and the

18  size of the conductive spacers."  Claim Construction Order at 5.  Given the compressibility of the

19  conductive spacers, the reliability of the electrical connection is sufficient so long as the diameter of

20  the conductive spacers is large enough to span the largest portion of the cell gap, regardless of

21  whether the cell gap itself is uniform.  Because this is what is claimed and described, the '480 Patent

22  satisfies the written description requirement.

23

24      C.      Invalidity Based on Anticipation

25      CMO identifies three separate references which it claims independently anticipate the '480

26  Patent: Japanese Patent Publication 06-289415 ("the '415 Publication"), Japanese Patent Publication

27  05-243333 ("the '333 Publication"), and U.S. Patent No. 5,757,456 (the '456 Patent).[4]  SEL disputes

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  that these references anticipate only on the grounds that not all claims are present in each invention.

2  SEL appears to acknowledge that the remaining applicable requirements of Section 102 are met with

3  respect to each reference, i.e. that each reference falls into a category of documents which may

4  constitute prior art and were published early enough to anticipate assuming that all claims are

5  disclosed.

6

7           1.      The '415 Publication

8          CMO has submitted a claim chart purporting to identify where each element of claims 1, 4,

9  5, 11, 14 and 15 is present in the '415 Publication.  Yan Dec., Exh. 25.  In response, SEL takes issue

10 with respect to the alleged presence of four claim elements in the prior art: (1) a plurality of

11 conductive spacers held between said first substrate and said second substrate (independent claims 1

12 and 11); (2) wherein at least one of said conductive spacers is held over said second interlayer

13 insulating film and in contact with both said second conductive film and said third conductive film

14 (independent claims 1 and 11); (3) a fourth conductive film between said third conductive film and

15 said second substrate (dependent claim 4); and (4) wherein each of said openings occupies an area

16 larger than an area occupied by each of said conductive spacers (independent claim 11).  The court

17 will consider each disputed limitation in turn.

18

19              a.      A plurality of conductive spacers held between said first substrate and
                        said second substrate (independent claims 1 and 11)

20

21         CMO claims that this element is described in the following passage from the '415

   Publication:

22

23              Opposing substrate 302 is connected to electrode 306 such as ITO
                over transparent organic insulating film via electroconductive
24              adhesive 320, and this electrode is connecting to wiring 318 below
                having common potential so that the potential of opposing substrate
                302 is set at the common potential.

25 '415 Publication ¶ 0018.  CMO asserts that the "electroconductive adhesive" coincides with the

26 conductive spacers in the '480 Patent.  CMO further claims that because Figure 3(a) of the '415

27 Publication shows at least four common contact regions, each of which contains an amount of the

28

                                              25

1    electroconductive adhesive, the '415 Publication's device includes a plurality of at least four

2    conductive spacers held between the "device substrate" and the "opposing substrate."

3         The conductive adhesive is comprised of conductive particles mixed into a resin. This court

4    construed "conductive spacers" to mean "conductive objects that span the gap between substrates."

5    Claim Construction Order at 10. SEL claims that because the individual conducting particles in the

6    conductive adhesive do not individually "span the gap between substrates," conducting spacers are

7    not present in the '415 Publication. CMO's expert, Dan Schott, testified that his opinion of what the

8    conductive adhesive is was "[j]ust pure speculation" when asked whether he had any idea what

9    conductive spacers are in element 320 of the '415 Publication. Schott Dep. at 166:7–18. In its

10   Reply Brief, CMO states that it considers the entire drop of hardened conductive adhesive, not the

11   individual conducting particles, to be the "conducting spacer." Rep. Br. at 8. As the court's

12   construction uses the broad term "conducting object," the hardened drop of conductive adhesive fits

13   this definition.

14        SEL claims that even if the conductive adhesive taken as a whole constitutes a conductive

15   spacer, the "plurality" requirement is not met because each common contact region in the '415

16   Patent contains only one unit of conductive adhesive. SEL compares figures 3(a) and 3(c) of the

17   '415 Publication to the prior art figures 12 and 13 set forth in the '480 Patent, revealing that even if

18   the conductive adhesive is considered to be a conducting spacer, the '415 Publication nonetheless

19   discloses exactly what the prior art discloses: a common contact portion with a single conducting

20   spacer. The '480 Patent, SEL claims, discloses a plurality of conductive spacers within each

21   common contact portion. '480 Patent, Figs. 6–10. CMO argues that the "plurality" requirement is

22   met by the fact that each panel contains four common contact regions.

23        This court has not previously construed the term "plurality" as it is used in this element.

24   Turning to the claims, Claim 1 claims "[a]n active matrix display device." '480 Patent col. 14 l. 27.

25   The "plurality of conductive spacers" therefore must appear within the "display device," which

26   encompasses multiple common contact regions. Further, the first mention of the conductive spacers

27   in the written description states that "[a] sealing material to which 3.0 wt % spherical conducting

28

26

spacers 401 were added was applied to regions 254*a*–254*d* shown in FIG. 4." Id. col. 11 ll. 7–8.

Figure 4 shows a square structure similar to Figure 3(a) of the '415 Publication and Figure 12 of the prior art, and each of the 254 regions is located within one of the four quadrants of the square structure. While this is consistent with CMO's argument that the "plurality" must exist within the overall structure and is satisfied by placing one spacer in each of four common contact regions, the ensuing discussion involving "spacers" creates an ambiguity as to whether multiple conducting spacers must be placed within a single common contact regions. The drawings of the '480 Patent, meanwhile, clearly and consistently show a plurality of conductive spacers within each common contact portion. Id., Figs. 1, 6–10. Notably, while each of the drawings showing conducting spacers show multiple spacers within a single common contact portion, the drawing labeled "Prior Art" shows a common contact portion with only a single spacer. Id., Fig. 13. Accordingly, a proper construction of the term "plurality" as used with respect to the conductive spacers is that each common contact portion must contain more than one conductive spacer. Because this limitation is not disclosed in the '415 Publication, claims 1 and 11 are not anticipated by the '415 Publication.

b. <u>Wherein at least one of said conductive spacers is held over said second interlayer insulating film and in contact with both said second conductive film and said third conductive film (independent claims 1 and 11)</u>

CMO claims that this element is present in the '415 Publication because Figure 3(c) shows that the electroconductive adhesive 320 is held over the transparent insulating film 319 and in contact with the common potential pad 305 and facing electrode 311. Yan Dec., Exh. 25 at 5. SEL claims that this requirement is not met because the conductive adhesive is centered over a through-hole in an insulating layer, not over the insulating layer itself. Figure 3(a) clearly shows that the conductive adhesive is over portions of the insulating layer. Accordingly, this element is present in the '415 Publication.

UNITED STATES DISTRICT COURT
For the Northern District of California

c.    <u>A fourth conductive film between said third conductive film and said second substrate (dependent claim 4)</u>

CMO claims that the "fourth conductive film" present in Claim 4 coincides with the "black matrix layer" located between the upper substrate and the facing electrode as disclosed in Figure 3(b) of the '415 Publication.  Yan Dec., Exh. 25 at 5.  In response, SEL states that, according to CMO's expert, "[i]t is not stated whether the black matrix, 310, is conductive or not."  What Schott's report actually states is:

> Although not explicitly stated that this black matrix is a conductive layer, the '480 Patent explicitly discloses that a black matrix can be formed from a conducting film.  It is therefore obvious that this black matrix could be conductive and, as in the '480 Patent be the fourth conductive film.

Yan Dec., Exh. 20 at 41–42.  SEL's expert, Paul Kohl, likewise testified that chromium, a conductive material, can be used to make black matrix.  Kohl Dep. at 246:18–250:4.  Accordingly, CMO has shown that a person of ordinary skill in the art would have known to use a conductive material to create the black matrix.  This element is therefore present in the '415 Publication.

d.    <u>Wherein each of said openings occupies an area larger than an area occupied by each of said conductive spacers (independent claim 11)</u>

CMO's chart points to nothing specific in the '415 Publication showing that this element is present, instead conclusorily stating that "[t]o a person of ordinary skill in the art, this reference discloses openings in the second insulating film occupies [sic] an area larger than an area occupied by each of the conductive spacers."  Yan Dec., Exh. 25 at 10.  Because CMO has failed to make any showing whatsoever in this regard, the court rejects CMO's assertions as to this element of Claim 11.

In sum, because not all limitations are disclosed in the '415 Publication, CMO has not shown that Claims 1, 4 or 11 are anticipated by the '415 Publication.

2.    <u>The '333 Publication</u>

As with the '415 Publication, CMO has submitted a claim chart based on the elements in the

UNITED STATES DISTRICT COURT
For the Northern District of California

'333 Publication.  Yan Dec., Exh. 26.  CMO asserts that the '333 Publication anticipates Claims 1, 5, 11 and 15.  In response, SEL takes issue with respect to the alleged presence of four claim elements in the prior art: (1) a first interlayer insulating film provided over said first substrate (claims 1 and 11); (2) wherein said first conductive film is connected with said second conductive film in said openings (claims 1 and 11); and (3) where at least one of said conductive spacers is held over said interlayer insulating film and in contact with both said second conductive film and said third conductive film (claims 1 and 11).

        a.    A first interlayer insulating film provided over said first substrate
              (claims 1 and 11)

        CMO's claim chart asserts that the first interlayer insulating film "is inherently formed over or integrated into substrate 14."  Yan Dec., Exh. 26 at 1.  In support of this assertion, CMO points to a December 29, 2005 PTO Action regarding a divisional application of the '480 Patent, in which CMO claims that the Examiner found a first interlayer insulating film inherent in the '333 publication.  CMO apparently meant to cite to the PTO's May 12, 2006 Action, which comes closest to its argument but does not go so far as to state that the first interlayer insulating film is inherent.  See Yan Dec., Exh. 22 at 6.

        "Inherent anticipation requires that the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art."  Trintec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002) (internal quotations omitted).  "[I]nherent anticipation requires that the missing element be 'necessarily' present in the reference, and that this element is not met simply because one skilled in the art would see as obvious the substitution of the missing element for the element actually disclosed in the reference."  Asyst Techs., Inc. v. Empak, Inc., No. 98-20451 JF, 2006 WL 3302476, at *8 (N.D. Cal. Nov. 14, 2006) (Fogel, J.) (quoting Trintec Indus., 295 F.3d at 1296).  SEL claims that CMO's expert's testimony stating that the interlayer element was "normally present," and rejecting the requirement that an inherent feature be "always present," Schott Dep. at 54:9–19, indicates that there is no evidence that the interlayer is "always present."

        In its Reply Brief, CMO seems to have abandoned its inherent anticipation claim and

29

1  acknowledges that this element is allegedly obvious rather than inherent.  Accordingly, CMO has

2  failed to show that the first interlayer insulating film is present in the '333 Publication.

3

4          b.  Wherein said first conductive film is connected with said second
            conductive film in said openings; and wherein at least one of said
5          conductive spacers is held over said interlayer insulating film and in
            contact with both said second conductive film and said third
6          conductive film (claims 1 and 11)

7          CMO's claim chart asserts that Figure 7(a) of the '333 Publication shows an underlying

8  metal layer 1 connected with a transparent metal layer 4 and/or overlay metal layer 3 via contact

9  holes 2.  Yan Dec., Exh. 26 at 7.  This, according to CMO, corresponds to the first conductive film

10 (metal layer 1) connected with the second conductive film (transparent metal layer 4 and/or overlay

11 metal layer 3) in the openings (contact holes 2) in the second interlayer insulating film.  Id.  CMO

12 further claims that Figure 7(a) shows metal particles 16 held over the insulating layer 5 and in

13 contact with the transparent metal layer 4 and/or overlay metal layer 3, and the copper plating

14 pattern 21.  Id. at 8.  Finally, CMO claims that Figure 5 shows the metal particles 16 held over the

15 insulating layer and in contact with the transparent metal layer 4 and the opposing electrode 17.  Id.

16 These two figures, CMO claims, disclose at least one conductive spacer (metal particle 16) being

17 held over the second interlayer insulating film (insulating layer 5) and in contact with both the

18 second conductive film (transparent metal layer 4 and/or overlay metal layer 3) and the third

19 conductive film (copper plating pattern 21/opposing electrode 17).

20         SEL counters, based on Kohl's rebuttal report, that the overlay metal layer 3 is not in contact

21 with the metal particle 16, but that only the transparent metal layer 4 is in contact with the metal

22 particle 16.  Kohl Dec., Exh. 1 at 3.  Layer 3, according to SEL, acts as an intervening layer that

23 prevents a direct connection between metal layer 1 and the transparent conductive layer 4.  SEL

24 therefore claims that the '333 Publication does not disclose a second conductive layer (transparent

25 metal layer 4/overlay metal layer 3) that is both connected to the first conductive layer (metal layer

26 1) and in contact with a conductive particle (metal particle 16).  In other words, transparent metal

27 layer 4 is in contact with the conductive particle, but overlay metal layer 3, a separate layer, is in

28

UNITED STATES DISTRICT COURT
For the Northern District of California

30

UNITED STATES DISTRICT COURT
For the Northern District of California

1   contact with the first conductive layer.

2   CMO characterizes SEL's argument as stating that each conductive material must be

3   considered its own conductive layer, and therefore what is in contact with layer 4 is not in contact

4   with layer 3 and vice versa.  This argument, according to CMO, creates a "Catch-22" for SEL.  On

5   the one hand, it is undisputed that the conductive layer in CMO's accused device that purportedly

6   corresponds to the "second conductive layer" for the purposes of patent infringement is made from

7   three separately deposited metal layers.  JSUF ¶ 21; Yan Dec., Exh. 9 at 15.  This, based on CMO's

8   analysis, creates a full defense to SEL's infringement claim, because what is in contact with the

9   topmost layer of CMO's purported conductive layer would not also be in contact with what the

10  bottom-most layer sits on.  Alternatively, if the three layers of CMO's purported conductive layer

11  are considered to be a single layer, the '333 Publication's layers 3 and 4 must be considered a single

12  component as well.  In other words, the '480 Patent is either not infringed by CMO's products or

13  anticipated by the '333 Publication.

14  In response, SEL asserts that layers 3 and 4 in the '333 Publication are separate structures,

15  made of different materials, that perform different functions.  In one example, the '333 Publication

16  states that layer 3 is formed from chromium, while layer 4 is formed from indium tine oxide.  Yan

17  Dec., Exh. 13 at CMO 0182876.  In general, the publication states that layer 3, the signal lines, the

18  source electrode and drain electrode are all formed from one type of metal, while layer 4 and the

19  pixel electrode are both formed from a second type of metal.  Id.  Additionally, layer 3 covers an

20  area less than half the size of the area covered by layer 4.  Id. at CMO 0182874.  It is therefore

21  unlikely that layers 3 and 4 constitute a single layer.  Accordingly, the second conductive layer

22  claimed in the '480 Patent is not disclosed in the '333 Publication.

23  Regarding the "Catch-22" element of CMO's argument, that its products cannot infringe the

24  '480 Patent if layers 3 and 4 of the '333 Publication do not constitute a single layer, CMO has not

25  met its burden of showing noninfringement.  In particular, CMO has not shown that its three

26  separately deposited metal layers are distinguishable in terms of form and function to the same

27  extent that layers 3 and 4 of the '333 Publication are distinguishable.

28

In sum, CMO has not shown that the '480 Patent is anticipated by the '333 Publication.

### 3.   The '456 Patent

As a final purportedly anticipating reference, CMO claims that the '456 Patent anticipates claims 1, 5, 11 and 15.  SEL disputes that the following claim elements are present in the '456 Patent: (1) an active matrix display device (all claims); (2) conductive spacers held between first and second substrates of an active matrix device (claims 1 and 11); and (3) openings in a second interlayer insulating film that are larger than the area occupied by the conductive spacers (claim 11).

#### a.   Active Matrix Device (all claims)

CMO's claim chart cites language from the '456 Patent stating that "the invention can be similarly applied to an active matrix display."  Yan Dec., Exh. 27 at 1.  SEL states that, notwithstanding this language, the '456 Patent relates only to the formation of a driver circuit on a stick crystal.  Given the numerous instances in which the '456 Patent discusses its applicability to an active matrix display, the court finds that this element is clearly and explicitly disclosed in the '456 Patent.

#### b.   Conductive spacers held between first and second substrates of an active matrix device (claims 1 and 11)

The '456 Patent discloses conductive particles 9 held between "conductive line pattern 4" and "semiconductor integrated circuit 2."  '456 Patent, col. 4 ll. 42–44.  SEL claims that these conductive particles are held between different layers within the same LCD substrate rather than between different substrates.  SEL relies on this court's construction of "conductive spacers" as "conductive objects that span the gap between substrates."  In response, CMO cites Figures 1C and 3 of the '456 Patent, which CMO claims demonstrates that the conductive spacers are indeed between the two substrates.  The figures clearly show two different substrates—one located below the conductive spacer and one located above the spacer—with the spacer filling the gap between the two substrates.  While the "gap" is less pronounced due to the presence of numerous conductors and

1   insulators between the upper substrate and the conductive particle, the gap is nonetheless present,

2   and fully spanned by the conductive particle.

3        Although the '456 Patent discloses a conductive spacer, it does not disclose a "plurality" of

4   conductive spacers as discussed above.  Because this limitation is absent, therefore, Claim 1 is not

5   anticipated by the '456 Patent.

6

7                    c.      Openings in a second interlayer insulating film that are larger than the
                             area occupied by the conductive spacers (claim 11)

8        CMO cites Figures 1D, 4C and 5A of the '456 Patent for the proposition that each of the

9   openings in the silicon nitride film 46 occupies an area larger than an area occupied by each

10  conductive particle 9.  Yan Dec., Exh. 27 at 7.  SEL disputes CMO's interpretation of the figures,

11  asserting that Figure 1D shows no openings in an interlayer insulating film, and that Figures 4C and

12  5A each show a single conductive spacer 48 that is plainly larger than the opening.  Furthermore,

13  SEL asserts that Schott does not contend that the '456 Patent discloses this limitation, but rather he

14  contends that this limitation would have been obvious.  Schlitter Dec., Exh. 8, § D-4 at 6.  In its

15  Reply Brief, CMO acknowledges that "it is impossible to test the truth" of the argument that the

16  '456 Patent does not show the opening in the second insulating layer to be larger than the area of the

17  conductive spacer, but claims that this would have been obvious.  Rep. Br. at 7.  This leads the court

18  to question why, if CMO acknowledges the impossibility of proving its own assertion that the '456

19  Patent anticipates Claim 11, it raised this argument in the first place.  This is the second instance in

20  which CMO claimed anticipation in its initial moving papers but retreated to obviousness in its

21  Reply Brief after acknowledging that its previous position lacked any merit.  This kind of about-face

22  may subject counsel to sanctions under Federal Rule of Civil Procedure 11.

23       In sum, because not all limitations of Claims 1 and 11 are disclosed in the '456 Patent, the

24  '456 Patent does not anticipate the '480 Patent.

25

26       D.      Invalidity Based on Obviousness

27

28  CMO arranges the asserted prior art in five different permutations in an attempt to show that

UNITED STATES DISTRICT COURT
For the Northern District of California

the '480 Patent is obvious.  The court considers each proposed combination in turn.

> 1.    The Admitted Prior Art, in Combination with the '333 Publication, the '415 Publication, and/or the '456 Patent

CMO asserts that Claims 1, 2, 4, 5, 11, 12, 14 and 15 are rendered obvious by this combination of prior art references.  CMO proceeds from the premise that the '480 Patent's Admitted Prior Art teaches every element of these claims except the limitation of "wherein at least one of said conductive spacers is held over said second interlayer insulating film and in contact with both said second conductive film and said third conductive film."  CMO then states that the '333 Publication, the '415 Publication and the '456 Patent all disclose an active matrix display device in which the conductive spacers in the common contact areas are held over the second interlayer insulating film.  Additionally, CMO claims that the '415 Publication teaches placing an electroconductive adhesive element on top of two layers of insulation and two conductive layers in order to connect the counter electrode and the common voltage pad to maintain constant voltage across the substrates, and the '456 Patent shows that conductive spacers are held over silicon nitride film and in contact with both electrodes.

In light of this characterization of the prior art, CMO claims that one of ordinary skill in the art, attempting to solve the problem of establishing reliable electrical contact between the substrates without disrupting the uniformity of the cell gap, "certainly" would have been motivated to modify the Admitted Prior Art by placing the conductive spacers on top of the second interlayer insulating film as shown in the asserted references.

In response, SEL disputes that only one claim limitation is missing from the Admitted Prior Art.  Rather, SEL claims that the Admitted Prior Art also fails to disclose the following limitations: (1) a second interlayer insulating film provided on said first conductive film, said second interlayer insulating film having at least two openings; and (2) a plurality of conductive spacers held between said first substrate and said second substrate.  Additionally, SEL claims that CMO has asserted no particularized motivation to combine.  "The showing of a motivation to combine must be clear and particular, and it must be supported by actual evidence."  Teleflex, Inc. v. Ficosa North Am. Corp.,

UNITED STATES DISTRICT COURT
For the Northern District of California

299 F.3d 1313, 1334 (Fed. Cir. 2002) (rejecting an obviousness argument where the party "offer[ed] no evidence in support of its conclusory assertion that the nature of the problem supplies the necessary motivation to combine, much less a clear and particular showing").

CMO indeed provides no specific motivation to combine apart from the conclusory statement that a person of ordinary skill in the art "certainly" would have had such motivation.  CMO claims that SEL's characterization of the standard "dispense[s] with recent Federal Circuit authority that firmly dispels any notion that 'particularized motivation to combine' references is required for a finding of patent invalidity."  Rep. Br. at 1.  CMO is apparently referring to DyStar, 464 F.3d at 1361, in which the Federal Circuit noted that "the suggestion test is not a rigid categorical rule." However, the point of the Federal Circuit's discussion in Dystar was that "[t]he motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself."  Id.  The Federal Circuit was rejecting the claim that "the prior art [must] contain express suggestion to combine known elements to achieve the claimed invention."  Id.  Dystar does nothing to decrease, let alone "firmly dispel," the necessity to set forth particular arguments showing a motivation to combine, whatever the source of that motivation might be.  Accordingly, CMO's conclusory motivation argument is insufficient to satisfy its burden on summary judgment.

## 2.  The '415 Publication or the '333 Publication in Combination with the Admitted Prior Art and/or the '456 Patent

CMO asserts that this combination renders Claims 2 and 12 obvious.  Proceeding from the premise that the '415 Publication anticipates Claims 1, 4, 5, 11, 14 and 15, CMO asserts that the '415 Publication does not anticipate Claims 2 and 12 because it does not explicitly teach conductive spacers as "sphere[s] coated with gold," as recited in Claims 2 and 12.  CMO makes a similar claim regarding the '333 Patent, which CMO claims anticipates Claims 1, 5, 11 and 15 but discloses silver spheres rather than gold-coated spheres.

CMO further claims that the Admitted Prior Art teaches the use of "spherical conducting spacers," and that the prior art is replete with references showing the common use of gold spheres to

35

make electrical contact between two LCD substrates.  As representations of this teeming prior art, CMO merely cites two U.S. Patents, Nos. 6,404,456 and 6,404,476.  Additionally, CMO claims that the '456 Patent discloses replacing the "bumps" supporting the cell gap with gold spheres.  CMO therefore claims that it would have been obvious to one of ordinary skill in the art to replace the silver spheres of the '333 Publication with gold spheres, and to use gold spacers in lieu of conductive adhesive when practicing the '415 Publication.

In response, SEL once again attacks CMO's premise—that the '415 and '333 Publications disclose all elements of Claims 2 and 12 except the use of gold spheres.  Additionally, Kohl's expert report states that "one skilled in the art would have been led away from modifying [the '415 Publication] by substituting a conductive spacer for adhesive 320," and then goes on to explain why such a modification would have been difficult and would have undesirably resulted in a larger device rather than a smaller device as envisioned by the '415 Publication.  Kohl Dec., Exh. 1 at 35–36.  SEL further attacks CMO's argument related to the '333 Publication as lacking sufficient particularity.  In light of this court's finding that the '333 Publication is not fully anticipatory, CMO's unsupported assertion regarding prior art in general, and CMO's conclusory assertions regarding the '415 Publication which have been countered by SEL's expert testimony, the court finds that CMO is not entitled to summary judgment of obviousness based on this combination of references.

3.    The '333 Publication or the '456 Patent in Combination with the '415 Publication

CMO asserts that combining the two Japanese patent publications renders Claims 4 and 14 obvious.  Specifically, CMO asserts that, while the '333 Publication does not expressly teach a fourth conductive film between the third conductive film and the second substrate, it would have been obvious to add the black matrix layer to the '333 Publication technology because it was well known in the art that such an inclusion would improve the performance of the product.  CMO raises an identical claim with respect to combining the '456 Patent with the '415 Publication's black matrix film.

36

UNITED STATES DISTRICT COURT
For the Northern District of California

1    As explained above, this court has found that the '333 Publication is lacking elements

2   beyond the fourth conductive film.  Furthermore, CMO acknowledges the "impossibility" of proving

3   that the '456 patent discloses properly sized openings, and therefore it cannot be said that the '456

4   Patent lacks only a fourth conductive film.  Finally, these arguments suffer from the same

5   conclusory nature as the prior arguments.  Accordingly, CMO is not entitled to summary judgment

6   based on this combination of references.

7

8                    4.      Additional Obviousness Arguments

9    Forced to retreat from certain of its anticipation arguments, CMO's Reply Brief raises some

10   obviousness arguments for the first time.  The first is the claim that, while the '333 Publication does

11   not expressly teach the first insulating film, it would have been obvious to combine the '333

12   Publication with the teachings of the '415 Publication, the '456 Patent and/or the Admitted Prior

13   Art, each of which teach a first insulating film.  In support of this claim, CMO quotes substantial

14   passages from a PTO reexamination grant regarding the '480 Patent which appear to support CMO's

15   contentions.  CMO does the same thing regarding its botched attempt to show that the openings in

16   the silicon nitride film of the '456 Patent anticipate the openings in a second interlayer insulating

17   film.

18   In light of the fact that CMO raises these arguments for the first time in its Reply Brief only

19   because of its carelessness in initially raising them as faulty anticipation claims, and in light of the

20   undeniably conclusory nature of CMO's initial obviousness arguments, the court finds that allowing

21   CMO to proceed with these arguments would be unduly prejudicial to SEL.  These arguments are

22   therefore disregarded.

23   Finally, CMO's Reply Brief inexplicably includes a passage related to SEL's 30(b)(6)

24   witness' testimony to the effect that none of the "secondary considerations" that might support non-

25   obviousness exist with regard to the '480 Patent.  This deposition took place on September 25, 2006.

26   CMO filed this motion on November 14, 2006.  CMO offers no explanation as to why it chose to

27   omit this argument from its initial filing, and the court will not permit CMO to raise it for the first

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  time in its Reply Brief.

2

3  III.    The '995 Patent

4

5        A.    Infringement

6        SEL alleges that CMO's One Drop Fill ("ODF") method for filling LCD substrates with

7  liquid crystal infringes claims 22–30, 40, 41, 53–58 and 62–67 of the '995 Patent.  The dispute over

8  the '995 Patent turns on whether CMO's accused filling method utilizes a "sealing structure."  CMO

9  asserts that the ODF method does not utilize a sealing structure because (1) a sealing structure must

10 be made of plastic and cannot be made from or include thermosetting resin, while the ODF method

11 utilizes thermosetting resin, not plastic, (2) a sealing structure is applied to two LCD substrates

12 jointly, while in the ODF method a sealant is applied to only one of the two LCD substrates, (3) a

13 sealing structure is applied after the substrates have been brought together, while in the ODF method

14 a sealant is applied before the substrates are brought together, and (4) the '995 patent's final product

15 requires both a sealing structure and thermosetting resin, while the ODF method's final product

16 includes only cured resin and lacks a separate sealing structure.  These issues will be addressed in

17 turn.

18

19          1.    Whether the "Sealing Structure" is Different from Resin

20        CMO asserts that per the court's construction of the term sealing structure, a sealing

21 structure requires the use of plastic and rules out the use of resin.  To support this proposition CMO

22 argues that the court, in describing the object to which the term "sealing structure" applied, found

23 that sealing structure "refers to the plastic sealing material [represented by material 9 in figure 1(E)

24 of the '995 patent] and not to the sealing resin."  Claim Construction Order at 37.  CMO asserts that

25 this means that a sealing structure must be made of plastic.  CMO further asserts that the '995 patent

26 itself differentiates between the application of a thermosetting sealing resin, which is meant to

27 contain the liquid crystal, and the application of a secondary plastic sealing material, which provides

28

UNITED STATES DISTRICT COURT
For the Northern District of California

38

security.

SEL counters that CMO's interpretation of sealing structure relies on a modification of the court's claim construction order, since the court's construction of the term sealing structure was "a structure, made after the second substrate is laid on the first, which may help to contain the liquid crystal material within the cavity between the two substrates or to keep impurities out." Id. at 38. Because this language does not specify that the structure must be made of plastic, SEL argues that a sealing structure need not be limited to structures made from plastic material. SEL characterizes the court's distinction between plastic sealing material and sealing resin as dicta.

SEL's characterization is inaccurate. While the court did provide, in its claim construction order, a chart to aid in the parties' understanding of the contested terms, the chart was introduced as a mere summary. The chart refers the parties to "the full analysis supporting each construction." Id. at 11. The court's analysis of the term sealing structure appears thereafter. Id. at 35. In its analysis, the court clearly indicated that in construing the definition of sealing structure, it was construing a term that referred to what the patent itself characterized as a plastic object. Id. at 37. The court is not at liberty to enlarge the scope of the patents' claims, as SEL would have it do, such that a sealing structure would be considered any object, made of presumably any material, that seals liquid crystal between two substrates.

SEL's contention is further contradicted by the patent itself. As CMO points out, claim 12 requires two separate steps: "a step of making a sealing structure on the periphery of the first and second substrates" and "a step of disposing a thermosetting resin on a periphery of the second substrate." '995 Patent col. 3 ll. 31–44. Though the latter step is un-enumerated, it nonetheless constitutes a distinct step. It is identified as a "step," which appears intended to place that clause, functionally, on a par with claim 12's other, enumerated clauses. Id.

In its opposition, SEL introduces the argument that claims 87 and 88 of the '995 patent establish that a sealing structure must not be limited to a plastic composition. This is so, SEL argues, because the methods described by these two claims "further comprise[] a step of covering the periphery of the first and second substrates with a plastic sealing material." '995 Patent col. 11

39

UNITED STATES DISTRICT COURT
For the Northern District of California

1    ll. 23–25.  If a sealing structure is necessarily plastic, SEL argues, this language would be nullified

2    since the patent would be describing two redundant structures.  This argument is without merit.  The

3    court made clear in its claim construction order that the '995 patent specification contains "two

4    separate structures labeled 'sealing.'"  Claim Construction Order at 36.  SEL briefly cites two cases

5    to support the proposition that a patentee's use of different terms in a claim may give rise to an

6    inference that a different meaning should apply to each.  But this argument undercuts SEL's

7    position.  This court has already explained that it is the patentee's own language and specification,

8    and more specifically, the patentee's own use of the distinct identifiers "plastic" and "resin," that led

9    it to conclude that a sealing structure specifically describes a plastic, not a resinous, material.  Id. at

10   37.

11          Accordingly, CMO is correct that the "sealing structure" must be plastic, and is separate

12   from the sealing resin.[5]

13

14                  2.      Application of the Sealing Structure

15          Based on this construction, and on the court's prior holding that "the 'sealing structure' is

16   applied to both substrates jointly, after they have been brought together and subjected to heat and

17   pressure," Id. at 37, CMO asserts that its ODF method cannot infringe because, in the ODF process,

18   (1) the sealant is applied to only one of the two LCD substrates, (2) the sealant is applied before the

19   substrates are brought together, and (3) the final product includes only cured resin and lacks a

20   separate sealing structure.  Essentially, CMO argues that its ODF method consists of a single

21   application of sealant rather than the two-step process of applying thermosetting resin and

22   subsequently applying a sealing structure.

23          In response, SEL claims that the cured resin involved in the ODF process constitutes a

24   sealing structure because the resin is cured into plastic after the two substrates are brought together,

25   thereby meeting the definition of sealing structure.  SEL therefore argues that CMO's single

26   application of sealant creates two separate structures: the thermosetting resin and the sealing

27   structure.  In other words, the sealant changes properties after being initially applied to the

28

40

UNITED STATES DISTRICT COURT
For the Northern District of California

1   substrates, and is therefore "a structure, made after the second substrate is laid on the first, which

2   may help to contain the liquid crystal material within the cavity between the two substrates or to

3   keep impurities out." Id. at 38.  The conflict arises from the fact that elsewhere in the order, under

4   the heading "Time of Formation," this court stated that "the 'sealing structure' is *applied* to both

5   substrates jointly, after they have been brought together and subjected to heat and pressure." Id. at

6   37.  The court must therefore resolve the ambiguity created by the use of the words "made" and

7   "applied."  In other words, because it is undisputed that CMO's sealant is applied before the

8   substrates are brought together, the court must decide whether the transformation of the resin

9   through the curing process constitutes making or applying for the purposes of establishing the

10  sealing structure.

11          The court finds that, in light of the Claim Construction Order, SEL's proposed interpretation

12  is overly broad.  The Claim Construction Order goes on at length regarding the fact that the

13  thermosetting resin and the sealing structure are two distinct functions.  See Claim Construction

14  Order at 35–37.  It would therefore be inconsistent to hold that the thermosetting resin is inherently

15  transformed into the sealing structure.  Furthermore, SEL's argument improperly conflates the steps

16  of curing the thermosetting resin and making the sealing structure.  The patent specification, and the

17  Claim Construction Order, state that the sealing structure is made *after* the application of heat and

18  pressure, not *through* the application of heat and pressure.  In other words, the application of heat

19  and pressure cures the thermosetting resin.  *After* this curing, an additional event must take place to

20  form the sealing structure.  This event cannot be the curing itself.

21          Finally, Shunpei Yamazaki, the named inventor on the '995 Patent, testified that the

22  thermosetting resin and the sealing structure perform two different functions, and that the sealing

23  structure is set up as a reinforcement of the thermosetting resin:

24          Q.  So if the thermosetting resin is already keeping the substrates
            together, what is the reason for adding a plastic sealing material in
25          addition?
            A.  The two substrates are brought together, but—and sealed, but they
26          could be subjected to, for example, a mechanical bending and the like.
            So we need to further provide a reinforcement.  And the sealing
27          material you just mentioned provides that reinforcement.  *It's another
            sealing.*
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

8/26/2006 Yamazaki Dep. at 312:24–313:8 (emphasis added).  Elsewhere Yamazaki testified that the sealing structure functions to prevent the overflow of liquid crystal if the thermosetting resin seal "isn't good enough."  Id. at 315:5–11.  The sealing structure could not perform the function of reinforcing the thermosetting resin if the thermosetting resin itself is formed into the sealing structure.  A structure cannot reinforce itself.

In sum, CMO's sealant does not constitute a "sealing structure."

### 3.   The Metal Bezel

In addition to the sealant, SEL claims that the metallic bezel that CMO uses in its manufacturing process constitutes a "sealing structure."  CMO claims that SEL has not properly disclosed this argument in its infringement contentions, and has separately moved to preclude SEL from proceeding with this argument.  In any case, because the court has determined that the sealing structure in the '995 patent is necessarily plastic, any metal bezel used by CMO cannot be considered a sealing structure.  Because this particular infringement argument fails as a matter of law, CMO's motion to preclude is moot.

### 4.   Conclusion

Because neither the ODF method nor the metal bezel satisfy the limitation of "sealing structure," CMO is entitled to summary judgment of noninfringement of the '995 Patent.

### B.   Invalidity

In the alternative, CMO asks the court to find that the '995 patent lacks enablement and/or suffers from inadequacy of written description and is therefore invalid.  CMO's invalidity argument, like its invalidity argument with respect to the '258 Patent, is conditionally premised on a claim construction that the court does not adopt.  Accordingly, the CMO is not entitled to summary judgment of invalidity as to the '995 Patent.

1

2

3

4

5   CONCLUSION

6        For the foregoing reasons, the court rules as follows.

7        CMO's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent

8   No. 6,756,258 is DENIED in all respects.

9        CMO's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent

10  No. 6,404,480 is DENIED in all respects.

11       CMO's Motion for Summary Judgment of Noninfringement and Invalidity of U.S. Patent

12  No. 4,691,995 is GRANTED IN PART and DENIED IN PART.  CMO's Motion as to the '995

13  Patent is GRANTED as to noninfringement and DENIED as to invalidity.

14       CMO's Motion to Preclude SEL From Pursuing Previously Undisclosed Infringement

15  Claims is DISMISSED as moot.

16       IT IS SO ORDERED.

17

18  Dated: April 17, 2007

19                                                    _____
                                                     MARILYN HALL PATEL
20                                                   United States District Judge
                                                     Northern District of California

21

22

23

24

25

26

27

28

1

**ENDNOTES**

2
1.  CMO also raises a "Catch-22" argument, claiming that if the inherent variations in the tapered
3
TFT manufacturing process occasionally produce stepped TFTs, then the inherent variations in the
process disclosed in the prior art related to tapered structures likewise occasionally produce stepped
4
TFTs.  Accordingly, CMO argues, if the '258 Patent covers CMO's production method it must also
read on the prior art, rendering the '258 Patent invalid as anticipated.  This argument is without
5
merit.  Patent infringement occurs when all the steps of a claimed method are performed.  Under
6
SEL's theory of infringement, CMO's manufacturing method takes at least two forms.  In one form,
the final product is a tapered TFT.  In another form, the final product is a stepped TFT.  CMO's
7
manufacturing process infringes only when it performs the steps leading to a stepped TFT.  This
8
theory is based on the real-world manufacturing process rather than the hypothetical steps delineated
in the prior art patents.  Furthermore, CMO has not demonstrated that it is impossible to design a
9
manufacturing process that consistently produces one or the other type of TFT.  The court therefore
10
need not assume that the prior art necessarily taught the method of producing stepped TFTs.

11
2.  CMO's citations to Shunpei Yamazaki's deposition testimony do not change this result.
Yamazaki testified at length about planarization, but nothing in his testimony indicates that the
12
common contact region must be planarized for the surface to be effective.

13
3.  Section 112 provides, in relevant part:

14
 

15
          The specification shall contain a written description of the invention,
          and of the manner and process of making and using it, in such full,
16
          clear, concise, and exact terms as to enable any person skilled in the
          art to which it pertains, or with which it is most nearly connected, to
17
          make and use the same, and shall set forth the best mode contemplated
          by the inventor of carrying out his invention.
18

19
4.  CMO often refers to the '456 Patent in conjunction with two Japanese patent publications
referred to in the '456 Patent.  However, because CMO's specific arguments relate only to the '456
20
Patent itself, the court will consider these three documents to be a unitary reference and refer to
them collectively as "the '456 Patent."
21

22
5.  This court's distinction between "resin" and "plastic" is complicated by SEL's assertion that
hardened resin becomes plastic.  While the parties' experts differ on this point, the court does not
23
find it significant in light of the analysis herein.  The controlling point is that the thermosetting resin
and sealing structure are two different *structures*.  The fact that these two different structures may or
24
may not be comprised of the same raw material is of little moment.

25

26

27

28