Teresa M. Corbin (SBN 132360)
Henry C. Bunsow (SBN 60707)
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, California  94105
Telephone:  (415) 848-4900
Facsimile:  (415) 848-4999
Email: corbint@howrey.com
Email: bunsowh@howrey.com

[Additional counsel listed on last page.]

Attorneys for Defendant CHI MEI OPTOELECTRONICS
CORP., INTERNATIONAL DISPLAY TECHNOLOGY
CO., LTD., INTERNATIONAL DISPLAY
TECHNOLOGY CO. USA, and WESTINGHOUSE
DIGITAL ELECTRONICS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEMICONDUCTOR ENERGY LABORATORY CO., LTD.,<br><br>        Plaintiff,<br><br>   vs.<br><br>CHI MEI OPTOELECTRONICS CORP., et al.,<br><br>       Defendants. | Case No. C 04-04675 MHP<br><br>**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF (A) NON-INFRINGEMENT AND INVALIDITY OF THE '258 PATENT; (B) NON-INFRINGEMENT AND INVALIDITY OF THE '995 PATENT; AND (C) NO LIABILITY FOR FOREIGN SALES AND/OR SALES TO AUTHORIZED LICENSEES**<br><br>Date:   May 23, 2007<br>Time:  2:00 p.m.<br>Place:  Court 15, 18th Floor |

HOWREY LLP

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

1

**TABLE OF CONTENTS**

2   I.   DEFENDANTS DO NOT INFRINGE THE '258 PATENT:  SEL CANNOT SUSTAIN ITS
3        BURDEN OF PRODUCING EVIDENCE SHOWING THAT CMO'S ACCUSED PROCESS
        ETCHES THE ENTIRE "EXPOSED PORTION" OF N+ SILICON ......................................... 1

4        A.   Judicial Estoppel Does Not Apply .................................................. 1

5        B.   CMO's Dry Etch Process Indisputably Etches Beneath The Mask, But Does Not
6             Entirely Remove The N+ Silicon That Is Subject To Etching ....................................... 3

7   II.  THE '258 PATENT IS INVALID IN LIGHT OF THE ACKNOWLEDGED PRIOR ART ...... 6

8        A.   The Prior Art Admittedly Showing The Claimed Stepped Structure Necessarily
             Discloses Overetching The Conductive Layer ....................................... 7

9        B.   It Would Have Been Obvious To Overetch The Conductive Layer To Form The Prior
10            Art's Stepped TFTs ......................................................... 8

11       C.   The JP '523 Publication And The JP '774 Publication Anticipate And/Or Render
             Obvious The Asserted Claims Of The '258 Patent ....................................... 11

12  III. CMO'S FOREIGN SALES DO NOT INFRINGE THE PATENTS-IN-SUIT ........................ 13

13       A.   CMO's Foreign Sales Cannot Directly Infringe The Patents-In-Suit ........................... 14

14       B.   CMO'S Foreign Sales Do Not Indirectly Infringe The Patents-in-Suit ........................ 16

15            1.   SEL Cannot Specify The Acts Of Direct Infringement...................................... 16

16            2.   SEL Cannot Prove That CMO Had Specific Intent Or Affirmatively Acted To
17                 Induce Infringement ........................................................... 18

18  IV.  SEL CANNOT RECOVER FOR SALES BEFORE NOTICE OF INFRINGEMENT WAS
        GIVEN................................................................................. 20

19

20

21

22

23

24

25

26

27

28

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

# TABLE OF AUTHORITIES

## CASES

*Air Turbine Technology, Inc. v. Atlas Copco AB,*
    410 F.3d 701, 707-08 (Fed. Cir. 2005) ...................................... 19

*Amsted Indus., Inc., v. Buckeye Steel Casings,*
    24 F.3d 178, 186-87 (Fed. Cir. 1994) ...................................... 20

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,*
    853 F.2d 1557, 1562 (Fed. Cir. 1988) ...................................... 11

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,*
    1 F.App'x. 879, 882 (Fed. Cir. 2001) ...................................... 17

*Cybiotronics, Ltd. v. Golden Source Elecs., Ltd.,*
    130 F. Supp. 2d 1152, 1170 (C.D. Cal. 2001) ...................................... 14

*DSU Medical Corp. v. JMS Co., Ltd.,*
    471 F.3d 1293, 1305 (Fed. Cir. 2006) ...................................... 14, 16, 17, 18, 20

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263, 1274 (Fed. Cir. 2004) ...................................... 14, 17

*ITC Ltd. v. Punchgini, Inc.,*
    2007 WL 914742 at *8 (2nd Cir. March 28, 2007) ...................................... 19

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,*
    439 F.3d 1335, 1336 (Fed. Cir. 2006) ...................................... 19

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corporation,*
    420 F.3d 1369, 1376-77 (Fed. Cir. 2005) ...................................... 15

*New Hampshire v. Maine,*
    532 U.S. 742, 750-51 (2001) ...................................... 2, 3

*Peters v. Active Mfg. Co.,*
    129 U.S. 530, 537 (1889) ...................................... 10

*Pfizer Inc. v. Aceto Corp.,*
    853 F. Supp. 104, 105 (S.D.N.Y. 1994) ...................................... 15

*Quality Tubing, Inc. v. Precision Tube Holdings Corp.,*
    75 F.Supp.2d 613, 625 (S.D. Tex. 1999) ...................................... 15

*Rotec Industries, Inc. v. Mitsubishi Corp.,*
    215 F.3d 1246, 1252, 1260 (Fed. Cir. 2000) ...................................... 15

*Warner-Lambert Co. v. Apotex Corp.,*
    316 F.3d 1348, 1364 (Fed. Cir. 2003) ...................................... 18, 19

*Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co., Ltd.,*
    2007 WL 926072 at *14 (S.D.N.Y. March 29, 2007) ...................................... 13, 14, 15

HOWREY LLP

- ii -

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

1

## STATUTES

35 U.S.C. § 271 (a) ........................................................................................................... 14, 15, 16

35 U.S.C. § 271 (b) ................................................................................................................ 16, 17

35 U.S.C. § 271 (g) ........................................................................................................ 14, 15, 16, 20

35 U.S.C. § 271 (i) ..................................................................................................................... 15

HOWREY LLP

- iii -

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

**I.    DEFENDANTS DO NOT INFRINGE THE '258 PATENT:  SEL CANNOT SUSTAIN ITS BURDEN OF PRODUCING EVIDENCE SHOWING THAT CMO'S ACCUSED PROCESS ETCHES THE ENTIRE "EXPOSED PORTION" OF N+ SILICON**

SEL does not dispute that, pursuant to this Court's Claim Construction Order ("CC Order"), the methods claimed in the '258 Patent require etching away of the **entire amount** of N+ silicon that is "subject to etching." *See* CC Order (Docket No. 111) at 16:5-7.  Yet, SEL fails to satisfy its burden of producing evidence from which a reasonable jury could conclude that CMO's accused TFT manufacturing process actually does etch the entire amount of N+ silicon that is exposed to the effects of CMO's so-called "reactive ion etching" ("RIE") step.  In fact, the evidence produced by CMO, the photographs relied upon by SEL, and the admissions of SEL's expert establish (a) that the entire amount of N+ silicon that is uncovered by electrode metal is "subject to etching" in CMO's RIE step; and (b) that CMO stops its RIE step before the entire amount of N+ silicon is removed/etched away.

Faced with this evidence, SEL first attempts to invoke the doctrine of judicial estoppel to prevent the Court from considering the merits of CMO's non-infringement position.  As demonstrated below, however, the doctrine of judicial estoppel does not apply here because during the *Markman* proceedings CMO did not represent anything about *CMO's particular* dry etching process—a fact this Court confirmed in denying CMO's motion for clarification—nor did the Court rely on any representation about CMO's dry etching process when it construed "exposed portion."

SEL next places its hopes on conceptual drawings purportedly showing that CMO does not etch any N+ silicon lying underneath the photomask—evidence which this Court already has characterized as "decidedly" NOT representative of CMO's actual products.  *See* Memorandum & Order Re: Defendants' Motions for Summary Judgment ("MSJ Order," Docket No. 331) at 13:15-14:2.  In short, SEL's "evidence" does not hold up to scrutiny nor does it contradict the unrefuted proof that CMO's RIE process results in etching of less than the entire "exposed portion" of N+ silicon.

**A.    <u>Judicial Estoppel Does Not Apply</u>**

SEL confuses CMO's previous representation that dry etching *generally* does not etch under a mask (made during claim construction proceedings) with CMO's present position (responding to SEL's infringement claim) that *CMO's particular* dry etching process does etch beneath a mask.  SEL Opposition to CMO Motion for Summary Judgment ("Opp.") (Docket No. 322) at 1-3.  SEL fosters

HOWREY LLP

1   this confusion because, without it, it is clear that the doctrine of judicial estoppel does not apply, as (a)

2   CMO's present position is not "clearly inconsistent" with its earlier representation, and (b) this Court

3   did not rely on any representation about *CMO's* dry etching process in rendering its claim construction.

4        The Supreme Court has made clear that for judicial estoppel to apply, the following factors

5   should be present: **First**, a party's later position must be "clearly inconsistent" with its earlier position;

6   **Second**, a party must have succeeded in persuading a court to adopt the earlier position, thereby posing

7   a "risk of inconsistent court determinations"; and **Third**, "the party seeking to assert an inconsistent

8   position would derive an unfair advantage or impose an unfair detriment on the opposing party if not

9   estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

10       CMO's representation that dry etching *generally* does not etch under a mask is entirely

11  consistent with its present position regarding the fact that *CMO's particular* RIE process does, in fact,

12  etch under a mask.  There is no dispute that CMO counsel's prior representations, including especially

13  statements made during the *Markman* hearing, were directed towards construing the '258 claim term

14  "exposed portion" – these representations had nothing to do with explaining or characterizing CMO's

15  own RIE process, which indisputably was not being evaluated at the claim construction stage.  This

16  fact is made clear in the part of CMO's counsel's response that SEL cropped from its Opposition (the

17  cropped portion being shown below in bold):

18  MR. TAUB:  But you agree that if you use a dry etch here that the dotted lines reflect
19  what will be etched away as opposed to everything else.

20  MR. YOCHES:  Yes.

    MR. TAUB:  Okay.

21
22  **MR. YOCHES:  Except -- and here's the important thing -- nothing in the claim and
    nothing in their definition limits that etchant to a dry etchant.**

23  **MR. TAUB:  Right.  But you don't dispute that the claims would include dry
    etchant, correct?**

24  **MR. MOSKO:  It would include that, but neither the claims or the -- because
25  neither the claims or the definition is limited to dry etchant, when you go to the next
    step [etching the N+ layer], as you properly recognized, if you were wet etching [the
26  N+ layer]-- we slipped through these -- the portion [of the N+ layer] etched away
    would have nothing to do with the mask here**.  [CC Hearing Tr. (Docket No. 110). at
27  56: 4-20 (emphasis added).]

28

- 2 -

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

Critically, this Court already has made crystal-clear that it **did not consider or rely on any representation about CMO's particular dry etching process when construing "exposed portion"**:

> As defendants know, however, the court was presented with no evidence about the accused process during claim construction, made no reference to it in its claim construction, and certainly did not rely on the accused process as extrinsic evidence of the meaning of the disputed terms.  [July 27, 2006 Order Re: Motion for Clarification (Docket No. 144) at 3.]

The fact that the Court was presented with no evidence concerning CMO's particular dry etching process eliminates any possibility that the Court's acceptance of CMO's current position "would create the perception that either the first or the second court was misled"; and the fact that the Court indisputably did not rely on any representations concerning CMO's particular dry etching process means that there is "no risk of inconsistent court determinations."  *New Hampshire*, 532 U.S. at 750.

**B.**     **CMO's Dry Etch Process Indisputably Etches Beneath The Mask, But Does Not Entirely Remove The N+ Silicon That Is Subject To Etching**

In its Motion, CMO demonstrates that its RIE process is partially isotropic (*i.e.*, that it etches the N+ silicon beneath the mask) and that CMO's RIE process does not remove the entire amount of the N+ layer that is actually etched.  CMO March 19, 2007 MSJ ("Motion") (Docket No. 298) at 3-5. This evidence includes not only CMO's process documents, testimony from CMO's Dr. Chou, SEM images of CMO's TFTs, and testimony from CMO expert, Dr. Hatalis; it also includes the testimony of SEL's own expert, Dr. Thomas, who concedes that CMO's process has an isotropic component.[1]  The scant evidence cited by SEL to rebut CMO's proof – the evidence that SEL relies upon in an attempt to satisfy its burden of production – simply does not create any genuine issue of material fact relating to CMO's dry etching process.[2]

---

[1] *See* Chou Dep. Transcript ("Chou Tr.") (Exh. 1) at 104:24-105:16, 187:20-189:5; Chou Dep. Exhs. 607 and 609 (Docket No. 194, Exhs. O and L); Exhibit 2 to Thomas Decl. in Support of SEL's Opp. to CMO's Motion for Summary Judgment re '258 Patent (Docket No. 241) (disclosing that images show entire exposed N+ region has been at least partially etched); Hatalis Dep. Transcript ("Hatalis Tr.") (Exh. 2) at 50:16-51:22, 170:10-171:16, 185:5-186:8; Hatalis Expert Rpt. ("Hatalis Rpt.") (Docket No. 193, Exh. A); Thomas Dep. Transcript ("Thomas Tr.") (Exh. 3) at 215:17-216:11; SEM photos showing tapered portions of CMO TFTs, proving CMO etch has isotropic component (Docket No. 267, Exh. F) at CMO 0089579.

   (Unless otherwise noted, "(Exh. ##)" refers to exhibits cited in the Unikel Decl. ISO CMO's March 19, 2007 Motion for Summary Judgment, Docket No. 299-1.)

   While SEL states that Dr. Thomas reserved the right to offer an opinion on infringement under the doctrine of equivalents (Opp. at 3, Fn 2), Dr. Thomas made clear that his report contained no such opinion.  Thomas Tr. (Declaration of Ryan E. Lindsey in Support of CMO Reply Brief ("Lindsey Decl."), Exh. A) at 165:6-166:9.

[2] SEL does not contest that CMO stops etching the N+ layer before the entire layer that is not covered by the electrodes is etched away.  *See* Motion at Fn 2 (citing SEL '258 MSJ Opp., Docket No. 239 at 7-8).

SEL first relies on a single drawing contained in a CMO process document (cited in CMO's previous summary judgment motion). Opp. at 4:12; *see also* Chou Dep. Exh. 607 (Docket No. 194, Exh. O). Specifically, on the page of this process document showing "ideal" or pure etch types, SEL points to the conceptual drawing labeled "Reactive ion etching" and leaps to the conclusion that this drawing accurately depicts CMO's dry etching process because "[t]here is no dispute that CMO uses a dry-etching process known as 'reactive ion etching.'" Opp. at 4. Ironically, the Court noted in its recent Order that SEL objected to CMO's use of this very document on the grounds that it was not a true and complete representation of CMO's processes. MSJ Order at 14:11-13. More importantly, to accept SEL's conclusion, the Court must ignore (1) that the very document upon which SEL relies states with respect to CMO's particular dry etching process that "Tapered and Sloped [is] More Important than Anisotropic" [Chou Dep. Exh. 607 (Docket No. 194, Exh. O) at CMO 0087609]; (2) that Dr. Chou (the only witness with actual knowledge of CMO's process to testify in this case) explained why and how the ideal "Reactive ion etching" drawing relied upon by SEL does not actually reflect CMO's dry etching profile [Chou Tr. (Lindsey Decl., Exh. B) at 226:8-14]; (3) that Dr. Chou testified that CMO's RIE process is <u>not</u> purely anisotropic and will etch all silicon exposed to the etchants [*Id.* at 226:18-227:2; *see also* Chou Dep. Exh. 607 (Docket No. 194, Exh. O) at CMO 0087607]; and (4) that CMO expert Dr. Hatalis explained how the anisotropy in CMO's dry etch process is "compromised" and that "any portions of the silicon layer that are not in direct contact with, and thus not protected by, the metal will be subjected to etching by the gas species." Hatalis Rpt. (Docket No. 193, Exh. A) at 19:8-9, 20:9-10. Perhaps more importantly, SEL ignores all of the SEM photos of actual CMO TFTs – the photos that SEL, itself, submitted purportedly to show that CMO produces a "stepped" TFT – which clearly show that the actual profile of CMO's produced TFTs looks nothing like the "ideal" etch drawing now relied upon by SEL. *See* Exhibit 2 to Thomas Decl. in Support of SEL's Opp. to CMO's Motion for Summary Judgment re '258 Patent (Docket No. 241). Thus, the "ideal" etch drawing cited by SEL, taken out of context, can be accorded little, or no, weight.

The only other "evidence" upon which SEL relies to satisfy its burden of proof is a conceptual drawing that CMO provided to its attorneys to illustrate its process steps in a very rudimentary way. Yet, again, this Court already has found that the drawing cited by SEL is NOT representative of

CMO's actual product.  *See* MSJ Order at 13:15-14:2 (citing Chou Tr. at 85:16-20, 104:8-16, 112:1-2; Shih Tr. at 183:20-186:6; and Kohl Tr. at 60:22-63:22).  Further, this drawing says and shows nothing about the degree of isotropy exhibited by CMO's RIE etchant.

Next, SEL resorts to mischaracterizing CMO's experts' opinions about CMO's RIE process.  For example, SEL disingenuously cites only part of Dr. Kanicki's *general* explanation of dry etching processes, leaving out the part that explains that dry etching can be isotropic:

> Although dry etching is generally regarded as an anisotropic process, an isotropic dry etch process could also be produced by using, for example, fluorine rich high-frequency (13.56 MHz) plasma, because such a plasma composition, when acting by itself, etches isotropically.  [Kanicki Report ("Kanicki Rpt.") (Docket No. 323, Exh., 6) at 20:18-21.][3]

Similarly, SEL suggests that Dr. Hatalis somehow admitted that CMO's dry etching process is anisotropic (*i.e.*, that it only etches the N+ under the mask opening), when in actuality, Dr. Hatalis unequivocally testified that CMO's process will etch portions of the N+ layer that are not covered by metal, *including portions under the mask*.  Hatalis Rpt. (Docket No. 193, Exh. A) at 19:8-9, 20:9-10.[4]

Finally, contrary to SEL's naked assertion, Dr. Chou also clearly testified that CMO's dry etching process will etch the uncovered N+ silicon under the mask.  *See* Chou Tr. (Exh. 1) at 104:24-105:16 ("all the areas exposed to the atmosphere, and also for the servers in the dry chamber that might have a chance to make contact with the etchant gas, all those areas will possibly be etched away"); *Id.* at 187:20-189:5 ("for dry etching it will lean towards the middle of these two.  That means between isotropic and anisotropic etching."); Chou Tr. (Lindsey Decl., Exh. B) at 269:10-273:12 ("First of all, channel etching is not necessarily a hundred percent anisotropic etching.  Earlier I say that anything that is exposed on the plasma surface will be etched.").[5]

---

[3] Importantly, SEL fails to mention that Dr. Kanicki has a limited knowledge of CMO's structure because he was asked only to investigate the validity of the '258 Patent.  Kanicki Tr. (Lindsey Decl., Exh. C) at 23:11-25:14, 31:15-32:3.

[4] SEL's claim notwithstanding, Dr. Hatalis NEVER conceded that the evidence he relies on fails to address etching the N+ layer.  Hatalis Tr. (Exh. 2) at 185:5-186:8.

[5] SEL's reliance on Dr. Chou's testimony that the dry etch process "should not be" isotropic is misleading.  In the context of the questioning, Dr. Chou makes clear that he was comparing the dry etch process to the wet etch process, which admittedly is entirely/purely isotropic; Dr. Chou never suggested that CMO's RIE process has NO isotropic component to it at all.  *See* Chou Tr. (Docket No. 323, Exh. 7) at 116:2-117:24.

SEL suggests that CMO's taper is the result of mask erosion.  This argument is nothing but rank speculation.  SEL offers no evidence that CMO's dry etching process completely erodes the mask, the metal layer or the N+ layer.  SEL's novel theory also ignores that if CMO's process included mask erosion, then there would be no portion of the N+ layer that would extend from the overlying metal layer to form the claimed stepped structure—that portion, like the mask and metal layers, would be completely eroded away.  Or, if it was not entirely etched away, then it would not satisfy the construed

HOWREY LLP

**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

1   Critically, SEL offers no proof of its own – no tests, no expert opinion, no independent data –

2   even to suggest, let alone to satisfy its burden of proving, that CMO's RIE process is purely

3   anisotropic (*i.e.*, that it is an "ideal," purely directional dry etch that will not etch under a mask).

4   Because SEL cannot reasonably dispute (a) that CMO's RIE process has an isotropic

5   component, such that any N+ silicon coming into contact with the etchant (even the N+ silicon under

6   the mask) will be etched, and (b) that CMO's RIE process ends before the entire amount of uncovered

7   N+ silicon is etched away, no reasonable jury following this Court's claim construction ruling could

8   find that CMO's manufacturing process performs the '258 claim step of "etching the exposed portion

9   of the second semiconductor film."

10  **II.      THE '258 PATENT IS INVALID IN LIGHT OF THE ACKNOWLEDGED PRIOR ART**

11          In its Opposition, SEL admits:

12  • That the prior art clearly and unequivocally discloses the stepped structure described in the
    '258 Patent claims[6]; and

13  • That several pieces of prior art disclose overetching the conductive layer to form TFTs[7].

14          Further, SEL's Opposition does not contest:

15  • That SEL's President, Mr. Yamazaki, admitted that overetching was routinely utilized in the
16    manufacture of TFTs since the 1970s [CMO Statement of Fact at ¶ 67];

17  • That prior art publication <u>Microchip Fabrication</u> discloses that "[i]n every etch process there is
      always some degree of overetch planned into the process.  This is necessary to ensure
18    complete removal of the thickest portions of the layer and to allow for the etch to break
      through any slow-etching layers on the top surface" [CMO Statement of Fact at ¶¶ 38, 39];

19  • That SEL cited to this Court, pursuant to Patent L.R. 4-2(b), the publication <u>Silicon VLSI</u>
20    <u>Technology</u>, as evidence of what one of ordinary skill in the art would have understood about
      overetching *at the time the original application to the '258 Patent was filed* [CMO Statement
21    of Fact at ¶ 59]; and

22  • That <u>Silicon VLSI Technology</u> discloses that "some overetching is normally part of every etch

23

24  claim term that the N+ layer subject to etching is completely removed.  Either way, this argument squarely contradicts
    SEL's infringement contentions.

25  [6] SEL does not dispute that the '567 Patent, JP '573, the '108 Patent, JP '258, and JP '238 disclose the '258 Patent's
26  "stepped" structure.  *See* Exhs. 4-6, 8-9; CMO Statement of Fact (Docket No. 320) at ¶¶ 15-29. In fact, on April 9, 2007,
    SEL disclaimed to the Patent Office claims 1 and 2 of the '258 Patent based, in large part, on the '567 Patent identified as
27  part of CMO's Petition for Reexamination.  SEL April 9, 2007 Communication to Patent Office (Lindsey Decl., Exh. D).

    [7] SEL does not dispute that the '694 Patent (Docket No. 194, Exh. T), JP '523 (Exh. 16), and JP '774 (Exh. 17) disclose
28  overetching the conductive layer to form TFTs.

process." [CMO Statement of Fact at ¶ 60][8]

Thus, SEL's only remaining argument is that the prior art does not disclose *the combination of* (1) the claimed stepped structure (which SEL now concedes was well-known) and (2) overetching the conductive layer (which SEL similarly concedes was well-known). SEL's own admissions, as well as the clarity of the prior art teachings, render this argument untenable.

## A.   The Prior Art Admittedly Showing The Claimed Stepped Structure Necessarily Discloses Overetching The Conductive Layer

SEL contends that although the '567 Patent, JP '238, JP '258 and JP '573 admittedly disclose the '258 Patent's claimed stepped structure, these references do not disclose overetching the conductive layer. Specifically, SEL suggests that because JP '258 discloses the use of multiple masks to form its stepped TFT structure, this somehow means that JP '258– and, indeed, the entire group of stepped TFT prior art – does not disclose overetching. Opp. at 7. Yet, SEL's suggestion is a virtual *non sequitur*, as neither the '258 Patent claims nor this Court's statements regarding "overetching" say anything at all about how many masks must be (or can be) used to perform overetching. As this Court explained in its Claim Construction Order, "Both parties agree that one of ordinary skill in the art would understand that overetching can be performed either as a separate step, involving the application of additional etchant, or by extending the original etching such that the etchant undercuts the mask. The language of claim 3 encompasses both meanings." CC Order at 17. It is axiomatic that more than one mask can be (and, in some instances, must be) used if overetching is "performed as a separate step, involving the application of additional etchant." *Id.* Moreover, the '258 Patent, itself, discloses and suggests the use of multiple masks to create the stepped TFT structure. *See e.g.,* '258 Patent (Docket No. 194, Exh. A) at Figs. 3(A)-3(H), 6:8-7:26.

Critically, SEL does NOT dispute – in fact, SEL does not even address – the prior art references and knowledge indisputably establishing that, for years prior to the filing of the '258 Patent application through today, **overetching was (and is) a part of every etch process to ensure that the**

---

[8] Amazingly, SEL now takes issue with the fact that Silicon VLSI Technology was published in 2000 and therefore cannot be considered prior art to the '258 Patent. However, as noted, SEL does not dispute that SEL **itself** submitted this publication to the Court, pursuant to Patent L.R. 4-2(b), as evidence of what one of ordinary skill in the art would have understood about overetching *at the time the original application to the '258 patent was filed*. Having made such a representation to the Court, SEL cannot now retract the representation because it is at odds with SEL's current position.

HOWREY LLP

1   **layer/material being etched is completely removed**.  *See* <u>Microchip Fabrication</u> (Exh. 12) at 222-223

2   ("[i]n every etch process there is always some degree of overetch planned into the process.  This is

3   necessary to ensure complete removal of the thickest portions of the layer and to allow for the etch to

4   break through any slow-etching layers on the top surface"); '694 Patent (Docket No. 194, Exh. T) at

5   3:55-63 ("This overetching is to ensure the complete removal of the second conductor in all of these

6   openings all across the wafer and particularly all across each of the individual thin film transistor

7   arrays being fabricated."); <u>Silicon VLSI Technology</u> (Exh. 10) at SEL-CMO 0089046; ("some

8   overetching is normally part of every etch process…. some overetch is always done in manufacturing

9   to ensure that the etch goes to completion everywhere"); Yamazaki Dep. Transcript ("Yamazaki Tr.")

10  (Exh. 11) at 405:13-21 ("manufacturing apparatus [in the early 1970s] were poor and consequently

11  overetching was done"); *See also* CMO Statement of Fact at ¶¶ 38, 61, 67.

12          This undisputed evidence makes clear that overetching necessarily and unvaryingly would have

13  been used to create the stepped structures admittedly shown in the '567 Patent, JP '238, JP '258 and JP

14  '573 (regardless of whether one mask or more than one mask was used to accomplish that overetch).[9]

15  Thus, each of these prior art references inherently anticipates the asserted claims of the '258 Patent.

16          **B.      It Would Have Been Obvious To Overetch The Conductive Layer To Form The**
17          **Prior Art's Stepped TFTs**

18          To the extent that the above prior art references and admissions do not prove by clear and

19  convincing evidence that overetching necessarily was (and is) part of every etch process, including the

20  processes used to create the admitted prior art stepped TFTs, those references and admissions certainly

21  establish that it would have been obvious to one of ordinary skill in the art to overetch the conductive

22  layer to create the prior art's stepped structures.  Indeed, the references make clear that any person of

23  skill in the art performing *any* etch of a TFT conductive layer inherently would be motivated to

24  overetch in order to assure that the targeted portion of the conductive layer was completely removed

25  and that the desired distance between the source and drain electrodes was established (*e.g.*, in the case

26  of the '567 Patent, to eliminate parasitic capacitance).  *See* <u>Microchip Fabrication</u> (Exh. 12) at 222-223;

27

28  ───────────────
[9] Dr. Kanicki reiterated that overetching is part of every amorphous silicon TFT manufacturing process.  *See* Kanicki Rpt. (Lindsey Decl., Exh. E) at 23:18-21, 27:17-24.  SEL's Dr. Thomas does not dispute Dr. Kanicki on this point.

1   '694 Patent (Docket No. 194, Exh. T) at 3:55-63; <u>Silicon VLSI Technology</u> (Exh. 10) at SEL-CMO

2   0089046; Yamazaki Tr. (Exh. 11) at 405:13-21; '567 Patent (Exh. 4).

3        SEL's primary response to CMO's obviousness argument is to suggest that the argument rests

4   solely on the expert testimony of Dr. Kanicki.  Even if this were a legitimate basis for criticism, SEL is

5   mistaken.  In addition to the unrebutted testimony of Dr. Kanicki, CMO relies on (a) <u>Microchip</u>

6   <u>Fabrication</u>; (b) the '694 Patent; (c) <u>Silicon VLSI Technology</u> (which SEL, itself, submitted as

7   evidence of how a person of skill in the art would understand overetching at the time the '258

8   application was filed); (d) the JP '523 Publication; (e) the JP '774 Publication; (f) Mr. Yamazaki's

9   admissions concerning the use of overetching since the 1970's; and (g) the testimony of SEL's own

10  expert, Dr. Thomas, concerning the known benefits (if not the necessity) of overetching in making

11  TFTs.  *See e.g.,* Thomas Expert Rpt. (Exh. 15) at 7:24-27 ("the extra etch time [by overetching]

12  ensures that any appreciable metal residues left in the area overlying the channel will be removed and

13  not be available for incorporation into the channel region during subsequent processing."); Thomas Tr.

14  (Lindsey Decl., Exh. A) at 133:8-134:23 ("The other process of removing the metal from the field, you

15  know, just doing that to take the metals away, **that would be an advantage [of overetching] someone**

16  **would realize, you know, that you want to make sure you remove all the metal**.") (emphasis

17  added).  Further, CMO points to the fact that the U.S. Patent Examiner took official notice that it was

18  "well known to overetch to expose the source and drain regions." '258 Patent File History (Exh. 14) at

19  3.[10]  All of these skilled artisans/prior art publications recognize that overetching was well-known and

20  desirable (if not necessary) for making a-Si TFTs.  This prior art knowledge of the benefits of/need for

21  overetching would have motivated one of ordinary skill to use overetching when forming the prior

22  art's acknowledged stepped TFT structures.

23        SEL's only *substantive* response to CMO's obviousness argument is to suggest that the '694

24  Patent somehow "teaches away" from using overetching to form a stepped TFT because the '694

25  Patent targets a tapered (rather than a stepped) structure.  Opp. at 7-8.  First and foremost, it is hard to

---

26

27  [10] As noted in CMO's Opposition to SEL's pending Summary Judgment Motion on the Affirmative Defense of Inequitable
    Conduct, SEL challenged the Examiner's "official notice" and affirmatively represented to the Examiner that overetching
    would not have been known to a person of skill in the art, despite SEL's indisputable knowledge that its representation was

28  false.  CMO Opposition to SEL Motion for Summary Judgment (Docket No. 321) at 19:25-31.

HOWREY LLP

- 9 -                                                          Case No.  C 04-04675 MHP
                                                    **Defendants' Reply in Support of Its MSJ of**
                                          **U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

reconcile SEL's criticism of the '694 Patent as a prior art reference with SEL's infringement claim against CMO, as SEL does not dispute that CMO targets a tapered TFT in the same way that the '694 Patent targets a tapered TFT. Opp. at 5:6-20. If targeting a tapered TFT means that the '694 Patent's described method – which explicitly includes overetching the conductive layer – "teaches away" from, and cannot be deemed to disclose, the '258 Patent's claimed method, then how can CMO's method, which similarly targets a tapered TFT and uses a substantially similar manufacturing process to that described in the '694 Patent, reasonably be found to be covered by the '258 Patent claims? "That which infringes, if later, would anticipate, if earlier" (*Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)); thus, CMO either does not infringe or the '258 Patent is invalid.

Moreover, while the '694 Patent does teach the desirability of a tapered TFT, the '694 Patent does NOT teach away from overetching a conductive layer to produce a final TFT structure – the one step that SEL represented to and convinced the '258 Patent Examiner was missing from the prior art. CMO Statement of Fact at ¶¶ 53-57. Indeed, the '694 Patent makes explicit, in multiple passages, that overetching is a common practice for creating space between electrodes and that overetching should be used when etching the conductive layers in a TFT structure so as to assure that the material is completely etched and the spacing is properly defined. *See* '694 Patent (Docket No. 194, Exh. T) at 2:24-27, 3:55-63; CMO Statement of Fact at ¶¶ 42, 43. Thus, any person of skill in the art seeking to define and create the space between the electrodes in the prior art's stepped structures would be motivated to use the '694 Patent's teachings concerning the benefits of overetching – benefits which are not tied to the creation of either a tapered or a stepped structure.[11]

In the end, SEL can (and does) provide no logical reason as to why overetching would be used

---

[11] SEL's assertion that Dr. Kanicki based his obviousness determination on a "general citation to hundreds of references" is demonstrably false. Dr. Kanicki provided detailed anticipation and obviousness analyses for each prior art reference, including the four here-at-issue. *See* Kanicki Rpt. (Exh. 13) at Exhs. C-9, C-10, C-12, C-28 and C-29. SEL also complains that Dr. Kanicki's/CMO's Final Invalidity Contentions ("FIC") regarding obviousness do not comply with Patent L.R. 3-3(b). Yet, for each primary reference upon which Dr. Kanicki/CMO based its obviousness contention, Dr. Kanicki/CMO refer specifically to a particular section or sections of a summary chart [Kanicki Rpt. (Exh. 13) at Exh. C-29] that (a) identifies specific references that disclose certain features (e.g., stepped TFT, overetching, etc), (b) where those features are found in the references, and (c) the motivation for combining those references with the initial prior art reference. Thus, Dr. Kanicki's/CMO's obviousness analysis complies with Patent L.R. 3-3(b). Tellingly, despite having received CMO's FICs on August 26, 2006 (almost 8 months ago) and Dr. Kanicki's report on October 15, 2006 (about 6 months ago), SEL never once objected to the FICs or indicated that Dr. Kanicki/CMO did not comply with Patent L.R. 3-3(b).

1  in EVERY etch process – as SEL's own evidence and testimony acknowledges, but not in the etch

2  processes used to create the stepped structures admittedly shown in the prior art.[12]

3      **C.**    <u>The JP '523 Publication And The JP '774 Publication Anticipate And/Or Render</u>

4          <u>Obvious The Asserted Claims Of The '258 Patent</u>

5          In its Opposition, SEL concedes that JP '523 and JP '774 "arguably" disclose overetching, but

6  SEL suggests that CMO's "attorney renditions" are insufficient to show that these references actually

7  disclose the claimed stepped structure. *See* Opp. at 6:18-19. SEL's suggestion falls flat given that

8  CMO's Motion identifies the <u>actual text</u> of JP '523 and JP '774 that describes a claimed stepped

9  structure and simply provides illustrations of the precise embodiments described in that text to more

10  clearly show those references' disclosures. <u>With or without the illustrations</u>, the text of the JP '523

11  and JP '774 references clearly discloses the use of overetching to create TFTs with stepped structures.

12  *See* JP '523 (Exh. 16) at § 3(Embodiment), and Fig. 2; JP '774 (Exh. 17) at § 3 (Embodiment); Kanicki

13  Rpt. (Exh. 13) at Exhs. C-11 (element i) and C-22 (element i). [13]

14          With respect to JP '523, SEL specifically complains that CMO wrongly characterizes figure 2

15  as an "interim" figure and suggests that CMO's rendition is possible only if the chromium layer is

16  etched beyond what JP '523 discloses. This is nothing but SEL's attempt to set up a strawman. The

17  text of JP '523 describes overetching the chromium film to prevent the N+ layer from undercutting the

18  chromium. JP '523 (Exh. 16) at § 3 (Embodiment). Dr. Kanicki readily determined that the N+ layer

19  (numerals 51 and 61) extends from the chromium layer (numerals 52 and 62) in figure 2 to form the

20  claimed stepped structure. *See* Kanicki Tr. (Lindsey Decl., Exh. C) at 98:14- 99:15. Dr. Kanicki

21  explains that the "further etching" of the chromium layer (explicitly called out on the JP '523 text)

22  necessarily results in the claimed stepped structure, since in order to ensure that the chromium is

---

23  [12] It should be noted that SEL cannot even attempt to offer any evidence of so-called "secondary considerations of non-

24  obviousness," as SEL's own 30(b)(6) witness, Mr. Kimura, admitted that no secondary considerations exist with respect to
the '258 Patent. Kimura Dep. Transcript (Docket No. 161, Exh. 9) at 42:10-45:22.

25  [13] SEL contends that CMO's supposed lack of expert testimony precludes use of its illustrations. Opp. at 10. Not only is
SEL's premise faulty (Dr. Kanicki specifically opined that JP '523 anticipates or renders obvious the '258 claims), but

26  <u>SEL's own authority squarely refutes SEL's contention</u>. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d
1557, 1562 (Fed. Cir. 1988) ("LAG asserts that the district court, unskilled in the art of shoe design, was legally unable to

27  resolve key, factual disputes on patent validity without the testimony of a qualified expert in that field. That argument is
wholly meritless. First, the court 'resolved' no factual issue on summary judgment. Second, LAG mistakenly asserts that

28  validity is a question of fact. Validity is a question of law. Third, a judge may decide the legal issue of validity unaided by
expert opinion.") (internal citations omitted).

      Case No. C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

1   etched *at least* as far as required to prevent the N+ layer from undercutting it, the chromium layer must

2   be further etched beyond the inner edge of the underlying N+ layer and thus form the required stepped

3   structure.  *See* Kanicki Tr. (Lindsey Decl., Exh. C) at 110:11-112:3; 116:20-119:4.

4          Critically, figure 1 of JP '523 unequivocally confirms Dr. Kanicki's analysis.  Figure 1 is a top-

5   view of a TFT created in accordance with the JP '523 teachings.  Upon careful inspection, figure 1

6   unambiguously shows that a portion of the N+ silicon (61) extends inside of, and is uncovered by, the

7   Cr film (62), which has been "further etched using the same resist," such that a step necessarily is

8   present.  *See* JP '523 (Exh. 16) at fig.1, § 3 (Embodiment); *see also* Color-coded enlargement of JP

9   '523 Fig. 1 (Lindsey Decl., Exh. F).  Thus, JP '523's own figures – not "attorney renditions" – show

10  that the '258 claims are anticipated.[14]

11         At a minimum, JP '523 renders the asserted '258 Patent claims obvious because, even if figures

12  1 and 2 were assumed to show the chromium layer and the N+ layer perfectly aligned with one another

13  (as SEL contends), one of ordinary skill in the art would be motivated to create a step by "further

14  etching" the chromium layer (as explicitly instructed by the JP '523 text) to ensure that the undercut is

15  prevented, thereby decreasing costs and increasing yield.  Kanicki Tr. at 116:20-119:4.[15]

16         In its Opposition, SEL contends that JP '774's description of the aluminum etching "inside" the

17  chromium layer refers to etching of the outer edge (away from the channel), rather than the inner edge

18  (inside the channel), of the aluminum.  In support of this contention, SEL relies on the part of JP '774

19  that refers to etching of the aluminum film 622 inside of chromium film 621.  Yet, SEL ignores that

20  the preceding paragraph refers to etching the chromium film (521, 621) "inside" the transparent film

---

[14] As SEL has been sure to point out in asserting that CMO's process for making a tapered TFT infringes the '258 Patent (because that process occasionally results in a TFT that has stepped characteristics), there are natural and inherent variations in etching that cannot be controlled perfectly.  Thus, SEL cannot reasonably dispute that it is impossible for any person of skill in the art practicing the JP '523's "further etching" step to assure that the chromium always is etched to the EXACT INNER EDGE of the N+ layer.  In reality, because the JP '523 Publication requires sufficient overetching of the chromium to assure that the N+ layer does not undercut the chromium, it is inevitable that the chromium will frequently (if not always) be etched far enough back to create a stepped structure.  *See* Motion at 11-12.

[15] As to the combination of JP '523 and the '567 Patent, SEL argues that the '567 Patent fails to disclose any process conditions.  SEL's own expert Thomas disagreed.  *See* Expert Rebuttal Report of Michael Thomas (Exh. 7) at App. B.  Because the '567 Patent further teaches (and thus motivates) one of ordinary skill in the art making TFTs that making the stepped structure is advantageous because it eliminates undesirable parasitic capacitance, it would have been obvious to combine the process of making TFTs in JP '523 with similar process and structure disclosed in the '567 Patent.  *See* Kanicki Rpt. (Exh. 13) at Exh. C-11, element i.

1    (97, 7) to prevent the lower transparent film from undercutting the overlying chromium film.  JP '774

2    (Exh. 17) at CMO 183083, ¶ (E).  Thus, JP '774 clearly uses "inside" to describe the inner, channel

3    edges.  Accordingly, when JP '774 describes etching the aluminum film "inside" the chromium film by

4    immersing it in a liquid etchant, one skilled in the art would understand that the aluminum is patterned

5    to form a step with the chromium and transparent films.  Kanicki Rpt. (Exh. 13) at Exh. C-22.[16]

6        Even if SEL's argument that JP '774 does not anticipate can be credited, it would have been

7    obvious to pattern JP '774's aluminum film (522, 622) inside the chromium film (521, 621) to prevent

8    undercutting for the exact reasons that JP '774 teaches this should be done with the chromium and

9    transparent films.  Further, SEL does not seriously contest that JP '774 in combination with any of the

10    prior art publications showing stepped structures (and teaching the benefits of stepped structures, *e.g.*

11    the '567 Patent) renders obvious the '258 Patent claims. [17]

12   **III.**    **CMO'S FOREIGN SALES DO NOT INFRINGE THE PATENTS-IN-SUIT**

13        In addition to the nearly $602 million in <u>U.S. Sales</u> which SEL contends are at issue in this

14    case, SEL attempts inappropriately to extend CMO's liability to CMO's <u>Foreign Sales</u> – despite the

15    fact that these sales concern products manufactured, sold and delivered ***entirely*** outside of the U.S.[18]

16    CMO Statement of Fact at ¶¶ 115-118.

17        Under U.S. patent laws, CMO can be liable for direct infringement based on its Foreign Sales if

18    and only if SEL can establish a sufficient nexus between those Foreign Sales and the U.S. – mere

19    "offers to sell" that have virtually no connection to the U.S. are, as a matter of law, not enough.  *See*

20    *Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactury Co., Ltd*., 2007 WL 926072 at *14 (S.D.N.Y.

21

---

22   [16] While SEL asserts that Dr. Kanicki/CMO somehow agree that JP '774 does not anticipate (because of Kanicki's

23   description of figure 2), neither Dr. Kanicki nor CMO rely on figure 2 for their invalidity contentions.  Moreover, SEL's assertion is belied by the detailed analysis Dr. Kanicki provided demonstrating that JP '774 anticipates and renders obvious the asserted claims of the '258 Patent.  *See* Kanicki Rpt. (Exh. 13) at Exh. C-22.

24   [17] CMO does not wish to devote time or attention to its claim as to the invalidity of the '995 Patent (given the Court's

25   recent summary judgment of no infringement.)  However, it should be noted SEL does not meaningfully dispute that the prior art teaches the only two features arguably missing from the '667 Patent– (1) placing liquid crystal on plural locations

26   (at least, prior art '210 and '332 Patents), and (2) avoiding overflow (at least, prior art '064 and '126 Publications).  Nor does SEL give any reason why Mr. Schott is incorrect when he explained that a skilled artisan would be motivated to place

27   liquid crystal on plural locations, and to avoid overflow of the liquid crystal, in order to achieve cost savings and in order to efficiently fill large-size LCD panels.  *See* Schott Rpt. (Lindsey Decl., Exh. G) at 5:14-8:3; 21:24-27; 22:4-6.

28   [18] *See* CMO U.S. Sales Charts (Lindsey Decl., Exh. H) at CMO 0182733-41.

HOWREY LLP

- 13 -

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

March 29, 2007) (and cases cited therein).  By the same token, CMO can be liable for indirect infringement based on its Foreign Sales if and only if SEL **proves** (a) that specifically-identified parties directly infringed SEL's patents (*i.e.* imported panels into the U.S. without SEL's authorization); and (b) that CMO intended to, and affirmatively acted to, induce each specifically-identified direct infringer to import the panels into the U.S. with knowledge that such importation would infringe SEL's patents.  *See DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004).[19]

SEL's Opposition confirms, as to CMO's Foreign Sales, that SEL cannot show a sufficient nexus between CMO's sales and the U.S. to support direct infringement; that SEL cannot identify or prove direct infringement by any CMO customers (other than, perhaps, Apple and HP); that SEL cannot show that CMO intended to or affirmatively acted to cause Apple or HP (again, the only two CMO customers as to whom SEL offers any proof) to infringe SEL's patents; and that SEL cannot show that CMO took any affirmative acts of inducement whatsoever with regard to CMO's nearly 600 other Foreign Sales customers.  CMO Statement of Fact at ¶¶ 125-131.  SEL's desire to present CMO's Foreign Sales to a jury, without actual proof of infringement, based purely on speculative "damages" theories, should be rejected by this Court.

### A.  CMO's Foreign Sales Cannot Directly Infringe The Patents-In-Suit

SEL does not dispute that CMO manufactures its panels entirely outside of the U.S.  CMO Statement of Fact at ¶¶ 116-118.  Further, as to those products that CMO ships outside of the U.S. ("Foreign Sales"), SEL does not dispute that the "direct infringers" are the individuals and companies that ultimately import, sell or use the CMO panel in the U.S.  CMO Statement of Fact at ¶ 115.  Since CMO does not fit within this definition, SEL now asks this Court to construe CMO as a direct infringer for making "offers to sell" in the U.S., despite the legal authority precluding a finding of direct infringement for offers that contemplate the sale outside of the U.S.  *See Wing Shing*, 2007 WL 926072 at *14  (finding no § 271 (a) liability for "offering to sell" when the contemplated sale did not occur in the U.S.); *Cybiotronics, Ltd. v. Golden Source Elecs., Ltd.*, 130 F. Supp. 2d 1152, 1170 (C.D. Cal.

---

[19] As per the Court's instruction, because the parties cross-moved on CMO's License/authorization defense, CMO does not address that defense in this brief.

1  *2001)* (holding that Section 271(a) did not extend to an offer to sell in U.S. if it did not contemplate

2  consummation of such sale in the U.S.); *Quality Tubing, Inc. v. Precision Tube Holdings Corp*., 75

3  F.Supp.2d 613, 625 (S.D. Tex. 1999) ("[defendant] has, **as a matter of law**, committed no act of

4  infringement under section 271 (a) or (g) by contracting, in the United States, to manufacture, sell, and

5  deliver a product in Scotland and Norway, for use in Norway").[20]

6  SEL has not offered (because it cannot offer) any evidence to establish that CMO's offers for

7  sale or contracts were intended to occur in the U.S.  First, the offer and contract evidence proffered by

8  SEL relates to products that CMO already has accounted for as *U.S. Sales* (i.e., panels known to have

9  been shipped to the U.S.), which are *not* the subject of this motion.[21]  *See* Motion at 23, Fn 25.

10  Second, as to Foreign Sales, there is no dispute that (1) CMO and its customers contemplate such sales

11  to take place outside of the U.S., and that (2) that all essential sales activities related to those sales

12  (purchase order, payment, performance and delivery) take place outside of the U.S.[22]  Finally, SEL's

13

14  [20] In *MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corporation,* 420 F.3d 1369 (Fed. Cir. 2005), the

15  Federal Circuit held that notwithstanding extensive e-mails between the foreign manufacturer defendant and Samsung
   Austin regarding technical support and supply and delivery terms, defendant's frequent trips to Austin, and defendant's

16  knowledge that its products were being shipped FOB to Samsung Austin, defendant could not be liable for direct
   infringement because there was no evidence "demonstrating that [defendant] SUMCO sold the accused wafers to Samsung

17  Austin in the U.S."  *MEMC,* 420 F.3d at 1376-77; *see also Pfizer Inc. v. Aceto Corp.,* 853 F. Supp. 104, 105 (S.D.N.Y.
   1994) ("Thus § 271 (g) 'will not give extraterritorial effect to U.S. law' and provides no remedy against foreign
   manufacturers whose infringing acts do not occur within the United States.").

18  SEL's reliance on *Rotec Industries, Inc. v. Mitsubishi Corp.,* 215 F.3d 1246 (Fed. Cir. 2000) is misplaced.  The
   majority opinion in *Rotec* did not reach the issue of whether an offer for sale is sufficient, by itself, for direct infringement.

19  *Wing Shing,* 2007 WL 926072 at *14.  Judge Newman's concurrence in *Rotec* instead addressed this issue by explaining
   that in light of the legislative history, 35 U.S.C. § 271 (a) and (i) can only be read to mean that an offer for sale "must be of

20  an item that would infringe the United States patent upon the intended sale."  *Rotec*, 215 F.3d at 1260 (concurring opinion).
   The court explained that the congressional intent behind the "offer to sell" language was to expand the time frame for

21  litigation (not the territorial application of patent liability).  *Id.* at 1252. ("offer to sell" contemplates those sales that will
   take place before expiration of the patent.)  In *Wing Shing*, the most recent published case on the issue, the Court in

22  S.D.N.Y. specifically compared *Cybiotronics* (cited by CMO) with *Wesley Jensen* and *SEB* (both cited by SEL), and chose
   to join *Cybiotronics* and the *Rotec* concurring opinion in concluding that the sale contemplated by the offer for sale must be

23  intended to occur in the U.S.  *See Wing Shing*, 2007 WL 926072 at *14.

24  [21] In hopes of creating confusion, SEL points to testimony and documents of Apple concerning *U.S. Sales* (as opposed to
   Foreign Sales), which are not the subject of this motion.  *See, e.g.*, Opp. at 18-19 (SEL citations to Apple Tr.).  SEL's own

25  counsel confirmed at Apple's deposition that the testimony was limited to procurement of CMO's panels during the
   developmental stage (as opposed to mass production).  The few developmental products that are sold and shipped directly

26  into the U.S. are treated by CMO as U.S. Sales, not Foreign Sales.  30(b)(6) Dep. of Apple ("Apple Tr.") (Lindsey Decl.,
   Exh. I) at 83:14-25.

27  [22] HP testified that (1) sales transactions of CMO's panels take place outside of the U.S. [HP Tr. (Lindsey Decl., Exh. J) at

28  156:11-17; see also Yang Tr. (Lindsey Decl. Exh. K) at 269:12-270:4], (2) that CMO's final sales decisions are made in
   Taiwan, not in the U.S. [HP Tr. (Lindsey Decl., Exh. J) at 159:1-7; *see also* Yang Tr. (Lindsey Decl., Exh. K) at 269:18-
   25], (3) that HP issues its purchase orders from Taipei, Taiwan and sends to CMO Taiwan; [HP Tr. (Lindsey Decl., Exh. J)

HOWREY LLP

- 15 -

1  alleged evidence of U.S. "contracts" with HP and Apple (the only CMO Foreign Sales customers that

2  SEL bothered to obtain relevant discovery from) [CMO Statement of Fact at ¶¶ 125-130] are merely

3  misleading characterizations of the real facts, disproved by the HP and Apple testimony, itself.[23]

4      In sum, SEL has not sustained (and cannot sustain) its burden of producing admissible evidence

5  from which a reasonable jury could find that CMO made the types of "offers to sell" to, or contracts

6  with, Apple and HP that are subject to patent infringement liability.   Further, SEL has offered

7  absolutely no evidence – nothing – to establish the required nexus between CMO's sales to its other

8  (non-HP and non-Apple) Foreign Sales customers and the U.S.  Therefore, as to CMO's Foreign Sales,

9  summary judgment of no direct infringement under 35 U.S.C. § 271 (a), (g) is appropriate.[24]

10      **B.      CMO'S Foreign Sales Do Not Indirectly Infringe The Patents-in-Suit**

11      Try as it might, SEL cannot avoid the heightened standard for proving inducement under 35

12  U.S.C. § 271 (b), as set forth in *DSU Medical Corp.*, 471 F.3d at 1293.  SEL presents unsupported

13  theories and *pre-DSU Medical* cases to support its untenable arguments that (1) "knowledge" is

14  enough to demonstrate inducement, (2) intent may be "presumed" and (3) that "one act" of direct

15  infringement is enough to bind CMO for its Foreign Sales to nearly 600 customers.  These arguments

16  fail, as a matter of law, because they contradict the unequivocal standards set forth in *DSU Medical*.

17      **1.      SEL Cannot Specify The Acts Of Direct Infringement**

18      Faced with the absence of any evidence of direct infringement by the Foreign Sale customers

19  (except, at most, HP and Apple), SEL argues that it can prove direct infringement merely by pointing

20  to "one act of direct infringement or inducement liability" in CMO's Foreign Sales category.  Opp. at

21  16, 22.  This ***unsupported legal assertion*** would conveniently relieve SEL of the burden of actually

22

23  at 114:8-9]; (4) that HP sends payments to CMO from its Singapore office to CMO Taiwan, [*Id.* at 155:7-156:5], and (5) that CMO ships its products from CMO Taiwan to HP in Shanghai [*Id.* at 156:6-22].

24      Likewise, Apple testified that (1) Apple's purchase orders are issued from Shanghai, China, (2) CMO ships the LCD panels from CMO Taiwan to Apple's OEM sites in Suzhou, China, Shanghai, and Taiwan [April 20, 2007 letter from Huffsmith (Lindsey Decl., Exh. L) at 1], and (3) that CMO's panels do not pass directly to Apple from CMO [*Id.* at p. 2].

25  [23] HP's representative testified unequivocally that HP had no agreements in place with CMO for LCD panels.  HP Tr.

26  (Lindsey Decl., Exh. J) at 108:21-109:7.  Apple's representative also could not confirm the existence of any agreements with CMO.  Apple Tr. (Lindsey Decl., Exh. I) at 124:20-23, 127:6-10, 127:15-17, 128:22-25, 129:7-9, 141:22-25, and

27  142:8-14; April 13, 2007 letter from Huffsmith (Lindsey Decl., Exh. M) at 2.

28  24 At a minimum, CMO is entitled to a summary judgment of no direct infringement with regard to all Foreign Sales to customers other than HP and Apple – the only customers concerning which SEL offers any evidence, however insufficient.

HOWREY LLP

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

1   proving infringement liability for 93% of CMO's LCD panel sales — sales to nearly 600 CMO

2   customers outside of the U.S.  CMO Statement of Fact at ¶ 119.[25]

3        As its sole authority for the proposition that "one act" of inducement is enough, SEL hides in a

4   footnote an unciteable case, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 1 F.App'x. 879,

5   882 (Fed. Cir. 2001), which predates and contradicts the standard set forth in *DSU Medical*.  There is

6   no doubt that to find liability under § 271 (b), SEL must now prove "***specific intent and action*** to

7   induce infringement".  *DSU Medical*, 471 F.3d at 1305 (emphasis added); *see also Dynacore*, 363 F.3d

8   at 1274 (inducement liability must "relate to the ***identified instances of direct infringement***").  It

9   logically follows that SEL must make this requisite proof as to *each* alleged infringer – not just as to

10  one infringer, as SEL suggests.  *Id.*

11       SEL also cites to *Sharper Image, Moleculon,* and *Lucas Aerospace* for the proposition that

12  circumstantial evidence of direct infringement as to some of the customers is sufficient to withstand a

13  motion for summary judgment.  Opp. at 27-28.  Each of these cases, as well as *Chiuminatta Concrete*

14  and *MEMC,* however, involved infringing sales to either a single customer, or *direct sales* by

15  defendants to end consumers in the U.S., which eliminated the need to identify the direct infringers or

16  the ultimate destination of the accused products.  By contrast, CMO sells its panels to hundreds of

17  system integrators and companies outside of the U.S., each of which incorporates CMO's panels (as

18  well as panels from various other panel manufactures) into an assortment of LCD products and sells to

19  brand companies which, in turn, send the completed LCD products (which incorporate panels from

20  several panel manufactures) to retailers all over the world.  *See Motion at 24-25.*[26]

21       Given the complexity of the LCD market, and the many layers of players involved, SEL must

22

---

23  [25] If SEL had sued each of the CMO Foreign Sales customers who are now asserted to be the direct infringers, there is no

24  question that SEL would have had to come up with some evidence to show that each of those customers actually committed infringing acts.  SEL cannot escape this burden of proving direct infringement by (a) suing CMO; (b) offering evidence as

25  to only two CMO Foreign Sales customers (HP and Apple); and (c) asserting without any support that CMO's actions and those of its Foreign Sales customers is identical to CMO's, HP's, and Apple's actions relative to the HP and Apple sales.

26  [26] The most that SEL's cited authority supports is that SEL need only show one act of direct infringement tied to one act of inducement ***for each customer***.  Thus, for example, if SEL truly can offer proof that Apple committed an act of direct

27  infringement and that CMO actually induced Apple to commit the infringing act, then SEL arguably is entitled to seek appropriate damages ***for all of APPLE's*** like-kind sales.  SEL's cited authority certainly does not suggest that if SEL proves one instance in which Apple was induced to infringe, then SEL somehow is entitled seek damages for the unproven

28  and unexplored acts of CMO's nearly 600, non-Apple Foreign Sales customers.

prove (1) ***exactly which companies*** in this multifaceted distribution channel ultimately imported products incorporating CMO's accused panels in the U.S., and (2) ***exactly how and why*** CMO should be liable for any of these supposed direct infringements. SEL cannot meet this burden. Because of SEL's deficient discovery, SEL cannot even identify the third-parties that actually imported accused panels into the U.S., much less show which and how many accused panels were imported.[27] In fact, the scant third party discovery taken by SEL only confirms SEL's inability to make this showing.[28]

The Court should grant summary judgment of no indirect infringement for CMO's Foreign Sales because there is insufficient evidence of direct infringement by any third party.[29]

### 2. SEL Cannot Prove That CMO Had Specific Intent Or Affirmatively Acted To Induce Infringement

Under *DSU Medical*, SEL's proffered proof of CMO's purported intent and affirmative acts to induce infringement is insufficient to avoid summary judgment. In essence, SEL contends that (1) CMO's intent to induce the acts constituting infringement "can be presumed" and that (2) SEL needs only to show that CMO had "knowledge" of the patents-in-suit or that its products would end up in the U.S. Yet, *DSU Medical* could not be clearer in requiring that ***"specific intent and action to induce infringement must be proven"*** and that ***"mere knowledge of possible infringement by others does not amount to inducement."*** *DSU Medical*, 471 F.3d at 1305 (emphasis added); *see also Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1364 (Fed. Cir. 2003). Thus, CMO's intent cannot merely be "presumed", as SEL suggests.

As anticipated by CMO in its Motion, SEL does not present a single document or snippet of testimony to demonstrate that CMO and HP/Apple (the only two companies that SEL offers evidence

---

[27] SEL's expert acknowledged that, to get an accurate account of Foreign Sales that end up in the U.S., it would be necessary to obtain information from CMO's Foreign Sales customers, including integrators. Wagner Dep. Transcript ("Wagner Tr.") (Exh. 35) at 97:11-98:16. SEL did not seek such discovery. Unikel Decl. at ¶ 39.

[28] *See* HP Tr. (Exh. 41) at 24:10-30:3, 144:1-145:1) (for each project, HP purchases LCD panels from numerous panel manufacturers, and that it is impossible without information from the system integrators to determine whether and which products containing CMO panels were ever imported into the U.S.); Apple Tr. (Lindsey Decl., Exh. I) at 173:6-15 (not known if Apple tells CMO which Apple products containing CMO panels are sold in the U.S.); Wagner Tr. (Exh. 35) at 97:11-98:16 (without discovery from system integrators, he cannot trace sales into the U.S.); April 20, 2007 letter from Huffsmith (Lindsey Decl., Exh. L) at 1 (title does not pass directly to Apple).

[29] Again, at a minimum, CMO is entitled to a summary judgment of no direct infringement with regard to all Foreign Sales to customers other than HP and Apple – the only customers as to which SEL offers any evidence, however insufficient.

1   concerning) discussed sale of products **intended for the U.S.** (rather than the non-U.S. market).  If

2   anything, the facts cited by SEL demonstrate the **absence** of discussions between CMO and its

3   customers regarding the U.S. Market.[30]

4        Grasping for straws, SEL next argues that summary judgment is not the proper vehicle for

5   determining CMO's lack of intent.  To the contrary, as this Court is well-aware, where there is an

6   absence of evidence from which a reasonable jury could find the necessary intent to induce, summary

7   judgment is not merely appropriate, it is required.  *See, e.g., Warner-Lambert,* 316 F.3d at 1364

8   (affirming grant of summary judgment of no inducement because no genuine issue of material fact was

9   raised as to intent to induce).[31]

10        Here, it is undisputed that CMO does not know, encourage or otherwise control where its

11  Foreign Sales customers sell their LCD products.[32]  Further, SEL offers no proof that CMO took any

12  affirmative acts with regard to HP and/or Apple designed and intended to induce those companies to

13  import their end products into the U.S., let alone any proof that CMO took any acts with the necessary

14  intent to cause infringement of SEL's patents.[33]  Finally, SEL offers no evidence whatsoever – nothing

15  but rank speculation – as to CMO's interactions with the nearly 600 non-HP/Apple, Foreign Sales

16  customers from whom SEL did not even bother to take representative discovery.  There is no authority

17  supporting the finding of indirect infringement under the circumstances.

18        Thus, this matter is ripe for a summary judgment that CMO's Foreign Sales do not directly or

19  indirectly infringe SEL's asserted '258 and '480 Patents.  At a bare minimum, CMO is entitled to a

20  [30] HP Tr. (Exh. 41) at 151:6-13; 153:7-17 (HP does not discuss the U.S. market with CMO); HP Tr. (Lindsey Decl., Exh.
21  J) at 122:3-5 (HP does not inform CMO where HP's products containing CMO modules are sold); Ishii Dep. Transcript
    (Lindsey Decl., Exh. N) at 83:20-84:12 (HP does not disclose to CMO where HP products will be sold); Yang Tr. (Exh. 34)
22  at 91:12-92:21 (CMO does not track sales to different markets or market share per region).

23  [31] *See also M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,* 439 F.3d 1335, 1336 (Fed. Cir. 2006) (reversing
    the district court's grant of summary judgment of inequitable conduct because there was no clear and convincing evidence
    demonstrating intent to deceive the patent office); *Air Turbine Technology, Inc. v. Atlas Copco AB,* 410 F.3d 701, 707-08
24  (Fed. Cir. 2005); *ITC Ltd. v. Punchgini, Inc.,* 2007 WL 914742 at *8 (2nd Cir. March 28, 2007).

25  [32] *See* HP Tr. (Exh. 41) at 171:21 – 172:14 ((1) CMO does not encourage HP to import products into the U.S., (2) CMO
    does not control where HP sells its products, and (3) HP does not inform CMO of which products they intend to sell, or
26  actually sell, in the U.S.); *see also* Yang Tr. (Exh. 34) at 268:8 – 269:1 (CMO is not informed about where its customers
    sell LCD products); S. Chen Dep. Transcript (Exh. 33) at 56:2-56:8.

27  [33] Indeed, it is not disputed that promptly after learning of SEL's accused patents, CMO obtained opinions of counsel
    concluding that CMO's accused products did not infringe.  Accordingly, CMO simply could not have acted, and did not
28  act, with the requisite intent.

HOWREY LLP

- 19 -                                                    Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

summary judgment of no direct or indirect infringement with regard to all Foreign Sales other than those to Apple and HP – the only two customers that SEL offers any proof regarding.

## IV.     SEL CANNOT RECOVER FOR SALES BEFORE NOTICE OF INFRINGEMENT WAS GIVEN.

With regard to SEL's claims based on the '480 Patent (claiming a product), SEL has identified no legally-significant facts precluding a summary judgment that SEL can recover damages (if at all) only for the period after September 29, 2004 – the date on which SEL first notified CMO of a specific product that SEL maintained infringed the '480 Patent.   *See Amsted Indus., Inc., v. Buckeye Steel Casings,* 24 F.3d 178, 186-87 (Fed. Cir. 1994) (only acts of patentee are relevant; knowledge or belief of defendant is irrelevant).  By SEL's own admission, its letter to CMO of December 16, 2003 did not notify CMO of a particular product accused of infringement, did not specifically identify the '480 Patent as potentially infringed, and was not intended by SEL to be a notice of infringement.  Indeed, SEL admits that it had not even completed its investigation of CMO's products when it sent the December 2003 letter.  *See* SEL Statement of Fact (Docket No. 319) at ¶ 38-39; Yamazaki Tr. (Lindsey Decl., Exh. O) at 180:11-184:20.

With regard to SEL's claims against CMO's Foreign Sales based on the '258 Patent (claiming a method), SEL can recover (if at all) only under an inducement theory.  Yet, as outlined thoroughly in CMO's Motion, the unmistakable import of *DSU Medical* is that a party must actually be aware of the patent to be liable as an inducer.  *See DSU Medical*, 471 F.3d at 1305; Motion at § III.D.1., *esp*. Fn 41.  SEL does not dispute (with reference to any actual evidence) that CMO first became aware of the '258 Patent on September 29, 2004.  CMO Statement of Facts at  ¶¶ 139, 140.

Finally, with regard to SEL's '258 Patent claims against the Co-Defendants (which necessarily are based on Section 271 (g) of the Patent Act, given that the Co-Defendants have no role in practicing CMO's accused TFT manufacturing process), SEL cannot dispute (a) that Section 287 (b) precludes SEL from recovering damages from any Co-Defendant until after that party received notice from SEL of the alleged infringement; and (b) that the first time SEL notified any of the Co-Defendants of the alleged '258 Patent infringement was when SEL served the Complaint in November/December 2004.

HOWREY LLP

- 20 -

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of
U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**

The electronic filer hereby attests that the individual whose name appears below has signed this document.  See General Order 45, Section X.

Dated:  April 30, 2007

Respectfully submitted,

HOWREY LLP

By:  _____/s/_____

Robert W. Unikel

Attorneys for Defendants Chi Mei Optoelectronics Corp., International Display Technology Co, Ltd, International Display Technology USA, Inc., and Westinghouse Digital Electronics, LLC

[Additional counsel continued from caption]

Christopher A. Mathews (SBN 144021)
Benjamin C. Deming (SBN 233687)
HOWREY LLP
550 South Hope Street, Suite 1100
Los Angeles, California  90071
Telephone:  (213) 892-1800
Facsimile:  (213) 892-2300
Email: mathewsc@howrey.com
Email: demingb@howrey.com

Robert W. Unikel (Admitted pro hac vice)
HOWREY LLP
321 North Clark Street, Suite 3400
Chicago, IL  60610
Telephone:  (312) 595-1239
Facsimile:  (312) 595-2250
Email: unikelr@howrey.com

Yuri Mikulka (SBN 185926)
Gregory S. Cordrey (SBN 190144)
HOWREY LLP
2020 Main Street, Suite 1000
Irvine, California  92614
Telephone:  (949) 721-6900
Facsimile:  (949) 721-6910
Email: mikulkay@howrey.com
Email: cordreyg@howrey.com

HOWREY LLP

Case No.  C 04-04675 MHP
**Defendants' Reply in Support of Its MSJ of**
**U.S. Pat. Nos 6,756,258 & 4,691,995 and No Liability**