1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEMICONDUCTOR ENERGY
LABORATORY COMPANY LTD

                Plaintiff,

      v.

CHI MEI OPTOELECTRONICS CORP., et
al.,

                Defendant(s).
_____/

No. C 04-04675 MHP

**MEMORANDUM & ORDER**
**Re: Motions for Summary Judgment**

      Plaintiff Semiconductor Energy Laboratory Company Ltd. ("SEL") brought this patent infringement action against defendant Chi Mei Optoelectronics Corp. ("CMO") et al., alleging infringement of four United States patents related generally to the design and manufacture of liquid crystal display ("LCD") devices.  Two patents in suit currently remain.  Now before the court are the parties' motions for summary judgment.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND

      An overview of the relevant technology and summaries of the asserted patents are provided in this court's Claim Construction Order.  Docket Entry 111 at 1–6 (hereinafter "Claim Construction Order").  SEL filed this action on November 3, 2004, alleging that CMO had infringed and was infringing various patents.  On August 11, 2006 the parties filed a stipulation dismissing with prejudice all claims regarding U.S. Patent No. 5,995,189.  April 19, 2007 this court entered an order granting summary judgment of noninfringement of U.S. Patent No. 4,691,995 ("the '995 patent").

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Docket Entry 331 (hereinafter "Summary Judgment Order").  All claims and defenses with respect

2   to the '995 patent were subsequently dismissed by stipulation.  Docket Entry 357.  Accordingly, two

3   patents-in-suit currently remain: U.S. Patent No. 6,756,258 ("the '258 patent") and U.S. Patent No.

4   6,404,480 ("the '480 patent").  The asserted claims of the '258 patent cover methods of fabricating

5   thin-film transistors ("TFTs") for use in LCDs.  In particular, the TFTs claimed by the '480 patent

6   include a "stepped" structure whereby the upper surface of the second semiconductor layer is

7   exposed.  The '480 patent claims an active matrix display device providing a way of reliably

8   creating an electrical connection between the substrates comprising the LCD.

9        SEL now moves for summary judgment on its claim of infringement of the '480 patent and

10   CMO's affirmative defenses of inequitable conduct, laches and patent misuse.  CMO moves for

11   summary judgment of noninfringement and invalidity of the '258 patent, noninfringement and

12   invalidity of the '995 patent, no liability for foreign sales and no liability for infringement prior to

13   the receipt of statutory notice of infringement.  The parties have additionally cross-moved for

14   summary judgment as to CMO's license defense.  Because the '995 patent is no longer at issue in

15   this case, the court will not reach the parties' arguments in these motions regarding the '995 patent.

16

17   LEGAL STANDARD

18        Summary judgment is proper when the pleadings, discovery and affidavits show that there is

19   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

20   matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

21   case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

22   genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

23   party.  Id.  The party moving for summary judgment bears the burden of identifying those portions

24   of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of

25   material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the

26   opposing party will have the burden of proof at trial, the moving party need only point out "that

27   there is an absence of evidence to support the nonmoving party's case."  Id.

28

2

1    Once the moving party meets its initial burden, the nonmoving party must go beyond the

2    pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

3    genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

4    party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.

5    1994). The court may not make credibility determinations, and inferences to be drawn from the

6    facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New

7    Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

8    The moving party may "move with or without supporting affidavits for a summary judgment

9    in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing

10   affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

11   evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

12   therein." Fed. R. Civ. P. 56(e).

13

14   DISCUSSION

15

16   I.    SEL's Motions

17

18        A.    Infringement of the '480 Patent

19   The parties' arguments regarding infringement of the '480 patent are substantively identical

20   to the arguments raised regarding CMO's previous motion for summary judgment. In essence, SEL

21   asserts that it has made a *prima facie* case for infringement, and that CMO's only defense against

22   infringement is its contention that the claim term "second interlayer insulating film" must be

23   construed as requiring a planar surface. Because CMO's products are intentionally non-planar,

24   CMO argues, CMO's devices cannot infringe. CMO does not appear to contest this characterization

25   of its position or otherwise offer any argument against infringement other than its argument based on

26   the planarity of the dielectric film.[1] CMO does raise a separate argument asserting SEL's inability

27   to show infringement based on foreign sales, which will be addressed in the section on defendant's

28

foreign sales motion below.

This court previously held that "the asserted claims of the '480 Patent cover nonuniform second interlayer dielectric films in the common contact portion of the matrix."  Summary Judgment Order at 22.  This order was issued after the initial briefing on the instant motions.  Because the court has previously resolved this issue in favor of SEL, SEL is entitled to summary judgment of infringement as to the '480 patent subject to the court's holdings regarding foreign sales set forth below.

B.    Inequitable Conduct

Inequitable conduct consists of (1) affirmative misrepresentations of material fact, (2) submission of false material information, or (3) the failure to disclose known material information during the prosecution of a patent, coupled with the intent to deceive the PTO.  Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1324 (Fed. Cir. 2000).  "Materiality and intent to deceive are distinct factual inquiries, and each must be shown by clear and convincing evidence."  Id.  CMO has raised inequitable conduct as an affirmative defense as to the '480 patent and the '258 patent.  SEL now moves for summary judgment as to both patents.

1.    The '480 Patent

CMO's theory of inequitable conduct with respect to the '480 patent is that SEL created fictional prior art and failed to cite actual prior art that would have revealed the falsity of SEL's purported prior art.

a.    Material Misrepresentation or Omission

Omitted prior art is material if "there is a substantial likelihood that a reasonable Examiner would have considered the information important in deciding whether to allow the application to issue as a patent."  Life Techs., 224 F.3d at 1325.  CMO must demonstrate materiality both as to the purported falsity of the admitted prior art, labeled as "Figure 13" in the '480 patent, and the actual

4

1   prior art references that SEL allegedly withheld from the PTO.

2

3                                    i.      Figure 13

4          Figure 13 of the '480 patent is a diagram labeled "Prior Art" showing a large conductive

5   spacer in the opening of a second insulating film.  As this court noted in its Claim Construction

6   Order, the location of the conductive spacer was a critical issue in the '480 patent:

7                    The '480 patent provides a way of reliably creating an electrical
                    connection from the TFT substrate to the opposing substrate while
8                    maintaining a uniform gap between the substrates.  One obstacle to
                    achieving a uniform gap in the prior art is variation in thickness of the
9                    insulating—or "dielectric"—layer deposited just beneath the
                    electrodes on the TFT substrate.  In prior art displays, the metal
10                   contact for the electrical connection to the counter substrate was
                    located on a layer *below* the level of the dielectric.  Thus, the
11                   conductive spacer had to be of a size roughly equal to the thickness of
                    the dielectric layer plus the width of the gap between the substrates in
12                   order to make electrical contact with both substrates.  Because it is
                    difficult to control the thickness of the dielectric layer from panel to
13                   panel, and even within a single panel, it was difficult to create spacers
                    of the correct size.  The improvement of the '480 patent is to locate the
14                   metal contact for the electrical connection *on top of* the dielectric
                    layer, eliminating the relationship between the thickness of the
15                   dielectric and the size of the conductive spacers.

16  Claim Construction Order at 4–5 (emphasis in original, citations omitted).  CMO claims that SEL

17  devised a prior art contact structure that would make SEL's claimed structure appear novel, but that

18  the actual prior art did not contain the defect purportedly addressed by the '480 patent.  Figure 13 is

19  clearly material in light of the fact that the location of the conductive spacer has been identified as

20  the innovation of the '480 patent.

21         The materiality of Figure 13 does not end the inquiry, however, as the court must determine

22  whether SEL has adduced sufficient evidence that the inclusion of Figure 13 was in fact a

23  misrepresentation.  In support of its claim that Figure 13 is a fabrication, CMO asserts that no SEL

24  witnesses, including the inventors, could recall or identify any device (other than an unspecified

25  SEL device), patent, patent application, text, article or publication with the structure disclosed in

26  Figure 13.  Unikel Opp. Dec., Exh. 2, Yamazaki Dep. at 250:19–259:17, 244:2–245:13; Unikel Opp.

27  Dec., Exh. 4, Hirakata Dep. at 43:19–44:2.  Additionally, the SEL employee who drew Figure 13

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    could not provide any information as to what she looked at to draw the figure or any other basis for

2    her understanding of the prior art structure.  Unikel Opp. Dec., Exh. 5, Sato Dep. at 91:9–96:6.  The

3    attorney who prosecuted the '480 patent likewise had no information as to whether the Figure 13

4    prior art drawing was accurate.  Unikel Opp. Dec., Exh. 6,  Robinson Dep. at 71:8–73:3.  Finally,

5    SEL has produced no prior art device or publication through discovery in this action which is

6    consistent with the structure shown in Figure 13.

7        In response, SEL claims that Figure 13 was developed based on SEL's own designs and

8    products, and that SEL's failure to provide the exact models does not support CMO's contention that

9    Figure 13 was a fabrication.  One inventor testified that he was familiar with a device that was

10   consistent with Figure 13, and that "at SEL panels with similar structures were being made" in 1996

11   and 1997.  Unikel Opp. Dec., Exh. 4, Hirakata Dep. at 43:19–44:2.  The other inventor likewise

12   testified that the structure disclosed in Figure 13 was one of the configurations that SEL was using in

13   1997.  Unikel Opp. Dec., Exh. 2, Yamazaki Dep. at 257:24–258:19.

14       Additionally, SEL claims that CMO's own invalidity contentions disclose a prior art

15   reference, U.S. Patent No. 6,219,124, which was cited by the examiner during the prosecution of the

16   '480 patent, as disclosing all claim elements except for a conductive spacer placed on top of an

17   insulating film.  Schlitter Rep. Dec., Exh. 6 at Exh. B3.  Finally, CMO's expert does not corroborate

18   CMO's argument regarding the falsity of Figure 13.  Schlitter Rep. Dec., Exh. 1, Mossinghoff Dep.

19   at 97:21–25 (stating that he had no information that any misrepresentations, as opposed to

20   omissions, were made in connection with the prosecution of the patents-in-suit).

21       Taken together, this evidence at least creates a genuine issue of material fact as to whether

22   Figure 13 was based on actual products with which the inventors of the '480 patent were familiar,

23   rather than a complete fabrication intended to mislead the PTO.

24

25                              ii.      Prior Art Publications

26       CMO relies on three publications in support of its inequitable conduct claim regarding the

27   '480 patent: U.S. Patent No. 5,757,456 ("the '456 patent"), Japanese Patent Publication 06-289415

28

1   ("the '415 publication"), and Japanese Patent Publication H06-186579 ("the '579 publication").

2   According to CMO, these references each disclose conductive spacers placed on top of an insulating

3   film rather than in the holes of the film.

4          This court discussed the '456 patent and the '415 publication at length in its Summary

5   Judgment Order.  With respect to the '415 publication, the court held that this reference disclosed

6   conductive spacers held over a second interlayer insulating film, but that the reference did not

7   disclose a "plurality" of such spacers.  Summary Judgment Order at 25–27.  The court likewise held

8   that the '456 patent does not disclose a plurality of conductive spacers, but made no specific holding

9   as to the location of the conductive spacers that were present.  Id. at 32–33.  Because SEL did not

10  contest that particular limitation in the prior summary judgment proceedings, however, SEL has

11  waived its objections to CMO's contention that the '456 patent discloses conductive spacers held

12  over a second interlayer insulating film.

13         SEL nonetheless claims that the '456 patent is cumulative to Figure 13, and therefore

14  immaterial as a matter of law.  See Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365,

15  1378 (Fed. Cir. 2001) (holding that "disclosures are not material if they are merely cumulative of

16  references that were already before the examiner").  A reference is cumulative if it "teaches no more

17  than what a reasonable examiner would consider to be taught by the prior art already before the

18  PTO."  Regents of the Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1575 (Fed. Cir. 1997).  SEL's

19  contention regarding Figure 13 is that it fails to disclose (1) a second interlayer insulating film

20  provided on said first conductive film, said second interlayer insulating film having at least two

21  openings; and (2) a plurality of conductive spacers held between said first substrate and said second

22  substrate.  Because these two limitations are likewise absent in the '456 reference, SEL argues, the

23  '456 reference is cumulative of the disclosed prior art.  However, the '456 reference also discloses

24  conductive spacers held over a second interlayer insulating film, as noted above.  This is an

25  additional critical limitation missing from Figure 13.  Accordingly, the '456 patent is not cumulative

26  of Figure 13, and SEL has not shown that the '456 patent is immaterial as a matter of law.

27         SEL likewise argues that the '579 publication is cumulative of Figure 13 because it is

28

UNITED STATES DISTRICT COURT
For the Northern District of California

7

"substantively identical" to the '415 publication.  SEL again argues that the reference is cumulative because it does not disclose a plurality if conductive spacers.  To the extent that the reference discloses conductive spacers held over the second interlayer insulating surface, however, the '579 reference contains a critical limitation absent from Figure 13 and is therefore not immaterial as a matter of law.

### b.   Intent

SEL does not challenge the sufficiency of CMO's evidence related to intent to deceive with respect to the '456 patent or the '579 publication.  Accordingly, SEL is not entitled to summary judgment on that basis.  SEL does, however, assert that CMO has provided insufficient evidence of intent to deceive regarding the '415 publication.

Specifically, SEL argues that no one having a duty to disclose prior art to the PTO in connection with the prosecution of the '480 patent was aware of the '415 publication during the prosecution.  In light of the intent requirement, there can be no duty to disclose an unknown prior art reference.  See FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415 (Fed. Cir. 1987).  As SEL points out, CMO's only evidence of knowledge with respect to the '415 publication is the fact that it was cited by Yamazaki and Hirakata, the two inventors of the '480 patent, during the prosecution of U.S. Patent No. 6,703,643.  SEL claims that SEL did not become aware of this reference until the Japanese Patent Office cited it on December 24, 2002, more than six months after the '480 patent issued.  Schlitter Dec., Exh. 23.  CMO responds to this argument in a footnote, acknowledging the facts of SEL's temporal argument but claiming that the citation in the '643 patent proves that Yamazaki and Hirakata knew of the '415 publication at some point in time prior to then.  CMO then cites the similarities between the '415 publication and the '579 publication, which was admittedly known to SEL during the '480 prosecution, and argues that a material issue of fact exists as to whether someone involved in the '480 prosecution knew of the '415 publication during that time.  While CMO's argument regarding the '415 publication is somewhat weak, inequitable conduct may be shown by circumstantial evidence.  In light of the additional factual issues regarding the

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1  remaining publications, therefore, the parties would be best served by having the jury consider

2  evidence related to the '415 publication as well.

3          In sum, SEL is not entitled to summary judgment on CMO's inequitable conduct defense

4  regarding the '480 patent.

5

6                          2.      The '258 Patent

7          A critical element of the asserted claims of the '258 patent is the step of "etching the exposed

8  portion of the second semiconductor film to form source and drain regions wherein a channel

9  forming region is formed in said first semiconductor film between said source and drain regions."

10 CMO asserts that SEL misrepresented the state of the prior art concerning "overetching" when

11 prosecuting the '258 patent, and withheld material prior art that would have revealed the true state of

12 the art.

13

14                          a.      Overetching

15         In rejecting the claims of the '258 patent, the examiner stated that the claims were not

16 patentably distinct from the claims of U.S. Patent No. 6,124,155 ("the '155 patent"), also owned by

17 SEL, and that "it is well known to overetch to expose the source and drain regions of the TFT

18 device." Unikel Dec., Exh. 14 at 3.  In response, SEL and Yamazaki requested that the examiner

19 cite references in support of the latter position, and stated that "overetching to expose the source and

20 drain regions of the TFT device is not conventional and would not have been known to one with

21 ordinary skill in the art at the time of invention." Id. at Response page 2.

22         CMO argues that this assertion was knowingly false, citing the following evidence.  SEL's

23 Local Patent Rule 4.2 Statement in this action indicates that "overetching [wa]s normally a part of

24 every etching process" at the time the '258 patent was filed.  Joint Statement of Undisputed Facts

25 ("JSUF") ¶¶ 59–60.  Additionally, Yamazaki testified that he was familiar with, and used, the

26 process of overetching to create semiconductor devices since at least the early 1970s.  Unikel Opp.

27 Dec., Exh. 2, Yamazaki Dep. at 405:13–21.  Finally, Yamazaki and SEL cited to U.S. Patent No.

28

                                           9

5,198,694 ("the '694 patent") in two patent applications prosecuted at the same time as the '258 application, but not in the '258 application itself.  CMO asserts that the '694 patent expressly discloses (1) that it was conventional to use a wet etchant to etch the conductive layer in a TFT; (2) that overetching the conductive layer with a wet etchant was common; and (3) that overetching the conductive layer with a wet etchant could result in a stepped structure.  Docket Entry 194, Exh. T, '694 Patent at 3:55–63.  CMO additionally claims that SEL separately submitted the entire family of prior art patents directly related to the '694 patent when prosecuting a separate patent.  Unikel Opp. Dec., Exh. 12 at 1 and attachments.

Regarding the '694 patent, SEL asserts that Yamazaki is not a named inventor of the '258 patent, which names Zhang and Kusomoto as the inventors, and that no inventor or prosecuting attorney of the '258 patent knew of the '694 patent.  Furthermore, SEL claims that there is no evidence that Yamazaki had any involvement in the prosecution of the '258 patent.  Likewise, although Robinson, the attorney who prosecuted the '258 patent, was involved in the prosecution of a separate SEL patent which cited the '694 patent, Robinson left the firm handling the former patent before the citation to the '694 patent was added.  Schlitter Dec., Exh. 11; Robinson Dec. ¶ 3. Because there is no evidence that Zhang, Kusomoto or Robinson knew of the '694 patent during the prosecution of the '258 patent, SEL argues, there was no duty to disclose this unknown reference.

CMO addresses the crucial issue of Yamazaki's involvement in the prosecution of the '258 patent in a footnote.  According to CMO, Yamazaki controlled the prosecution of SEL's patent portfolio, and Yamazaki closely monitored and directed the prosecution strategy for the '258 patent. Unikel Opp. Dec., Exh. 2, Yamazaki Dep. at 16:20–19:1, 390:9–392:16; Unikel Opp. Dec., Exh. 9 at SEL-CMO 0068867–81.  CMO's chief piece of evidence tying Yamazaki directly to the '258 patent is a memorandum dated January 6, 1999 describing a prior art device which SEL allegedly withheld from the PTO.  The memorandum is titled "Meeting with President Yamazaki," and states that "according to President Yamazaki's instructions, claim 1 is broad, and a Notice of Rejection will likely come, so there is probably no need to move now."  Unikel Opp. Dec., Exh. 9 at 0068872.[2]

In response to this evidence, SEL argues that the memorandum indicates the instruction from

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Yamazaki was given no later than January 6, 1999.  The next application related to the '258 patent

2   following this memorandum was filed on April 14, 1999, and issued as U.S. Patent No. 6,335,213 on

3   January 1, 2002.  Schlitter Dec., Exh. 1.  SEL therefore asserts that any duty of disclosure tied to

4   Yamazaki's instructions in the January 1999 memorandum terminated on January 1, 2002.  Chiron

5   Corp. v. Genentech, Inc., 268 F. Supp. 2d 1126, 1138 (E.D. Cal. 2002) (holding that "the duty to

6   disclose information ends when a patent is granted on an application").  Because Yamazaki did not

7   learn of the '694 patent until November 2003 at the earliest, Yamazaki had no duty to disclose the

8   '694 patent in prosecuting the application for the '213 patent.  Unikel Opp. Dec., Exh. 12.

9   Additionally, the application for the '258 patent was filed on May 8, 2002, and the patent issued on

10  June 29, 2004.  Apart from the memorandum from January 1999 related to a patent that issued three

11  years later, CMO has presented no evidence that Yamazaki was involved in the prosecution of the

12  '258 patent itself.  CMO is thus left to rely on its contentions regarding Yamazaki's general interest

13  in SEL's patents.  Absent more substantial evidence of Yamazaki's involvement in the specific

14  application at issue, CMO cannot meet its burden on summary judgment.

15          Additionally, SEL states that the '694 patent is immaterial because its relevant teaching is

16  limited to the fact that overetching was known in the prior art.  SEL contests CMO's assertion that

17  the '694 patent also taught the formation of a stepped TFT structure, citing testimony from CMO's

18  own expert stating that the '694 "was teaching away from that structure, step-down structure."

19  Schlitter Rep. Dec., Exh. 3, Kanicki Dep. at 306:5–7.  Because the '694 patent disclosed only the

20  process of overetching generally, which was known in the prior art, the reference is immaterial as a

21  matter of law because the Examiner is presumed to be familiar with the prior art.

22          Turning to SEL's representations regarding the state of the prior art as to overetching, SEL

23  denies that it made any misleading statements in this regard.  In particular, SEL argues that its

24  position was that overetching *to create stepped structures* was not known, not that overetching *itself*

25  was not known.  Significantly, the contested statement from the examiner was that "it is well known

26  to overetch *to expose the source and drain regions of the TFT device*."  Unikel Dec., Exh. 14 at 3

27  (emphasis added).  SEL's response was likewise tied to the specific process of creating stepped

28

11

structures, claiming that "overetching *to expose the source and drain regions of the TFT device* is not conventional and would not have been known to one with ordinary skill in the art at the time of invention." Id. at Response page 2 (emphasis added). CMO's evidence regarding SEL's knowledge of the use of overetching as a part of semiconductor manufacturing in general does not contradict SEL's assertions regarding the use of overetching to the specific, purportedly novel, purpose of creating a stepped TFT structure. Accordingly, CMO has provided insufficient evidence of inequitable conduct related to the prior art regarding overetching.

b.     Stepped TFT Structures

CMO additionally alleges that SEL made false representations regarding the novelty of creating a stepped TFT structure. In particular, CMO claims that SEL (1) responded to the '258 patent examiner's rejection based on the '155 patent by suggesting that the claimed "stepped" TFT structure was somehow new and different from prior art structures, and (2) challenged the examiner's reliance on Japanese Patent No. JP 63-86573 ("the '573 patent") by implying that the reference did not show the same structure described in the '258 claims. CMO claims that these assertions were misleading because SEL knew of one reference, U.S. Patent No. 5,270,567 ("the '567 patent") which discloses a stepped structure.

Regarding the '573 patent, as a reference which the PTO undeniably had access to and considered, this reference categorically cannot form the basis of an inequitable conduct claim. "When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it can not be deemed to have been withheld from the examiner." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1582 (Fed. Cir. 1991). Additionally, attempting to distinguish prior art does not constitute a material omission or misrepresentation. Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1482 (Fed. Cir. 1986). When a patentee makes a representation regarding prior art, "[t]he examiner [i]s free to reach his own conclusion . . . based on the art in front of him." Id. CMO's assertion that SEL somehow duped the examiner into misinterpreting the '573 patent when the examiner was able to perform his or her own independent

analysis of the reference cannot support an inequitable conduct defense.

Regarding the '567 patent, SEL argues that this reference is cumulative of the '573 patent and therefore immaterial. The parties appear to agree that the '567 patent discloses a TFT device having a stepped structure with exposed source and drain regions, which is the basis for the materiality of the '573 patent. '567 patent, Fig. 2. Attempting to establish that the '567 patent is not cumulative, CMO raises two principal points. First, based on the diagrams in the '567, '573 and '258 patents, CMO claims that the TFT structure shown in the '567 patent is "visually, much more similar" to the structure in the '258 patent. Unikel Opp. Dec., Exh. 11, Kanicki Dep. at 330:5–332:3, 349:16–350:22. While it is not immediately clear that the diagram in the '567 structure is indeed more similar to the structure of the '258 patent, CMO offers no authority for its proposition that it may overcome a cumulativeness argument by citing increased visual similarities between diagrams. The salient issue is claim limitations. The purported increased similarity does not change the fact that both references disclose a stepped TFT structure.

Second, CMO claims that the '573 patent fails to disclose that a TFT with a stepped structure is beneficial to help reduce parasitic capacitance. The '567 patent specifically identifies this as a benefit of the stepped structure. '567 patent at 1:50–2:2, 2:6–22. Again, CMO offers no authority supporting its claim that a reference that discloses a *benefit* of a claim limitation where the claim limitation itself is disclosed elsewhere is more material than the reference which discloses the claim limitation only. CMO has failed to establish that the additional information in the '567 patent is material in any way.

In sum, CMO has failed to raise sufficient evidence to support any of its theories of inequitable conduct with respect to the '258 patent. SEL is therefore entitled to summary judgment on CMO's inequitable conduct claim as to the '258 patent.[3]

C.    Laches

CMO acknowledges that its laches defense pertains only to the '995 patent. Accordingly, SEL is entitled to summary judgment on CMO's laches claims as to the '480 patent and the '258

patent.

D.    Patent Misuse

"Patent misuse is an equitable defense to patent infringement," the purpose of which is "to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1184 (Fed. Cir. 2005) (internal quotations omitted). In assessing a claim of patent misuse, the "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." Id. (internal quotations omitted). CMO asserts that SEL has engaged in patent misuse by (1) offering to license its patents as a package rather than individually and (2) seeking to enforce invalid patents through bad faith litigation.

1.    Package Licensing

CMO argues that SEL's practice of licensing its patents as packages constitutes patent misuse. In a striking display of chutzpah, CMO relies exclusively on cases decided in other circuits and districts before the establishment of the Federal Circuit and before a critical amendment to the patent statute for the proposition that such package-licensing constitutes patent misuse. See Hazeltine Research, Inc. v. Zenith Radio Corp., 388 F.2d 25, 33 (7th Cir. 1967), aff'd in part, rev'd in part, 395 U.S. 100 (1969); American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769, 777 (3d Cir. 1959); Duplan Corp. v. Deering Milliken, Inc., 444 F. Supp. 648, 703–04 (D. S.C. 1977), aff'd in part, rev'd in part, 594 F.2d 979 (4th Cir. 1979); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F. Supp. 1, 50 (D. Md. 1963). While this may have been the law of the land in times past, the legal landscape of today is somewhat different.

Congress has established a statutory provision addressing the legality of package patent licensing:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed

14

hhhh

1

> guilty of misuse or illegal extension of the patent right by reason of his
> having . . . conditioned the license of any rights to the patent or the
> sale of the patented product on the acquisition of a license to rights in
> another patent or purchase of a separate product, unless, in view of the
> circumstances, the patent owner has market power in the relevant
> market for the patent or patented product on which the license or sale
> is conditioned.

35 U.S.C. § 271(d).  Additionally, the Federal Circuit has held that, "[t]o establish the defense of

patent misuse, the accused infringer must show that the patentee has power in the market for the

tying product."  U.S. Philips, 424 F.3d at 1186.  The Federal Circuit explicitly held that the usual

presumptions in antitrust law that market power necessarily flows from patent ownership do not

apply in the context of patent misuse.[4]  Id. at 1185–86.  Rather, the accused infringer must present

evidence of market power in order to establish that a tying arrangement constitutes patent misuse.

Because CMO has provided no evidence whatsoever of market power, its patent misuse claim as it

relates to package licensing fails as a matter of law.

Furthermore, SEL has cited unrefuted evidence showing that it has accommodated at least

one request to license an individual patent.  Schlitter Dec., Exh. 48, Yamazaki Dep. at 38:16–42:18.

Even if package-licensing constituted patent misuse, therefore, SEL has shown a willingness to

refrain from the practice.

## 2.   Litigation

In addition to its claims regarding licensing practices, CMO argues that SEL has committed

patent misuse by seeking to enforce patents known to be invalid and/or unenforceable.  "The

bringing of a lawsuit to enforce legal rights does not of itself constitute violation of the antitrust laws

or patent misuse; there must be bad faith and improper purpose in bringing the suit, in

implementation of an illegal restraint of trade."  Glaverbel Societe Anonyme v. Northlake Marketing

& Supply, Inc., 45 F.3d 1550, 1558 (Fed. Cir. 1995).  Because "a patent infringement suit is

presumed to be brought in good faith," Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572,

1577 (Fed. Cir. 1990), CMO must present evidence of bad faith or improper purpose in order to

establish patent misuse based on patent enforcement.  CMO cites no evidence whatsoever to

UNITED STATES DISTRICT COURT
For the Northern District of California

15

1   overcome the presumption of good faith litigation.  SEL is therefore entitled to summary judgment

2   on CMO's patent misuse defense.

3

4   II.   CMO's Motions

5

6       A.   NonInfringement of the '258 Patent

7       CMO asserts that it does not infringe the '258 patent because CMO's manufacturing process

8   does not include the claim element, "etching the exposed portion of the second semiconductor film

9   to form source and drain regions wherein a channel forming region is formed in said first

10  semiconductor film between said source and drain regions."  Addressing the parties' arguments in

11  this regard requires a brief review of the court's claim construction regarding this element.

12      In addressing the issue of how much of the semiconductor film (N+ layer) is etched away,

13  the court first held that the term "exposed" means "made subject to etching."  Claim Construction

14  Order at 15.  The court further held that the exposed portion depended upon the type of etchant used.

15  "If a dry etchant is used to remove the semiconductor film, only the area not covered by the mask

16  will be removed, regardless of whether the conductive layer was previously overetched using a wet

17  etchant.  If a wet etchant is used to remove the semiconductor film, part of the semiconductor film

18  lying underneath the mask will also be removed, regardless of whether the conductive layer was

19  previously etched using a dry etchant."  Claim Construction Order at 15.  The Court then held that

20  "the claims encompass the use of both wet and dry etchants in performing the patterning step, and

21  also encompass the use of a dry etchant in performing the etching step."  Id.  Finally, the court held

22  that the phrase "etching the exposed portion of the second semiconductor film" means "removing

23  the entire exposed portion of the second semiconductor film."  Id. at 16.  Incorporating the

24  construction of the term "exposed," the construction becomes "removing the entire portion of the

25  second semiconductor film made subject to etching."

26      For the purposes of the instant motion, the parties dispute whether the accused process must

27  remove only the portion of the N+ layer uncovered by the mask, or the portion uncovered by the

28

16

UNITED STATES DISTRICT COURT
For the Northern District of California

electrodes.  CMO asserts that the exposed portion is that uncovered by the electrodes in light of the claim limitation, "a portion of the patterned second semiconductor film [N+ layer] is exposed between said source and drain electrodes."  SEL claims that only the portion uncovered by the mask must be etched away, citing the court's prior discussion of dry etching.  The dispute arises from the fact that CMO's etching process is classified as "dry etching" and yet apparently removes a portion of the N+ layer larger than the area left uncovered by the mask.

### 1.    Judicial Estoppel

SEL claims that CMO is judicially estopped from asserting that its dry etch removes portions of the N+ layer below the mask, in light of its representations during the claim construction hearing that dry etching does not remove portions of the layer beneath the mask.  In other words, despite CMO's assertion at claim construction that dry etching is anisotropic (i.e., removes material only in the direction of bombardment), CMO now claims that its own dry etching has an isotropic component, meaning the dry etchant removes material in directions other than the direction of bombardment.  SEL asserts that judicial estoppel requires that CMO be bound to its initial representations regarding dry etching.

Judicial estoppel is an equitable doctrine that "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotations omitted).  Although the doctrine is not easily defined, the Supreme Court has identified three factors that are relevant to the application of the doctrine.  Id. at 750.  First, a party's position in the second instance must be "clearly inconsistent" with its position in the first matter.  Id.  Second, a court must have accepted the party's earlier position, "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled."  Id. at 750–751.  The third consideration is whether the party asserting an inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id. at 751.

Regarding the first factor, CMO denies that it has taken inconsistent positions. According to CMO, its representations at claim construction were directed toward dry etching "generally," while its current representations involve CMO's particular dry etching process. The parties focus on a particular exchange from the claim construction hearing between the court and CMO's counsel:

> MR. TAUB:[5]  But you agree that if you use a dry etch here that the dotted lines [indicating the opening created by the mask] reflect what will be etched away as opposed to everything else [beneath the mask].
> MR. YOCHES:  Yes.
> MR. TAUB:  Okay.
> MR. YOCHES:  Except — and here's the important thing — nothing in the claim and nothing in their definition limits that etchant to a dry etchant.
> MR. TAUB:  Right.  But you don't dispute that the claims would include dry etchant, correct?
> MR. MOSKO:  It would include that, but neither the claims or the — because neither the claims or the definition is limited to dry etchant, when you go to the next step [etching the N+ layer], as you properly recognized, if you were wet etching [the N+ layer] — we slipped through these — the portion [of the N+ layer] etched away would have nothing to do with the mask here.

Claim Construction Hearing Transcript at 56:4–20.  Nowhere in this exchange, however, does defense counsel indicate that a dry etchant can be isotropic.  Rather, defense counsel asserted that the etching process could be isotropic *if a wet etchant were used*.  CMO was putting forth the assertion that the '258 claims covered isotropic etching not because they covered isotropic dry etching but because they covered wet etching.

The court's subsequent orders was consistent with the view — consistent with the representations of defense counsel — that all dry etchants are anisotropic and all wet etchants are isotropic.  The court's Claim Construction Order states:

> Etchants come in one of two varieties.  So-called "dry" etchants are abrasive substances that are used to bombard the target material and remove the material anisotropically, in the direction of the bombardment—a process similar to sandblasting.  When a dry etchant is used in conjunction with a mask, only those areas not covered by the mask are etched. "Wet" etchants, on the other hand, are solvents that remove the target materially isotropically, or at the same rate in all directions.

Claim Construction Order at 13.  Furthermore, in denying CMO's subsequent Motion for Reconsideration, the court stated the following regarding the reasoning behind its construction of the

18

term "exposed":

> The court relied upon the claim language, which is broadly stated, noting it encompasses the use of both wet and dry etchants; the description in the specification of the use of different types of etchant; and the parties' stipulations in their papers and at argument that one of ordinary skill in the art would understand that a wet etchant will remove a different part of the surface of a semiconductor device than a dry etchant.

Docket Entry 144 at 3. Although the court stated that "[n]o part of this reasoning depends on reference to the accused process," id., the parties' agreement regarding the nature of wet and dry etchants was a significant basis for the court's decision.

Although the court's previous orders have focused on the words "wet" and "dry," the more pertinent distinction is between "isotropic" and "anisotropic." Phrasing the distinction in this manner is consistent with the scientific evidence, which demonstrates that the characterization of an etching process as "wet" or "dry" does not necessarily determine whether the process is isotropic or anisotropic. In other words, while using the terms "wet" and "dry" as proxies for "isotropic" and anisotropic," respectively, was helpful in the context of claim construction, characterizing the accused process as "wet" or "dry" is inconclusive in terms of determining infringement. The court must now take a more comprehensive view of isotropic and anisotropic etching. Accordingly, CMO is not judicially estopped from asserting that its etching process, however it is characterized in terms of "wet" and "dry," has an isotropic component, and yet does not remove the entire exposed portion of the N+ layer.

### 2. CMO's Dry Etch Process

As stated above, CMO claims that its dry etch process etches beneath the mask but does not remove the entire exposed portion of the N+ layer. This court previously held that the extent of the "exposed" portion of the second semiconductor film "would depend on the type of etchant used." Docket Entry 144 at 2. Accordingly, CMO is correct that, in an isotropic etching process, the "exposed" portion of the second semiconductor film is the portion uncovered by the conductive layer. Accordingly, if there is no material dispute as to whether a portion of CMO's N+ layer

UNITED STATES DISTRICT COURT
For the Northern District of California

19

UNITED STATES DISTRICT COURT
For the Northern District of California

1    uncovered by the electrodes remains after the etching process is complete, CMO is entitled to

2    summary judgment of noninfringement.

3            CMO's dry etching process involves reactive plasma gases which are able to move to areas

4    beneath the mask where they can react with and thereby etch any N+ silicon that is not covered by

5    the electrodes.  Unikel Dec., Exh. 1, Chou Dep. at 104:24–105:16, 187:20–189:5.  According to

6    CMO, all knowledgeable witnesses as well as SEL's expert agree that (1) CMO's plasma etching

7    process is at least partially isotropic, (2) all N+ silicon not covered by the metal electrodes will be

8    exposed to and etched by the plasma gas, and (3) CMO's process is designed so that this dry etching

9    step is completed without etching away the entire amount of N+ silicon that is uncovered by the

10   electrodes.  Additionally, SEL claims that its "tapered" TFT structures are inconsistent with what

11   would be expected from an anisotropic etching process, which generally creates vertical surfaces.

12           In response to these claims, SEL relies on a process flow diagram and a conceptual drawing

13   which, according to SEL, indicate that CMO's etching process does not disturb the portions of the

14   N+ layer beneath the mask, and is therefore anisotropic.  Schlitter Opp. Dec., Exh. 1; Schlitter Opp.

15   Dec., Exh. 6 at 25.  As discussed above, if CMO's etching process is anisotropic, the "exposed"

16   portion of the N+ layer for the purposes of the '258 claims is the portion uncovered by the mask.

17   Because CMO does not deny that the entire portion of the N+ layer uncovered by the mask is

18   removed by its etching process, if CMO fails to establish that its etching process is isotropic its

19   noninfringement theory fails.

20           Regarding SEL's evidence as to whether the N+ layer is etched under the mask, however,

21   this court has previously held that process flow diagrams and conceptual drawings are unhelpful in

22   determining the specific dimensions of the ultimate TFT structure.  See Summary Judgment Order at

23   13–14.  Accordingly, these idealized images do not create a genuine issue of fact with respect to

24   whether CMO's etching process is isotropic or anisotropic.

25           Additionally, SEL cites a statement from CMO's expert, Dr. Hatalis, stating that plasma

26   reactive ion etching ("RIE") such as that used by CMO is anisotropic.  Schlitter Opp. Dec., Exh. 4 at

27   19:6–9.  What Dr. Hatalis actually stated, however, was that "[i]n general the RIE plasma etch

28

1   process tends to be anisotropic, but in this case at it is explained next, the anisotropy is

2   compromised." Id. at 19:8 –9.  Dr. Hatalis went on to specifically state that a portion of the N+

3   layer beneath the mask is etched by CMO's RIE process: "It is important to note, that any portions

4   of silicon layer that are not in direct contact with, and thus not protected by, the metal will be

5   subjected to etching by the gas species.  This etching as stated above will occur even in the small

6   portion of the material under the photoresist [mask]." Id. at 20:9–11.  The report of another of

7   CMO's experts, Dr. Kanicki, is consistent with this analysis, stating that "[a]lthough dry etching is

8   generally regarded as an anisotropic process, an isotropic dry etch process could also be produced by

9   using" plasma.  Schlitter Opp. Dec., Exh. 6 at 20:18–21.  Additionally, SEL claims that Dr. Hatalis

10  never reviewed evidence related to the N+ layer, though the deposition testimony SEL cites does not

11  support this broad proposition.  Finally, although SEL contends that Dr. Kanicki stated that the

12  tapered wall profiles are the result of mask erosion, Dr. Kanicki additionally opined that isotropic

13  overetching may etch the film under the mask.  Schlitter Opp. Dec., Exh. 6 at 24.

14        Because the evidence cited by SEL does not contradict CMO's evidence that CMO's

15  isotropic etching process removes portions of the N+ layer without removing the entire portion

16  uncovered by the electrodes, CMO is entitled to summary judgment of noninfringement of the '258

17  patent.

18

19        B.     Invalidity of the '258 Patent

20        CMO claims that the '258 patent is anticipated and/or rendered obvious by a number of prior

21  art references, focusing, again, on the step "wherein said conductive layer is overetched to form a

22  stepped portion from an upper surface at the source and drain electrodes to the surface at the first

23  semiconductor film."  In particular, CMO has identified five prior art references which disclose a

24  stepped TFT structure as claimed in the '258 patent: U.S. Patent No. 5,270,567 ("the '567 patent"),

25  Japanese Patent Publication No. S63-86573 ("the '573 publication"), U.S. Patent No. 4,797,108

26  ("the '108 patent"), Japanese Patent Publication No. S63-224258 ("the '258 publication") and

27  Japanese Patent Publication No. H02-281238 ("the '238 publication").  SEL does not deny that these

28

21

references disclose a stepped TFT structure.  The dispute therefore turns on CMO's second contention: that the references additionally disclose overetching to create a stepped TFT structure, or that the use of overetching to create such a structure would have been obvious to one skilled in the art.

1.    Anticipation

To prove invalidity based on anticipation, CMO must show that a single prior art reference discloses every limitation of the claimed invention.  Schering Corp. v. Geneva Pharm., Inc., 339 F.3d 1373, 1377 (Fed. Cir 2003).  Anticipation is a question of fact.  SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1343 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 2887 (2006).  "However, without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law."  Id.  The burden of proof in all instances falls upon the party seeking to establish the invalidity of a patent claim, who "must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence."  State Contracting & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1067 (Fed. Cir. 2003).

a.    The '567 Patent, the '238 Publication, the '258 Publication and the '573 Publication.

CMO claims that, because overetching was, and is, a well known part of every etch process, overetching is inherently taught by the '567 patent, the '238 publication, the '258 publication and the '573 publication.  In advancing this inherency argument CMO appears to acknowledge that none of these references explicitly discloses the use of overetching to create a stepped TFT structure.

"Inherent anticipation requires that the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art."  Trintec Indus., Inc. v. Top-U.S.A. Corp., 295 F.3d 1292, 1295 (Fed. Cir. 2002) (internal quotations omitted).  As discussed above in reference to CMO's inequitable conduct claims, SEL acknowledges that overetching itself was generally known in the art at the time of the invention.  CMO has also cited additional evidence that

1  overetching is always part of any etching process.  SEL's expert, Dr. Thomas, testified that

2  overetching is part of every etch process for entirely removing a layer of material.  Unikel Dec.,

3  Exh. 3, Thomas Dep. at 122:15–123:23.  A prior art textbook additionally states that "[i]n any etch

4  process there is always some degree of overetch planned into the process."  Unikel Dec., Exh. 12 at

5  222–23.  Yamazaki himself testified that overetching was used in the early 1970s in his own work in

6  the fabrication of TFTs.  Unikel Dec., Exh. 11, Yamazaki Dep. at 405:13–21.  Accordingly, SEL

7  claims that the innovation of the '258 patent was the use of overetching as a means of creating a

8  stepped N+ layer.

9         In response to CMO's argument, SEL claims that the '258 publication teaches that the N+

10  step is formed by using multiple masks rather than overetching, and that this indicates that an N+

11  step can be formed by a process other than overetching.  If this is the case, the stepped structures

12  disclosed by the other references could be made by means other than overetching, and overetching

13  would therefore not be an inherent element in the formation of these structures.  CMO counters that

14  this is not a meaningful distinction between the '258 publication and the '258 patent, for two

15  reasons.  First, in its Claim Construction Order, this court construed the overetching step broadly,

16  holding as follows:

17         The systematic variation of claim language suggests that
           "overetched," as used in claim 3, is not confined to a particular type of
18         etching (which is added in claim 6) or a particular timing for etching
           (which is added in claims 7 and 8).  Claim 3 requires only that the
19         conductive layer be overetched. Both parties agree that one of
           ordinary skill in the art would understand that overetching can be
20         performed either as a separate step, involving the application of
           additional etchant, or by extending the original etching such that the
21         etchant undercuts the mask.  The language of claim 3 encompasses
           both meanings.
22
23  Claim Construction Order at 17.  Second, the '258 patent itself suggests the use of multiple masks to

24  create the stepped TFT structure.  '258 Patent, Figs. 3(A)–3(H), 6:8–7:26.  CMO claims that this

25  establishes that the use of multiple masks does not affect the necessary involvement of overetching

26  in the formation of the N+ step.

27         While overetching was known in the art, and appears to have been a byproduct of many

28  etching processes, none of the asserted references disclose the use of overetching as a tool to create a

1  stepped TFT structure.  Rather, the stepped structure was created by other means.  SEL's claimed

2  innovation of specifically using overetching to create a stepped structure is therefore not disclosed in

3  these references, and these references do not anticipate the '258 patent.

4

5                          b.      The '523 Publication

6          CMO additionally argues that the '258 patent is anticipated by Japanese Patent Publication

7  No. H01-180523 ("the '523 publication"), which teaches a method of producing a TFT using a form

8  of overetching the conductive layer.  In particular, the '523 publication teaches to "process the Cr

9  [chromium] film by photo-etching, and separate the drain electrode . . . and the source electrode . . .

10  as well as removing the Cr film on the pixel electrode."  Unikel Dec., Exh. 16 at CMO 0183037.

11  The publication additionally states that "when the Cr film is further etched using the same resist, the

12  Cr film 52 and 62 of the drain electrode 5 and the source electrode 6 move backwards and the

13  undercut of the n type amorphous silicon film can be prevented."  Id.  CMO asserts that this "further

14  etching" step necessarily results in a stepped TFT structure because preventing undercut of the N-

15  type material inherently requires moving the chromium layer backward from the inner edge of the

16  N-type material, resulting in an exposed upper surface of the N-type layer.  As SEL points out,

17  however, the publication further states that this "further etching" step results in the structures shown

18  in Figures 1 and 2 of the publication.  These figures fail to disclose a stepped N-type layer.

19          Additionally, SEL's expert, Dr. Thomas, has opined that the '523 publication discloses only

20  an "aligned structure" rather than a stepped structure, i.e. that the edge of the N-type layer is aligned

21  with the edge of the chromium layer.  Thomas Dec., Exh. 3 at 4–7.  CMO acknowledges that this

22  was Thomas' conclusion but asserts that Thomas was incorrect.  Significantly, CMO's motion offers

23  no expert evidence of its own, or any other evidence for that matter, supporting its own

24  interpretation of the '523 publication.  Only in CMO's reply brief does it cite testimony from its own

25  expert claiming that the '523 "further etching" step results in a stepped structure.  Even assuming

26  that CMO's expert evidence on this topic has been properly presented after having been omitted

27  from its opening brief, the court cannot resolve this expert dispute on summary judgment.  At the

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    very least, SEL has created a genuine issue of fact as to whether there is clear and convincing

2    evidence that the '523 publication anticipates the '258 patent.

3

4                           c.    The '774 Publication

5         Finally, CMO claims that Japanese Patent Publication No. H2-272774 ("the '774

6    publication") anticipates the '258 patent.  CMO cites two passages from the '774 publication dealing

7    with etching metal films and transparent conductive films.  The first passage states that

8              [o]ne may process chromium film etching → transparent conductive
              film etching → chromium film etching, so as to form the etching
9              pattern of the metal film such as a chromium metal film . . . on the
              inside of the etching pattern of the transparent conductive film . . . to
10             prevent the backward movement of the chromium metal film pattern
              toward the underside of the transparent conductive film pattern.

11

12   Unikel Dec., Exh. 17 at CMO 183083.  The second passage states that "one may further immerse the

13   metal film into the liquid etchant for the metal such as aluminum, so as to form the pattern . . . made

14   from a metal film such as aluminum inside the pattern . . . made from a metal film such as chromium

15   film."  Id.  The publication indicates that the transparent conductive film sits atop the N-type silicon

16   layer.  No illustrations are provided for these two optional processes in the publication.  CMO

17   nonetheless claims, again without citation to expert testimony, that these two processes necessarily

18   create a step from the transparent conductive film to the N-type silicon.

19        In response, SEL makes two arguments.  First, SEL claims that CMO's expert, Dr. Kanicki,

20   testified that the '774 publication discloses an N-type silicon layer completely covered by the

21   electrodes.  Schlitter Opp. Dec., Exh. 11, Kanicki Dep. at 162:9–12.  CMO responds that this

22   testimony referred only to a particular figure in the '774 patent which does not form the basis for

23   their current anticipation argument.  Id. at 162:3–8.  Second, SEL claims that the processes

24   discussed above discuss only etching the source electrodes rather than the drain electrode.

25        Taken together, this does not constitute clear and convincing evidence that the '774

26   publication discloses the stepped N-type layer present in the '258 patent.  However, the reference

27   clearly discloses overetching and the formation of stepped structures other than the N-type layer, and

28   therefore may render the '258 patent obvious as discussed below.

UNITED STATES DISTRICT COURT
For the Northern District of California

25

1

UNITED STATES DISTRICT COURT
For the Northern District of California

### 2.    Obviousness

In addition to raising anticipation arguments, CMO claims that each of the above references renders the '258 patent obvious.

### a.    Obviousness Standard

To prove that a patented invention is invalid as obvious, the accused infringer must identify prior art references "which alone or combined with other references would have rendered the invention obvious to one of ordinary skill in the art at the time of invention." Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citations omitted). "Obviousness is a question of law premised on underlying findings of fact." Eolas Techs. Inc. v. Microsoft Corp., 399 F.3d 1325, 1332 (Fed. Cir. 2005), cert denied, 126 S.Ct. 568 (2005) (citing Graham v. John Deere Co., 383 U.S. 1, 17–18 (1966)). These underlying factual determinations include: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and, if necessary, (4) secondary evidence of nonobviousness. Graham, 383 U.S. at 17–18; Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc., 73 F.3d 1085, 1087–88 (Fed. Cir. 1995). Like anticipation, the affirmative defense of obviousness must be established by clear and convincing evidence. See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1353 (Fed. Cir. 2003).

The Supreme Court has recently clarified the test for obviousness, specifically the analysis applicable to whether there exists some "teaching, suggestion or motivation" to combine prior art references, which has traditionally been a requirement for a finding of obviousness. The Court described this test as a "helpful insight" rather than a rigid formula, and held that "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." KSR Int'l Co. v. Teleflex Inc., ___ U.S. ___, 127 S. Ct. 1727, 1741 (2007). The Court further emphasized the need for courts to value "common sense" over "[r]igid preventative rules." Id. at 1742–43.

26

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   While <u>KSR</u> was pending before the Supreme Court, the Federal Circuit emphasized the

2   flexibility of the teaching, suggestion or motivation analysis in <u>DyStar Textilfarben GmbH & Co.</u>

3   <u>Deutschland KG v. C.H. Patrick Co.</u>, 464 F.3d 1356 (Fed. Cir. 2006), <u>cert. denied</u>, ___ S.Ct. ____,

4   2007 WL 682021 (2007).  There, the court held that the "suggestion test is in actuality quite flexible

5   and not only permits, but *requires*, consideration of common knowledge and common sense."  <u>Id.</u> at

6   1367 (emphasis in original).  Furthermore, the court acknowledged the possibility of an implicit

7   motivation to combine, i.e. one not explicitly apparent in the prior art.  "If, as is usually the case, no

8   prior art reference contains an express suggestion to combine references, then the level of ordinary

9   skill will often predetermine whether an implicit suggestion exists."  <u>Id.</u> at 1370.  Thus a high skill

10   level renders a finding of implicit motivation more likely, as skilled individuals are more likely to

11   combine references "without being told to do so."  <u>Id.</u>

12   Accordingly, this court's analysis of the parties' arguments regarding obviousness must be

13   flexible and guided by common sense.

14

15   b.   <u>Preclusion</u>

16   As a general matter, SEL claims that each of CMO's obviousness arguments are precluded

17   because CMO allegedly failed to properly disclose these theories in its Final Invalidity Contentions

18   as required by the Patent Local Rules.  "If a combination of items of prior art makes a claim

19   obvious, each such combination, and the motivation to combine such items, must be identified" in a

20   party's Final Invalidity Contentions.  Pat. L.R. 3-3(b).  According to SEL, CMO's Invalidity

21   Contentions and Kanicki's report contain only general allegations of obviousness.  Schlitter Opp.

22   Dec., Exh. 6 at Exh. C-9 at 4, Exh. C-29 at 1–11; Schlitter Opp. Dec., Exh. 9 at C-9 & C-29.  CMO

23   claims that Kanicki's report and the Invalidity Contentions are sufficiently detailed to pass muster

24   under Rule 3-3(b), and that all references were properly disclosed.

25   The application of Local Rules is within the discretion of the District Court.  <u>Genentech, Inc.</u>

26   <u>v. Amgen, Inc.</u>, 289 F.3d 761, 768 (Fed. Cir. 2002).  Reviewing the Invalidity Contentions and expert

27   report, it is apparent that CMO has provided detailed citations to prior art rather than conclusory

28

27

1   statements.  Furthermore, SEL has not argued that any of the particular references relied upon by

2   CMO were previously undisclosed.  Accordingly, the Invalidity Contentions and expert report

3   satisfy Patent Local Rule 3-3(b), and the court will consider CMO's obviousness arguments.

4

5                               c.      Obviousness Analysis

6        CMO's obviousness argument with respect to the above references essentially boils down to

7   an overall contention that a person having ordinary skill in the art would have known to combine the

8   known process of overetching to create the known stepped TFT structures.  In response, SEL raises

9   two arguments in addition to its preclusion argument discussed above.  First, SEL faults CMO for

10  excessive reliance on expert testimony.  Although "an expert's opinion on the legal conclusion of

11  obviousness is neither necessary nor controlling," Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853

12  F.2d 1557, 1564 (Fed. Cir. 1988), expert opinion is nonetheless helpful in interpreting scientific

13  evidence.  Furthermore, CMO raises specific arguments based on citations to and interpretations of

14  various prior art references beyond the opinions of its own experts as to the legal outcome.

15  Accordingly, CMO's reliance on expert evidence is not fatal to its obviousness argument.

16       Second, SEL claims that CMO's references teach away from the use of overetching to form a

17  stepped N+ region.  Kanicki testified that the '694 patent, which discloses overetching to form a

18  tapered TFT structure, "was teaching away from that structure, step-down structure."  Schlitter Rep.

19  Dec., Exh. 3, Kanicki Dep. at 306:5–7.  Additionally, the other references that disclose overetching

20  do not mention step-down structures.  With respect to the '694 patent, CMO counters that the '694

21  patent taught away from stepped TFT structures generally, not the use of overetching to create

22  stepped structures.  Furthermore, with respect to the silence of the other references on the subject of

23  stepped TFT structures, a reference's failure to mention a particular use does not constitute teaching

24  away from that use.  Dystar, 464 F.3d at 1364 ("We will not read into a reference a teaching away

25  from a process where no such language exists.").  Accordingly, SEL is incorrect in its assertion that

26  any of these references, including the '694 reference, teaches away from the use of overetching to

27  create a stepped TFT structure.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

28

1    Ultimately, CMO has shown indisputable evidence that the process of overetching, in

2    addition to being well known as part of every etching process, was specifically used to create

3    tapered TFT structures (via the '694 patent) and aligned TFT structures (via the '523 publication).

4    In light of the highly sophisticated nature of the relevant art, the court easily concludes that a person

5    skilled in the art, knowing the benefits of stepped TFT structures as disclosed in the other prior art

6    references discussed above, would have known to adapt the known overetching processes to create

7    stepped TFT structures.  It is also significant that SEL makes no argument whatsoever as to the

8    secondary considerations that may defeat a finding of obviousness.  Accordingly, CMO is entitled to

9    summary judgment on its obviousness affirmative defense with respect to the '258 patent.

10

11          C.     Foreign Sales

12          The Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells

13   any patented invention, *within the United States* or imports into the United States any patented

14   invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a) (emphasis

15   added).  CMO seeks summary judgment of no liability for sales involving its foreign customers,

16   both on the basis of lack of direct infringement and lack of indirect infringement.

17

18                 1.     Direct Infringement

19          The parties' dispute regarding direct infringement for CMO's so-called "foreign sales" is

20   purely legal.  The parties disagree over whether an "offer of sale" made in the United States may

21   give rise to direct infringement where the sale is not consummated in the United States.  The parties

22   acknowledge that CMO makes offers of sale within the United States pertaining to products which

23   are manufactured and ultimately sold outside the country.  Likewise, although SEL cites evidence of

24   offers of sale within the United States that are consummated within the United States, CMO claims

25   that it has accounted for these sales as domestic sales.  In any case, evidentiary issues regarding the

26   proportion of sales which are consummated inside or outside the United States are factual questions

27   to be resolved at trial.  The court need only decide whether an offer of sale made in the United States

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   can constitute direct infringement if the product is ultimately sold in a foreign country.

2        The Federal Circuit appears to have answered this question in the affirmative in <u>Rotec</u>

3   <u>Indus., Inc. v. Mitsubishi Corp.</u>, 215 F.3d 1246 (Fed. Cir. 2000), at least according to the concurring

4   opinion in that case.  There, Judge Newman stated that "the majority opinion necessarily accepts the

5   critical premise that an 'offer to sell' made in the United States can constitute patent infringement

6   even when the contemplated sale could not infringe the patent."  <u>Id.</u> at 1258 (Newman, J.,

7   concurring).  Judge Newman rejected this proposition, but nonetheless concurred in the judgment

8   because, as the majority found, "no offer for sale was made whereby the sale itself could infringe . . .

9   ."  <u>Id.</u>  Thus, the Federal Circuit did not squarely hold that a domestic offer of sale had given rise to

10  liability for direct infringement where the sale was to be completed outside the country.

11       In light of the fact that the parties here rely on District Court opinions for support of their

12  respective positions, it would appear that this issue is unsettled.  <u>Compare</u> <u>SEB, S.A. v. Montgomery</u>

13  <u>Ward & Co.</u>, 412 F. Supp. 2d 336, 341 n.6 (S.D.N.Y. 2006) ("Defendants' assertion that 'offers in

14  the United States to sell accused products outside of the United States do not satisfy § 271' is

15  inaccurate."); <u>Wesley Jessen Corp. v. Bausch & Lomb, Inc.</u>, 256 F. Supp. 2d 228, 233 (D. Del.

16  2003) ("The geographic location and physical destination of the subject matter of the 'offer' appear

17  to be immaterial to the analysis, so long as the 'offer' was made in the United States."); <u>Halmar</u>

18  <u>Robicon Group Inc. v. Toshiba Int'l Corp.</u>, 53 U.S.P.Q.2d 1501, 1503–04 (W.D. Pa. 1999) (denying

19  summary judgment of no liability where the offer of sale was made in the United States and the

20  product was manufactured and sold outside the United States) <u>with</u> <u>Wing Shing Prods. (BVI), Ltd. v.</u>

21  <u>Simatelex Manufactory Co.</u>, No. 01 Civ. 1044(RJH), 2007 WL 926072, at *14 (S.D.N.Y. Mar. 29,

22  2007) (holding that "plaintiff's 'offer to sell' theory of liability must . . . fail because the sales

23  contemplated by the offer to sell . . . were intended to occur outside the United States, and indeed

24  did occur outside the United States"); <u>Cybiotronics, Ltd. v. Golden Source Elecs. Ltd.</u>, 130 F. Supp.

25  2d 1152, 1170 (C.D. Cal. 2001) (holding that "liability under Section 271(a) does not extend to

26  'offers to sell' which do not contemplate actual 'sales' of goods to be consummated within the

27  United States"); <u>Quality Tubing, Inc. v. Precision Tube Holdings Corp.</u>, 75 F. Supp. 2d 613, 625

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

(S.D. Tex. 1999) (holding that the defendant, "as a matter of law, committed no act of infringement under section 271(a) or (g) by contracting, in the United States, to manufacture, sell, and deliver a product in Scotland and Norway, for use in Norway").

Of the cases cited by CMO decided after <u>Rotec</u>, one, <u>Cybiotronics</u>, 130 F. Supp. 2d at 1170, held that <u>Rotec</u> had not decided the question of liability for domestic offers to sell goods that would not end up in the United States, because the court in <u>Rotec</u> found no admissible evidence that any such offer had been made.  In <u>Wing Shing</u>, 2007 WL 926072 at *14, the court likewise held that the question was left unanswered by the court in <u>Rotec</u>.  The parties offer the court little support outside the holdings of their respective cases, apparently inviting the court to simply choose a line of cases to follow.  The Supreme Court has recently provided additional guidance in this area in <u>Microsoft Corp. v. AT & T Corp.</u>, ___ U.S. ____, 127 S.Ct. 1746 (2007).  Although that case dealt with a separate section of the Patent Act, the Court emphasized that "[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law," and cited "[t]he traditional understanding that our patent law operates only domestically and does not extend to foreign activities."  <u>Id.</u> at 1758 (internal quotations omitted).  The Court held that this presumption "tugs strongly against construction" of a statute that would encompass foreign activities.  <u>Id.</u>

In light of the strong presumption against extraterritorial application, the court holds  that "the 'offer to sell' language was *not* intended to (and could not) extend the protection of a U.S. patent to allow the patentee to . . . prevent sales taking place in other countries."  <u>Cybiotronics</u>, 130 F. Supp. 2d at 1171 (emphasis in original).  Rather, an "offer of sale" may constitute direct infringement only if the contemplated sale is to take place within the United States.

### 2.    Indirect Infringement

CMO seeks summary judgment on SEL's claim of inducement under 35 U.S.C. section 271(b), which provides that "whoever actively induces infringement of a patent shall be liable as an infringer."  Inducement liability requires a showing of direct infringement by a third party.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  Moleculon Research Corp. v. CBS, Inc., 872 F.2d 407, 410 (Fed. Cir. 1989).  Additionally, SEL

2  must show that CMO acted with "specific intent and action to induce infringement."  DSU Med.

3  Corp. v. JMS Co., 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc in relevant part) (internal

4  quotations omitted).  In other words, "knowledge of the acts alleged to constitute infringement is not

5  enough."  Id. (internal quotations omitted).  "While proof of intent is necessary, direct evidence is

6  not required; rather, circumstantial evidence may suffice."  Id. at 1306.  CMO challenges the

7  sufficiency of SEL's evidence both as to direct infringement by third parties and intent on the part of

8  CMO.

9

10                    a.       Direct Infringement by Third Parties

11        Because SEL's theory of induced infringement is premised on the importation of infringing

12  goods into the United States, CMO claims that SEL must present evidence of actual, specific

13  importations by CMO's customers.  See Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d

14  1263, 1274 (Fed. Cir. 2004) (holding that "[p]laintiffs who identify *individual* acts of direct

15  infringement must restrict their theories of vicarious liability—and tie their claims for damages or

16  injunctive relief—to the *identified act*") (emphasis in original).  However, where a plaintiff alleges

17  inducement based on a defendant's customers as a class, broader theories of liability are appropriate

18  and the court may consider circumstantial evidence of direct infringement.  Id. ("Plaintiffs who

19  identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of

20  vicarious liability more broadly, and may consequently seek damages or injunctions across the entire

21  category.").  For example, in Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.

22  Cir. 1986), the court held that "circumstantial evidence of extensive puzzle sales, dissemination of

23  an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and

24  the availability of a solution booklet on how to solve the puzzle" were sufficient to meet the

25  plaintiff's burden of showing infringement by purchasers of the infringing puzzles under section

26  271(b).  Similarly, in Sharper Image Corp. v. Target Corp., 425 F. Supp. 2d 1056, 1065–66 (N.D.

27  Cal. 2006) (Wilken, J.), the court held that where there was "circumstantial evidence that those who

28

32

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  followed the product instructions infringed" the patent, "evidence that some, and possibly many,

2  consumers did not infringe" was insufficient to obtain summary judgment on the plaintiff's claim of

3  inducement.  CMO attempts to distinguish these cases on the basis that each case involved direct

4  sales to the customer by the accused inducer, rather than a third-party seller.  This is not a

5  meaningful distinction, however, as "us[ing]" and "import[ing]" each constitute independent means

6  of infringement under Section 271(a).  The fact that the third parties in <u>Moleculon</u> and <u>Sharper</u>

7  <u>Image</u> were using whereas CMO's customers are allegedly importing does not detract from the

8  availability of circumstantial evidence to show third-party direct infringement when direct infringers

9  are identified as a class.

10  According to SEL's expert, approximately 29% of all CMO LCD panels ultimately reach the

11  United States.  Wagner Dec., Exh. A at 41–42.  SEL has specifically identified two CMO customers

12  which allegedly import CMO LCD panels into the United States in end products which are

13  ultimately sold in the United States.  According to the public filings of these companies, 60% of one

14  company's sales and 40% of the other company's sales are in the United States.  Although SEL

15  acknowledges an evidentiary void as to whether the sales of CMO products track the same

16  percentages as sales of products generally, SEL asserts that it is not required to make such a showing

17  in order for indirect infringement liability to attach.  In other words, a reasonable jury could infer,

18  based on the available data, that CMO's customers sell its infringing products in the United States.

19  A similar holding was reached in <u>Lucas Aerospace, Ltd. v. Unison Indus., L.P.</u>, 899 F. Supp.

20  1268, 1286–87 (D. Del. 1995), with respect to contributory infringement under Section 271(c).

21  There, the court upheld the jury's finding of contributory infringement.  The court based its

22  conclusion on the facts that (1) the defendant supplied 50 percent of the third party's requirements

23  for a particular engine component, and (2) 55 to 60 percent of the third party's engines made their

24  way into the United States.  <u>Id.</u>  The court concluded that this constituted "substantial evidence for

25  the jury to conclude [that defendant] knew a significant portion of" its infringing devices supplied to

26  the third party were used or sold in the United States.  <u>Id.</u> at 1287.

27  The court finds the reasoning of <u>Lucas Aerospace</u> persuasive.  SEL alleges that CMO sells

28

33

1   its products to customers who then import infringing end-products into the United States.  SEL need

2   not identify every specific act of direct infringement (i.e., each individual importation) by each of

3   CMO's numerous customers in order to prove its claim for inducement.  The circumstantial

4   evidence that SEL has identified is sufficient to create a material issue of fact for trial.

5

6                          b.      Specific Intent

7           CMO further asserts that SEL has insufficient evidence of CMO's specific intent to

8   encourage infringement by its customers.  Specifically, CMO claims that it has no control over, and

9   is not informed of, the final destination of its products after they are sold to its foreign sales

10  customers.  Rather, CMO claims that its sales efforts were focused on worldwide sales rather than

11  targeted toward U.S. sales.  Unikel Dec., Exh. 34, Yang Dep. at 91:4–92:21.  Furthermore, CMO

12  obtained noninfringement opinions of counsel immediately after being notified of the patents-in-suit,

13  which CMO asserts undercuts SEL's allegation that CMO believed its products infringed.  Unikel

14  Dec., Exhs. 42–44.  While opinions of counsel are certainly probative regarding intent, they are not

15  dispositive.  See Pickholtz v. Rainbow Techs., Inc., 260 F. Supp. 2d 980, 988 (N.D. Cal. 2003)

16  (Breyer, J.).

17          In response, SEL cites evidence that CMO knew its products would ultimately be sold in the

18  United States, principally consisting of testimony from CMO's customers.  CMO also apparently

19  has designated return and repair centers in the United States for defective panels.  SEL claims that

20  this evidence of knowledge precludes summary judgment on the issue of intent, because "[i]ntent is

21  a factual determination particularly within the province of the trier of fact and may be inferred from

22  all of the circumstances."  Insituform Techs., Inc. v. CAT Contracting, Inc., 385 F.3d 1360, 1378

23  (Fed. Cir. 2004).  As such, the court should be hesitant to grant summary judgment when presented

24  with circumstantial evidence of intent.  Given the factual allegations regarding return and repair

25  centers, coupled with the additional affirmative acts alleged below, the jury should be permitted to

26  determine whether to infer intent based on the totality of the circumstantial evidence presented.

27  Accordingly, triable issues of fact exist with respect to intent, and summary judgment is

28

UNITED STATES DISTRICT COURT
For the Northern District of California

34

1   inappropriate.

2

3                    c.      Affirmative Acts

4           CMO separately attacks the sufficiency of SEL's evidence related to CMO's alleged actions

5   in encouragement of direct infringement.  SEL has identified a number of domestic activities on the

6   part of CMO directed toward the use and sale of its products by third parties.  The conduct includes

7   (1) providing technical support, (2) shipping products directly to U.S. customers in order to address

8   technical problems of pre-existing products, (3) on-site technical presentations in the United States,

9   (4) adjustments in the manufacturing process to accommodate customer concerns, and (5)

10  coordinating shipping via e-mail.  The Federal Circuit has held that such activities may constitute

11  evidence of culpable conduct.  MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,

12  420 F.3d 1369, 1379 (Fed. Cir. 2005).  As with intent, the jury should be permitted to consider this

13  circumstantial evidence and determine whether these acts amount to encouragement.  Summary

14  judgment is therefore inappropriate on this basis.

15

16         D.     Notice

17          For claims of infringement involving a patented device, notice is required under 35 U.S.C.

18  section 287(a).  "Absent marking, damages may be recovered only after actual notice is given."  SRI

19  Int'l, Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1469 (Fed. Cir. 1997).  "Actual notice

20  requires the affirmative communication of a specific charge of infringement by a specific accused

21  product or device."  Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir.

22  1994).

23          CMO seeks summary judgment that SEL cannot recover damages from any defendant for the

24  period prior to September 29, 2004, the date on which SEL provided CMO notice of the patents, and

25  that SEL cannot recover damages from WDE, IDTech USA or IDTech for the period of time before

26  these defendants were served with the complaint in this action on November 11, 2004, December 9,

27  2004 and December 14, 2004, respectively.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Regarding the '480 patent, which claims a device, SEL points to a letter dated December 16,

2   2003 from SEL to CMO which stated that "an LCD product of yours is infringing some or our listed

3   patents," referring to a list of SEL patents.  Schlitter Opp. Dec., Exh. 59.  The only specificity

4   included in the letter was that the listed patents concerned amorphous silicon thin film transistor

5   technology.  Id.  Although SEL did not identify a particular model name or number, the letter

6   contains sufficient specificity with respect to the type of product or device implicated to create an

7   issue of material fact as to whether the December 2003 letter provided notice under Section 287(a).

8   See Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1111 (Fed. Cir. 1996) (holding that "[c]ompliance with

9   section 287(a) is a question of fact").

10   Regarding the '258 patent, for which notice is not required under Section 287(a), CMO

11   claims that it cannot be liable for induced infringement prior to receipt of the September 2004 letter,

12   in light of the knowledge requirement associated with indirect infringement.  Because SEL has

13   produced no evidence that CMO had actual knowledge of the '258 patent before September 29,

14   2004, CMO is entitled to summary judgment of no damages for induced infringement before that

15   date.

16   Finally, applying the above notice and knowledge requirements to the additional defendants,

17   SEL claims that an issue of fact exists as to whether CMO's knowledge was imputed to the other

18   defendants, claiming that knowledge in this context can be imputed from a parent company to its

19   subsidiaries.  SEL contends that a material issue of fact exists as to imputation given CMO's

20   ownership stakes in the IDTech and IDTech USA.  SEL does not appear to dispute that liability on

21   the part of WDE should be limited to the period after WDE was served with its complaint.  Apart

22   from general allegations regarding ownership interests, SEL has offered no evidence that would

23   support imputing knowledge from CMO to its subsidiaries.  Accordingly, CMO is entitled to

24   summary judgment as to its subsidiaries.

25

26   III.   Cross-Motions as to License

27   The parties have each filed summary judgment motions directed toward CMO's affirmative

28

36

defense of license.  The basis for CMO's defense is the assertion that, by accepting royalties from its licensees for products containing CMO panels, SEL implicitly and explicitly authorized those licensees to engage in the conduct at issue in this action.  Additionally, CMO claims that SEL cannot recover royalties for sales made by SEL's licensees because the licensees have already compensated SEL for those sales.

A.    License Agreements

SEL has license agreements with a number of customers of CMO authorizing these customers to practice the patents-in-suit.  It is undisputed that none of the licenses expressly authorizes CMO to practice the patents-in-suit.  Additionally, each of the licenses contains an express disclaimer of authorization of sales of products made by third parties, thereby contractually preventing the licensees from selling CMO's products.  "In light of [these] express disclaimer[s], no license can be implied."  LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1369 (Fed. Cir. 2006).  CMO attempts to distinguish this case by arguing that, under LG Electronics, notice of SEL's express disclaimer must have been given to CMO.  This is an absurd reading of LG Electronics.  At best, the notice requirement applies to the purported implied licensee.  Here, because CMO is asserting that the licenses preclude a finding of direct infringement on the part of CMO's customers (and therefore indirect infringement on the part of CMO), the implied license, if any, would be granted to CMO's customers.  The express disclaimers in the licenses between SEL and CMO's customers therefore satisfy any notice requirement that may be gleaned from LG Electronics.

Accordingly, the license agreements themselves disclose no express or implied license authorizing the sale by CMO's customers of any of CMO's products that infringe the patents-in-suit.[6]

B.    Royalties

CMO's assertions regarding the contractual language aside, CMO's main argument is that

37

UNITED STATES DISTRICT COURT
For the Northern District of California

allowing SEL to recover from CMO would amount to double recovery in light of the fact that SEL has allegedly received payment for CMO's products via royalties from CMO's customers/SEL's licensees.  SEL claims that, to the extent that CMO induces patent infringement on the part of its customers by supplying infringing products, CMO and its customers are joint tort-feasors.  See Shockley v. Arcan, Inc., 248 F.3d 1349, 1364 (Fed. Cir. 2001) (holding that "parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale").  In such a situation, "[e]ach joint tort-feasor is liable for the full amount of damages (up to a full single recovery) suffered by the patentee."  Id.  Where a patentee "has already received actual damages for the manufacture and sale of infringing devices which explicitly were a measure of the royalty for full rights in the patent," the patentee may not collect again from an additional defendant.  Glenayre Elecs., Inc. v. Jackson, 443 F.3d 851, 866 (Fed. Cir. 2006), cert denied, 127 S.Ct. 582 (2006).[7]  Accordingly, if CMO can establish that its customers have already paid royalties to SEL which would cover the accused products, CMO is entitled to summary judgment on its license defense.

According to the parties' Joint Statement of Undisputed Facts, "[a]s of September 9, 2006, SEL had received nearly 120 million U.S. Dollars and more than 7 billion Japanese Yen in payments from the SEL Licensees," "SEL has received payments for products imported into or sold in the U.S. by [these] licensees," and "SEL has not rejected a royalty payment from any Licensee for including amounts attributable to sales of products containing CMO's LCD panels."  JSUF ¶¶ 134–136.  The figures in JSUF ¶ 134 are drawn from an SEL Royalty Report.  Unikel Dec., Exh. 52.

In response to this evidence, SEL claims that, of the four licensees at issue, three are subject to lump-sum payments rather than running royalties.  Schlitter Opp. Dec., Exhs. 63 & 65 § 4.01; Exh. 64 § 3.01.  SEL states that CMO has no basis for claiming that the lump-sum payments included an apportionment for expressly unauthorized third-party products.  The fourth license, which is subject to a running royalty, is apparently reflected in the Royalty Report cited by CMO.  However, SEL claims that the report does not reflect any payments for CMO products or mention CMO or its products.  SEL therefore characterizes CMO's contentions as "attorney speculation

1   about private dealings to which CMO was not a party."

2       While CMO has not conclusively established that SEL has received royalty payments

3   attributable to the accused products, the undisputed facts at least raise a triable issue as to whether

4   SEL has previously been compensated for CMO's alleged infringement.  In other words, SEL has

5   not established that the payments it has received from its licensees did not include payment for third-

6   party products.  Drawing all inferences against summary judgment on both sides, therefore, the court

7   concludes that neither party has demonstrated that they are entitled to judgment as a matter of law

8   with respect to CMO's license defense.  SEL's "private dealings" will therefore be a topic for trial.

9   /

10  /

11  /

12  /

13  /

14  /

15  /

16  /

17  /

18  /

19  /

20  /

21  /

22  /

23  /

24  /

25  /

26  /

27  /

28

39

1   /

2   /

3   /

4   <u>CONCLUSION</u>

5        For the foregoing reasons, the court rules as follows.

6        SEL's Motion for Summary Judgment of Infringement of the '480 patent is GRANTED.

7        SEL's Motion for Summary Judgment as to Inequitable Conduct is GRANTED as to the

8   '258 patent, and DENIED as to the '480 patent.

9        SEL's Motion for Summary Judgment as to Laches with respect to the '480 patent and the

10  '258 patent is GRANTED, and in all other respects DENIED.

11       SEL's Motion for Summary Judgment as to Patent Misuse is GRANTED.

12       CMO's Motion for Summary Judgment of Noninfringement of the '258 patent is

13  GRANTED.

14       CMO's Motion for Summary Judgment of Invalidity of the '258 patent is DENIED as to

15  anticipation and GRANTED as to obviousness.

16       CMO's Motion for Summary Judgment of Non-Liability for Foreign Sales is GRANTED as

17  to direct infringement and DENIED as to indirect infringement.

18       CMO's Motion for Summary Judgment as to Notice is GRANTED IN PART and DENIED

19  IN PART as set forth in Section II.D above.

20       The parties' Motions for Summary Judgment as to License are DENIED.

21       CMO's Motion for Leave to File a Supplemental Opposition is DENIED.

22       IT IS SO ORDERED.

23

24  Dated: June 19., 2007

25                                        _____
                                          MARILYN HALL PATEL
26                                        United States District Judge
                                          Northern District of California

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

**ENDNOTES**

1.  CMO has filed a request for leave to file a supplemental opposition to SEL's motion for summary judgment in order to set forth an entirely new non-infringement argument.  CMO's request is denied.

2.  CMO additionally cites passages from another District Court decision in which SEL was involved discussing Yamazaki's role in SEL's patent practice.  <u>Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.</u>, 4 F. Supp. 2d 477 (E.D. Va. 1998).  For the purposes of this motion, the court is concerned only with the evidence in the instant action, not the findings of another court in a separate action.

3.  CMO attempts to preserve additional inequitable conduct arguments related to a host of other references by cramming a number of conclusory statements into a large footnote in its opposition brief.  CMO Opp. at 24 n.20.  Such tactics do not suffice to preserve arguments, nor do CMO's conclusory arguments present sufficient evidence to satisfy its burden on summary judgment.  Accordingly, SEL is entitled to summary judgment with respect to these references.  <u>See</u> <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (quoting <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")).

4.  In fact, the presumption of market power in a patented product has been eliminated in the antitrust context as well.  <u>Illinois Tool Works Inc. v. Indep. Ink, Inc.</u>, 547 U.S. 28, 126 S.Ct. 1281, 1284 (2006).

5.  Mr. Taub, one of the court's law clerks at the time, is questioning counsel on behalf of the court in this exchange.

6.  The parties also raise a dispute regarding the application of the subcontractor provision of SEL's licenses.  SEL asserts that the provision does not apply.  CMO asserts that it applies with respect to one of its customers.  CMO has raised substantial evidence related to this question, and therefore an issue of fact remains for trial as to the applicability of the subcontractor provision to the customer identified by CMO.

7.  SEL confuses CMO's double recovery theory with the doctrine of "patent exhaustion," which requires an "unconditional sale" of patent rights rather than the license arrangements present here.  <u>LG Elecs.</u>, 453 F.3d at 1369.  CMO's theory is not based on patent exhaustion, but rather on the general legal principle preventing a tort victim from recovering twice for the same tort.

41